```
 1                      UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2
        * * * * * * * * * * * * * *    )
 3      UNITED STATES OF AMERICA,      )       Criminal Action
                                       )       No. 20-MJ-00068
 4                     Plaintiff,      )
                                       )
 5        vs.                          )
                                       )
 6      THEODORE B. DOUGLAS,           )       Washington, DC
                                       )       May 27, 2020
 7                     Defendant.      )       2:13 p.m.
                                       )
 8      * * * * * * * * * * * * * *    )

 9


10        TRANSCRIPT OF VIDEO-TELECONFERENCE PRELIMINARY HEARING
               BEFORE THE HONORABLE G. MICHAEL HARVEY,
11                  UNITED STATES MAGISTRATE JUDGE


12


13      APPEARANCES:

14      FOR THE GOVERNMENT:      STEVEN B. WASSERMAN, ESQ.
         (Appearing             UNITED STATES ATTORNEY'S OFFICE
15        Via VTC)                 FOR THE DISTRICT OF COLUMBIA
                                 555 Fourth Street, NW
16                               Eleventh Floor
                                 Washington, DC 20530

17


18      FOR THE DEFENDANT:       EUGENE OHM, ESQ.
         (Appearing             OFFICE OF THE FEDERAL PUBLIC
19        Via VTC)                 DEFENDER
                                 625 Indiana Avenue, NW
20                               Suite 550
                                 Washington, DC 20004

21


22      FOR PRETRIAL SERVICES:  CHRISTINE SCHUCK
         (Appearing
23        Via VTC)


24


25
```

1   REPORTED BY:              LISA EDWARDS, RDR, CRR
      *(Via VTC)*              Official Court Reporter
2                             United States District Court for the
                                 District of Columbia
3                             333 Constitution Avenue, NW
                              Room 6706
4                             Washington, DC 20001
                              (202) 354-3269
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                I N D E X

2

3                                    Direct      Cross        Red.

4

WITNESSES FOR THE GOVERNMENT:

5

Maxwell Poupart                        8          20          44

6

7

8

EXHIBITS RECEIVED IN EVIDENCE                              PAGE

9

10   Government's Exhibit No. 1                             14

11   Government's Exhibit No. 2                             15

12   Government's Exhibit No. 3                             16

13   Government's Exhibit No. 4                             17

14   Government's Exhibit No. 5                             18

15

16

17

18

19

20

21

22

23

24

25

```
1              THE COURT:  Let's go ahead and call the case.
2              THE COURTROOM DEPUTY:  This is Case 20-MJ-68, the
3      United States of America versus Theodore Douglas.
4              I'm sorry.  I seem to be having issues.  Did
5      anybody hear what I was saying?
6              I can see your lips moving, Judge.  I can't hear
7      you.
8              THE COURT:  I need to unmute myself.
9              Go ahead, Mr. Tran.  Call the case again.
10             THE COURTROOM DEPUTY:  This is 20-MJ-68, the
11     United States of America versus Theodore Douglas.
12             This is scheduled to be a video preliminary
13     hearing.
14             Would the parties please introduce themselves to
15     the Court, beginning with the Government.
16             MR. WASSERMAN:  Good afternoon, your Honor.
17     Steven Wasserman for the United States.
18             THE COURT:  Good afternoon.
19             MR. OHM:  Eugene Ohm on behalf of Mr. Douglas.
20     Good afternoon, your Honor.
21             THE COURT:  Good afternoon.
22             So this matter's been scheduled for a preliminary
23     hearing.
24             Mr. Ohm, we'll start with you.  Of course, we're
25     proceeding by video because of the pandemic.  Does your
```

1    client consent to these proceedings being conducted by video

2    here today?

3             MR. OHM:  He does, your Honor.

4             THE COURT:  Okay.  I have received exhibits.  I

5    don't know if they're from the Government and the Defendant,

6    but I do have the exhibits.  I've had -- I've struggled

7    today seeing the video.  I can try to see the video today on

8    my machine, if we need to.  But I would like to first try to

9    use the screen [indiscernible], and I hope both sides know

10   how to do that.  But I do have the -- the exhibits have been

11   provided to me ahead of time, which I can try and get if

12   that function doesn't work.

13            So this matter's been scheduled for preliminary

14   hearing.

15            Is the Government ready to proceed?

16            MR. WASSERMAN:  Yes, your Honor.

17            THE COURT:  Mr. Ohm, are you ready as well?

18            MR. OHM:  Yes, your Honor.

19            THE COURT:  I think the next hearing that's before

20   me is at 3:00, but there is some flexibility there in that

21   it is before me.  But if we can keep this as short as

22   possible, that would be helpful.

23            Let me just ask the Defendant, can you hear me,

24   sir?  I can't hear you yet if your mute is on.

25            I still can't hear you.  I'm not hearing you now.

1   Maybe you can get the corrections officer to help you.

2   Please watch whatever they do, because it is important that

3   you know how to use the mute function.

4          It looks like we've lost the Defendant.  Maybe

5   they're trying to rejoin.

6          Officer, you're buzzing in and out, too, on my

7   screen, anyway.

8          OFFICER POUPART:  My apologies, your Honor.  I'm

9   not sure what I can do here.  I'm using a computer at work.

10          THE COURT:  Are you hooked up to wireless through

11   work?

12          OFFICER POUPART:  Honestly, I'm not sure if this

13   computer is wireless or hard Ethernet cable.  I honestly

14   don't know.

15          THE COURT:  Well, your audio is coming through

16   fine.

17          OFFICER POUPART:  It's just the visual that's

18   fuzzy?

19          THE COURT:  Well, I mean, it pixilates every few

20   seconds.

21          THE CORRECTIONS OFFICER:  Hello?

22          THE COURT:  Yes.

23          THE DEFENDANT:  Yes.  I can hear you.

24          THE COURT:  Thank you.

25          So it's important as this proceeding goes forward

1    that you mute the microphone there.  In the prison, there's

2    often a lot of background noise.

3            Everyone on the call, if you're not speaking, you

4    should mute.

5            So you should know how to do it, Mr. Douglas.  It

6    sounds like you didn't there.  It was just a technical

7    problem before.  Do you know how to mute?

8            THE DEFENDANT:  Yes, your Honor.

9            THE COURT:  As this hearing goes forward, if

10   there's something you want to say to Mr. Ohm, then let me

11   know.  All right?  Say, "Can I talk to my attorney?"  Wave

12   your hand.  And then Mr. Ohm has a way to reach you, to call

13   you directly.  The rest of us mute.  We won't hear.  Or

14   [indiscernible] yours so we won't hear that discussion.  At

15   any point, if you want to have a word with Mr. Ohm, we can

16   allow you to do that.  Okay?

17           THE DEFENDANT:  Okay.

18           THE COURT:  All right.  We'll go ahead.  Everyone

19   mute their phones and I'm going to turn it over to

20   Mr. Wasserman.

21           You may begin.

22           MR. WASSERMAN:  Thank you, your Honor.

23           The Government calls Officer Maxwell Poupart to

24   testify.

25           Good afternoon, Mr. --

```
 1              THE COURT:  Mr. Tran, let me go ahead and get him
 2      sworn in.  Mr. Tran, swear in the officer, please.
 3              THE COURTROOM DEPUTY:  Yes, your Honor.
 4          MAXWELL POUPART, GOVERNMENT WITNESS, SWORN.
 5              THE COURT:  Mr. Wasserman, before you begin, I
 6      just want to make sure.
 7              Is the reporter able to hear everything that's
 8      happening?
 9              THE COURT REPORTER:  Yes, Judge.  Thank you.
10              THE COURT:  Mr. Wasserman, go right ahead.
11                      DIRECT EXAMINATION
12      BY MR. WASSERMAN:
13      Q.  Can you please introduce yourself and spell your last
14      name for the court reporter.
15      A.  Good afternoon.  I am Officer Maxwell Poupart -- that is
16      P-O-U-P-A-R-T -- of the Metropolitan Police Department.
17      Q.  And what's your position with MPD?
18      A.  I'm an officer in the narcotics and special
19      investigations division.
20      Q.  How long have you been a police officer with MPD?
21      A.  I have been with MPD for approximately four years.
22      Q.  And just briefly, if you can describe your duties with
23      the NSID.
24      A.  [Indiscernible] many different investigations ranging
25      from narcotics to firearms to human trafficking.  Mainly,
```

 1    narcotics investigations operations.

 2    Q.  All right.  Officer Poupart, I want to direct your

 3    attention to April 22nd of this year.  Were you involved in

 4    [indiscernible] that resulted in the seizure of a firearm in

 5    the area of the 2300 block of 15th Street, Northeast,

 6    Washington, DC?

 7    A.  Yes.

 8    Q.  And can you still hear me?

 9    A.  Yes.  And yes, I was.

10    Q.  Approximately what time of day was that?

11    A.  It was approximately 3:00 p.m.

12    Q.  And during your investigation, were you involved in the

13    [indiscernible] relating to the seizure of this?

14    A.  Yes, I was.

15    Q.  Who was that?

16    A.  That would be Mr. Theodore Douglas.

17    Q.  And was a criminal complaint and statement of facts

18    generated in support of the arrest for Mr. Douglas?

19    A.  Yes, it was.

20    Q.  And are you aware of whether anyone other than

21    Mr. Douglas was arrested as a result of this investigation?

22    A.  Yes.

23    Q.  And who was that?

24    A.  That would be Mr. Tavonte Williams.

25    Q.  Are you the author of a sworn statement of facts that

1   went with the criminal complaint in this matter?

2   A.  I did.

3   Q.  And have you had an opportunity to review your sworn

4   statement of facts in support of the arrest of Mr. Douglas?

5   A.  Yes, I have.

6   Q.  And do you have personal knowledge of some of the

7   information included in your statement of facts?

8   A.  Yes.

9   Q.  Was some of the information included in your statement

10  of facts provided to you by other officers or work that you

11  reviewed?

12  A.  Yes.

13  Q.  Are there any changes that you'd like to make to your

14  sworn statement of facts at this time?

15  A.  No.

16  Q.  If permitted by the Court, would you adopt the sworn

17  statement of facts in the criminal complaint as part of your

18  testimony in this matter?

19  A.  Yes.

20          MR. WASSERMAN:  Your Honor, I would

21  [indiscernible] that Officer Poupart be permitted to adopt

22  the complaint and sworn statement of facts as part of his

23  testimony.

24          THE COURT:  Any objection, Mr. Ohm?

25          MR. OHM:  No, your Honor.

```
 1              THE COURT:  Okay.  His complaint will be adopted
 2      as part of this -- his testimony in this proceeding.
 3              MR. WASSERMAN:  Thank you, your Honor.
 4      BY MR. WASSERMAN:
 5      Q.  Officer Poupart, [indiscernible] participation in this
 6      investigation, have you become familiar with the appearance
 7      of Theodore Douglas?
 8      A.  Yes.
 9      Q.  And do you see Mr. Douglas anywhere on your screen?
10      A.  Yes, I do.
11      Q.  Can you please identify him by describing an article of
12      clothing that he's wearing.
13      A.  He's wearing an orange shirt.
14              MR. WASSERMAN:  Your Honor, I would ask that the
15      record reflect the identification of the Defendant.
16              THE COURT:  Mr. Ohm, any objection?
17              MR. OHM:  No objection, your Honor.
18              THE COURT:  The record will reflect an
19      identification of this Defendant.
20      BY MR. WASSERMAN:
21      Q.  Officer Poupart, what, if any, description was broadcast
22      by the undercover officer of the two suspects that were
23      observed to have been engaged in the exchange that the
24      undercover observed in this matter?
25      A.  A lookout was broadcast for a black male [indiscernible]
```

```
 1     puffy coat and blue hood.

 2     Q.  What -- did you [indiscernible] that?

 3     A.  Yes, I did.

 4     Q.  And were you able to locate an individual that was

 5     matching -- that matched that description?

 6     A.  Yes, I was.

 7     Q.  Where did you locate that individual, approximately?

 8     A.  Approximately the [indiscernible] off the 2300 block of

 9     15th Street.

10     Q.  And were you able to identify that individual that

11     matched the description of the blue puffy coat?

12     A.  Yes.

13     Q.  And who was that?

14     A.  That was Mr. Theodore Douglas.

15     Q.  Are you aware of whether the additional suspect that you

16     mentioned in this case was located?

17     A.  Yes, he was.

18     Q.  Which officer located the other suspect?

19     A.  Officer Gabster.

20     Q.  Is that G-A-B-S-T-E-R --

21     A.  Correct.

22     Q.  -- for the court reporter?

23          Do you know the first name of Officer Gabster?

24     A.  I'm sorry.  I can't remember.

25     Q.  Thank you.
```

Poupart - DIRECT - By Mr. Wasserman

1          And was that individual the second suspect that

2     turned out to be Tavonte Williams?

3     A.  Yes.

4     Q.  I'm going to try to show you what's been marked for

5     identification as Government's Exhibit No. 1.

6          THE COURT:  Have the exhibits been shared with

7     Mr. Ohm prior to today, Mr. Wasserman?

8          MR. WASSERMAN:  Yes, your Honor.

9          THE COURT:  Mr. Ohm, are you going to have any

10    objections to these exhibits, to the admission of these

11    exhibits?

12         MR. OHM:  No, your Honor.

13         THE COURT:  Okay.  Obviously, you're sharing.  I'm

14    going to see it right now.  So that's why I wanted to ask

15    Mr. Ohm.

16         MR. WASSERMAN:  Yes.

17    BY MR. WASSERMAN:

18    Q.  Here we go.

19         Officer Poupart, I've shown you what's been marked

20    for identification as Government's Exhibit No. 1.  Are you

21    able to see that on your screen?

22    A.  Yes.

23    Q.  And do you recognize that photograph?

24    A.  Yes.

25    Q.  And who is that a photograph of?

```
1     A.   Defendant Douglas.

2     Q.   And is that photograph a fair and accurate depiction of

3     how Mr. Douglas appeared on April 22nd of this year when he

4     was arrested?

5     A.   Yes.

6                MR. WASSERMAN:  Your Honor, I would move

7     Government's Exhibit No. 1 into evidence.

8                THE COURT:  No objection, Mr. Ohm?

9                MR. OHM:  No, your Honor.

10               THE COURT:  It will be admitted, Exhibit 1.

11               (Whereupon, Government's Exhibit No. 1 was entered

12    into evidence.)

13    BY MR. WASSERMAN:

14    Q.   Officer Poupart, I'm going to show you Government's

15    Exhibit No. 2.  I apologize.  Are you able to see that,

16    Officer Poupart?

17    A.   Yes.

18    Q.   And do you recognize that photograph?

19    A.   Yes.

20    Q.   And who is that a photograph of?

21    A.   A photograph of Defendant Williams.

22    Q.   And is that a fair and accurate depiction of how

23    Mr. Williams appeared on April 22nd of this year?

24    A.   Yes.

25    Q.   And just for the record, what does -- what type of coat
```

1    does Mr. Williams appear to be wearing there?

2    A.  He has -- the jacket underneath is kind of a greenish

3    jacket with an orange-lined hood as well as the jacket worn

4    over that was, like, the color black, gray, something like

5    that.

6              MR. WASSERMAN:  Your Honor, I would move

7    Government's Exhibit No. 2 in evidence.

8              THE COURT:  Any objection?

9              MR. OHM:  No, your Honor.

10             THE COURT:  It will be admitted.

11             (Whereupon, Government's Exhibit No. 2 was entered

12   into evidence.)

13   BY MR. WASSERMAN:

14   Q.  Thank you.

15             Officer Poupart, I'm going to show you what I've

16   marked for identification as Government's Exhibit No. 3.

17   Are you able to see that photograph?

18   A.  Yes.

19   Q.  And what is that a photograph of?

20   A.  That is a photograph of my hand on Defendant Douglas's

21   back.

22   Q.  And is that photograph a fair and accurate depiction

23   of -- well, let me ask you this:  Is that a still shot from

24   your body-worn camera?

25   A.  Yes.

1    Q.  And is that a fair and accurate depiction of a portion

2    of your body-worn camera on April 22nd of 2020?

3    A.  Yes.

4              MR. WASSERMAN:  Your Honor, I would move

5    Government's Exhibit No. 3 into evidence.

6              THE COURT:  Any objection?

7              MR. OHM:  No, your Honor.

8              THE COURT:  It will be admitted.

9              (Whereupon, Government's Exhibit No. 3 was entered

10   into evidence.)

11   BY MR. WASSERMAN:

12   Q.  Officer Poupart, are you able to describe what you're

13   doing with your hand there in Exhibit 3?

14   A.  Yes.  Conducting an external frisk.

15   Q.  And is there anything you were able to detect during

16   that external frisk?

17   A.  I was able to detect what I recognized to be the handle

18   of a firearm.

19   Q.  And is that what you appear to be grabbing in Exhibit

20   No. 3?

21   A.  Essentially, yes.

22   Q.  I want to show you Exhibit -- Government's Exhibit No.

23   4.  Are you able to see Government's Exhibit No. 4?

24   A.  Yes.

25   Q.  And what is Government's Exhibit No. 4?

1  A.  That is a photo of the firearm that was recovered.

2  Q.  And where is that -- where is that firearm located in

3  that photograph?

4  A.  Inside the backpack by the Defendant.

5  Q.  And is that a fair and accurate depiction of the firearm

6  as it was found inside the backpack worn by the Defendant on

7  April 22nd of 2020?

8  A.  Yes.

9        MR. WASSERMAN:  Your Honor, I would move

10  Government's Exhibit No. 4 in evidence.

11       THE COURT:  Any objection?

12       MR. OHM:  No, your Honor.

13       THE COURT:  It will be admitted.

14       (Whereupon, Government's Exhibit No. 4 was entered

15  into evidence.)

16  BY MR. WASSERMAN:

17  Q.  And finally, I'm going to show you what I've marked for

18  identification as Government's Exhibit No. 5.

19       Are you able to see that, Officer Poupart?

20  A.  Yes.

21  Q.  And what is that a photograph of?

22  A.  That is a photograph of the firearm recovered from the

23  Defendant's backpack.

24  Q.  Is it a fair and accurate depiction of the firearm

25  recovered from Defendant Douglas's backpack on April 22nd of

1    2020?

2    A.  Yes.

3           MR. WASSERMAN:  Your Honor, I would move

4    Government's Exhibit No. 5 into evidence.

5           THE COURT:  Any objection?

6           MR. OHM:  No objection, your Honor.

7           THE COURT:  It will be admitted.

8           (Whereupon, Government's Exhibit No. 5 was entered

9    into evidence.)

10   BY MR. WASSERMAN:

11   Q.  Officer Poupart, you indicated that Co-Defendant Tavonte

12   Williams was stopped and also arrested.

13           Can you tell us where Mr. Williams was arrested in

14   relation to where Theodore Douglas was arrested?

15   A.  Defendant Williams was stopped and arrested in the 2300

16   block of 15th Street.  Defendant Douglas was stopped at the

17   end of the walkway that goes between the parking lot and the

18   2300 block of 15th Street.

19   Q.  And do you know whether Mr. Williams was stopped before

20   or after you stopped Mr. Douglas?

21   A.  He was stopped after I had stopped Mr. Douglas.

22   Q.  And how were you able to determine that?

23   A.  The body-worn camera.

24   Q.  And whose body-worn camera did you review in connection

25   or to figure out when Mr. Douglas was arrested -- excuse

1      me -- when Mr. Williams was arrested relative to

2      Mr. Douglas?

3      A.  Officer Gabster.

4      Q.  And based on your review of Officer Gabster's body-worn

5      camera, at the time that Mr. Williams was stopped, was there

6      anyone in his immediate vicinity, anyone else?

7      A.  Yes.

8      Q.  And do you know how many other people?

9      A.  I believe it was two other people standing with him.

10     Q.  Was Mr. Williams to your knowledge searched after he was

11     stopped by police?

12     A.  Yes.

13     Q.  And to your knowledge, was any money recovered from his

14     person?

15     A.  No.

16     Q.  Do you know or have any knowledge whether Mr. Williams

17     handed any money to anyone shortly before he was stopped by

18     police?

19     A.  I'm not aware of that occurring.  It's possible.

20     Q.  You don't know.  Is that correct?

21     A.  I don't know.

22              MR. WASSERMAN:  The Court's indulgence.

23              THE COURT:  Okay.

24              MR. WASSERMAN:  Your Honor, that's all I have.

25              THE COURT:  Mr. Ohm, I want to read the complaint.

1     It's on my phone here.  So I'm going to do that for a moment

2     before you begin.

3                    MR. OHM:  Sure.

4                    THE COURT:  Okay, Mr. Ohm.  Go right ahead.

5                    MR. OHM:  Thank you, your Honor.

6                             CROSS-EXAMINATION

7     BY MR. OHM:

8     Q.  Good afternoon, Officer -- is it "Poupart"?

9     A.  "Poupart."

10    Q.  Did you [indiscernible] any handwritten notes during the

11    course of this case?

12    A.  No.

13    Q.  I want to talk about sort of what was going on in the

14    neighborhood when this incident occurred.

15            You had said in your complaint, I think, there was

16    some NSID operations being conducted?

17    A.  Yes.

18    Q.  And Mr. Douglas wasn't like a target of this operation.

19    Right?

20    A.  Well, I mean, can you define "target"?

21    Q.  Mr. Douglas specifically [indiscernible] was not a

22    target of the operation that was set up to monitor this

23    neighborhood on this day?

24    A.  Not specifically.

25    Q.  And Mr. Williams wasn't either.  Right?

```
1    A.  Not to my knowledge.

2    Q.  And there were -- is it fair to say there were a lot of

3    police officers out there that day?

4    A.  Where do you mean?  In the city?

5    Q.  No.  I mean in the neighborhood during the time of the

6    incident.

7    A.  Well, I mean, it's kind of hard to say if there were a

8    lot of police officers in our unit.  We're not a patrol

9    unit, so there's not a lot of marked cruisers and things

10   going by from our unit.  We're not patrol.

11   Q.  Okay.  I'm going to show you a still of your body-worn

12   camera.  Okay?

13   A.  Sure.

14   Q.  And this is Defense 1 at T19, 14:37.  At least after the

15   arrest, there were a lot of police officers that were

16   around.  Correct?

17   A.  Yes.  You could say that.

18   Q.  And they're all -- some are in uniform.  Correct?

19   A.  Correct.

20   Q.  And there are also uniformed police officers and

21   plainclothes police officers who were in the area before the

22   arrest.  Right?

23   A.  I mean, the majority moved in to effect the arrest.

24   Q.  And were you one of the individuals who moved in?

25   A.  Yes.
```

1    Q.  And you were in your car at the time?

2    A.  Yes.

3    Q.  And was it a marked car?

4    A.  No.  It was an unmarked vehicle.

5    Q.  Were there also marked police cars there?

6    A.  I believe some marked cars arrived.

7    Q.  Okay.  Now, the undercover officer told you that he saw

8    Mr. Douglas standing in a walkway.  Right?

9    A.  Yes.  I believe so.

10   Q.  And then he said that he saw Mr. Williams approaching

11   Mr. Douglas?

12   A.  Yeah.

13   Q.  Is that something that you saw also?

14   A.  No.

15   Q.  So before you got out of the car, did you notice

16   Mr. Douglas?

17   A.  Yes.

18   Q.  When you first noticed Mr. Douglas, what was Mr. Douglas

19   doing?

20   A.  He was standing near the corner of the parking lot in

21   the walkway.

22   Q.  Was he standing [indiscernible]?

23   A.  No.

24   Q.  Was he standing with Mr. Williams?

25   A.  No.

1    Q.  Was he standing with the two individuals that he was

2    standing with when you initially approached?

3    A.  Yes.

4    Q.  And when you got out of your car, did you notice

5    Mr. Williams?

6    A.  No.

7    Q.  And other than [indiscernible] standing there, did you

8    see Mr. Douglas do anything else?

9    A.  Not particularly.

10   Q.  So you didn't see him making any gestures?

11   A.  No.

12   Q.  He was just standing there talking to the other

13   individuals?

14   A.  Essentially, yeah.

15   Q.  Without telling us exactly where the undercover was,

16   could you tell us whether the undercover was stationary or

17   moving?

18   A.  I believe he was stationary at the time.  I can't speak

19   to his exact actions.

20   Q.  And could you see whether -- did you know whether the

21   undercover was looking through any obstructions like trees

22   or windows or anything like that?

23   A.  That I don't know.

24   Q.  So you never talked to the undercover about his line of

25   sight and whether he had a clear view?

1    A.  Well, he said that he was able to see everything that he

2    had called out clearly.

3    Q.  Okay.  But he was obviously describing something.  You

4    don't have any information about his opportunity to observe?

5    A.  What do you mean?

6    Q.  Well, was the undercover where he was because he was

7    looking at that walkway in particular or was the undercover

8    just sort of generally looking in that area?

9    A.  I would think he was looking in that area.  I couldn't

10   specifically say what he chose or didn't choose to focus on.

11   Q.  Okay.  Approximately how far from what he says he

12   observed was the undercover?

13             MR. WASSERMAN:  Objection.

14             MR. OHM:  It goes to opportunity to observe, your

15   Honor.

16             THE COURT:  Is that going to -- you tell me,

17   Mr. Wasserman.

18             MR. WASSERMAN:  Your Honor, it potentially reveals

19   the location of the undercover.

20             MR. OHM:  Your Honor, it only matters if the

21   undercover was in a [indiscernible].  Number one, it's

22   still --

23             THE COURT:  I can imagine a scenario in which the

24   distance out there would tell a great deal about it, because

25   they're [indiscernible] the distance he's at.  I don't know

1    enough about the neighborhood to respond to figure out

2    whether or not the response would disclose where the

3    undercover was.

4              Officer, do you know?  Would revealing the

5    approximate distance of the undercover's location reveal the

6    undercover, where he was located?  You understand the

7    neighborhood better than I do.

8              THE WITNESS:  It's possible that it could.

9              THE COURT:  Well, then, I'm going to sustain the

10   objection.

11   BY MR. OHM:

12   Q.  Let me ask this, Officer:  Is the undercover operation

13   like a continuous operation from that particular location?

14             MR. WASSERMAN:  I'm going to object to that.

15             THE COURT:  Hold on, Officer.

16             Go ahead, Mr. Wasserman.

17             MR. WASSERMAN:  I don't think it's relevant

18   whether it was a continuing operation or a one-off.

19             MR. OHM:  Well, if it's a one-off, your Honor,

20   then who cares whether it's revealed or not?  If he's in a

21   car at the corner, then the opportunity to observe is a

22   question that is relevant to probable cause and there's no

23   real prejudicial effect that the Government needs to worry

24   about if it's not going to be used again.

25             THE COURT:  Mr. Wasserman, any objection?

```
 1                    Go on, Mr. Poupart.
 2              MR. OHM:  I'm sorry.  I didn't hear.  I missed the
 3    operative verb.
 4              THE COURT:  I'm sorry.  I'm going to sustain the
 5    objection.
 6              MR. OHM:  Okay.
 7    BY MR. OHM:
 8    Q.  Officer, was the undercover elevated or on ground level?
 9    A.  As far as I know, he was ground level.
10    Q.  And if I can ask a broader question, was the undercover
11    over 100 feet away from the location of what he was
12    observing?
13    A.  I'm not sure of the exact distance that he was.
14    Q.  Now, do you know what area the undercover was saying
15    that it observed the transaction or the interaction between
16    Mr. Williams and Mr. Douglas?
17    A.  Yes.
18    Q.  Is it any sort of a private area?
19    A.  Well, it's a walkway between buildings in this complex.
20    Q.  So I guess I'm trying to figure out like if it's a
21    walkway like just an open sort of sidewalk through the
22    property or is it like --
23    A.  Yes.
24    Q.  -- a walkway that's hidden from view?
25    A.  No.  It's an open sidewalk in the property.
```

1    Q.   So it's not secluded at all?

2    A.   No.

3    Q.   And did the undercover observe the people that are

4    identified as Mr. Douglas and Mr. Williams -- did he observe

5    them sort of walking away to have a more secluded

6    interaction?

7    A.   I believe when the undercover witnessed the transaction,

8    they had been [indiscernible], two of them.

9    Q.   So I guess what I'm asking is, did they meet and then

10   walk off or did they just meet and then have an interaction,

11   according to the undercover?

12   A.   Well, at some point, after the exchange, they did walk

13   off.

14   Q.   Sure.

15        So in terms of the exchange itself, did the

16   exchange happen where the two of them met or did they meet

17   and then walk off somewhere more secluded and then have an

18   interaction at that stage?

19   A.   That much I don't recall.

20   Q.   Got it.

21        And the undercover didn't report Mr. Douglas

22   looking around [indiscernible] there or anything like that.

23   Right?

24   A.   Not that I recall.

25   Q.   And you were listening to the undercover over some radio

1    [indiscernible]?

2    A.  Yes.

3    Q.  And did the undercover report observing Mr. Williams

4    acting nervously at all?

5    A.  I don't recall.

6    Q.  According to the undercover, how long was the

7    interaction between Mr. Douglas and Mr. Williams?

8    A.  I would say no more than a couple minutes.

9    Q.  So the undercover didn't describe how much time the

10   interaction was?

11   A.  Well, just going by what I recall from the undercover

12   observing and voicing, the interaction wasn't more than a

13   couple minutes.

14   Q.  And then the undercover -- I'm sorry.  And then the

15   undercover called the lookout and then moved in on

16   Mr. Douglas?

17   A.  Correct.

18   Q.  And when you first observed Mr. Douglas, did he match

19   the lookout?

20   A.  Yes.

21   Q.  Now, you were the original officer that originally

22   stopped Mr. Douglas.  Right?

23   A.  Yes.

24   Q.  And you stayed with him throughout the time he was on

25   the scene?

1    A.  Yes.

2    Q.  And he was talking to you and [indiscernible]?

3    A.  Yes.

4    Q.  He never said that he was aware there was a firearm in

5    the bag.  Right?

6    A.  I don't recall him making any [indiscernible].

7    Q.  And if he did, that would be something that you would

8    put into your statement of facts.  Right?

9    A.  Typically, yes.  Yeah.

10   Q.  And he never said that he was aware that there was

11   something.  Right?

12   A.  No.  I don't remember him mentioning any contraband.

13   Q.  And the bag was like a [indiscernible].  Correct?

14   A.  Yeah.  I think that was the brand.

15   Q.  Like an expensive-looking leather backpack?

16   A.  Right.  Like a little designer bag.

17   Q.  Now, while you were approaching Mr. Douglas, he didn't

18   try to evade you in any way, did he?

19   A.  No.

20   Q.  He didn't make any motions towards the bag or towards

21   anything?

22   A.  No.

23   Q.  He was entirely cooperative?

24   A.  Yeah.  He got a little verbal.  But beyond that, he

25   wasn't resistant.

1    Q.  And I know that you said that you personally did not

2    observe Mr. Douglas until you were -- I think right before

3    you [indiscernible].  Right?  That's correct, right?

4    A.  Yes.  I saw him as we were pulling into the parking lot.

5    Q.  Okay.  Regarding the undercover, what was Mr. Douglas

6    doing before he interacted with Mr. Williams?

7    A.  I don't recall what -- I don't recall what he was doing

8    beforehand regarding Mr. Williams.

9    Q.  And according to the undercover, what was Mr. Williams

10   doing before the interaction?

11   A.  I don't know.

12   Q.  Did you talk with any other officers who noticed

13   Mr. Douglas before this interaction?

14   A.  No.

15   Q.  Did you talk with any of the officers who noticed

16   Mr. Williams before the interaction?

17   A.  No.

18   Q.  Now, prior to you making contact with Mr. Douglas, other

19   than what you heard from the undercover, did you have any

20   other information about Mr. Douglas?

21   A.  Other than what I heard from the undercover, no.

22   Q.  Now, according to the undercover, did he lose sight of

23   Mr. Douglas?

24   A.  Not that I recall.

25   Q.  From where he -- from where the undercover was

1   positioned, was he in a position where he would have lost

2   sight of Mr. Douglas?

3   A.  I don't believe so.  No.

4   Q.  And from where the undercover was positioned, was he in

5   a position where he would have lost sight of Mr. Williams?

6   A.  Not that I'm aware of.

7   Q.  So without telling us where the undercover was, you know

8   where the undercover was.  Right?

9   A.  Essentially.  The basic area.

10  Q.  And in that basic area, he had a continuous line of

11  sight on both Mr. Douglas and Mr. Williams?

12  A.  As far as I know.

13  Q.  And during your approach of Mr. Douglas, the undercover

14  was sort of narrating what Mr. Douglas was doing.  Right?

15  A.  Yes.

16  Q.  He was describing Mr. Douglas and Mr. Williams.  Right?

17  A.  Yes.

18  Q.  Now, you testified that no money was recovered from

19  Mr. Williams.  Right?

20  A.  Correct.

21  Q.  And the undercover never said that while he kept his

22  eyes on Mr. Williams, Mr. Williams was ever -- had ever

23  transferred money anywhere else.  Right?

24  A.  No.  I don't believe so.

25  Q.  And he was -- okay.

1           Did Mr. Williams attempt to leave or flee when

2      police approached him?

3      A.  No.  I don't believe so.

4      Q.  And how far away was Mr. Williams from Mr. Douglas?

5      Like how far away were the two different points where they

6      were stopped?

7      A.  Approximately -- I can approximate, if you'd like.

8      Q.  That would be great.

9      A.  Maybe -- I don't know -- 40 feet, maybe.

10     Q.  So they were pretty close?

11     A.  Yes.

12     Q.  Now, when you were approaching Mr. Douglas and

13     interacting with him, you were communicating with other

14     individuals that were part of your team.  Right?

15     A.  Yeah.  A little.

16     Q.  So there was the undercover that was on the radio.

17     Right?

18     A.  Right.

19     Q.  And there was also some sort of a supervising officer

20     that you were interacting with.  Right?

21     A.  Yes.  There was the [indiscernible].

22     Q.  And at a certain point in time, you asked that officer

23     if you were good for a search.  Right?

24     A.  Yes.

25           MR. WASSERMAN:  Objection.  Objection.  Beyond the

1    scope.

2              THE COURT:  Yes, Mr. Wasserman?

3              MR. WASSERMAN:  It's beyond the scope.

4              THE COURT:  The question was:  Was he good for a

5    search?  Is that the question, Mr. Ohm?

6              MR. OHM:  Yes, your Honor.  That there was a point

7    in time where he asked a superior officer if he was good for

8    a search.

9              THE COURT:  Well, how is that within the scope of

10   what the Government presented for probable cause in this

11   case?

12             MR. OHM:  If the Court would like, I can re-call

13   him in my case, I guess, if that's the objection.

14             THE COURT:  Well, I don't know why you would do

15   that.  But in any event, I'm going to sustain the objection.

16             MR. OHM:  So it's -- if I can ask it in a

17   nonleading fashion, would that be permissible?

18             THE COURT:  I mean, okay, then.  What's the

19   relevance of this to probable cause?

20             MR. OHM:  I think I would agree that it's not

21   relevant to probable cause.  But it is -- given that this is

22   the preliminary hearing, that would normally be done through

23   the proffer that the Court relied upon in its determination

24   about whether Mr. Douglas should be detained, that this

25   information is [indiscernible] in the weight of the evidence

1    against Mr. Douglas.

2             THE COURT:  Mr. Wasserman, do you understand?  The

3    concept is that in the normal course, pre-pandemic, we would

4    have a joint preliminary and detention hearing, assuming

5    that there was no indictment, but I think you've just got to

6    assume that.

7             And Mr. Ohm's argument is that he would have been

8    allowed to ask questions that would go to the weight of the

9    evidence as well, which this --

10            MR. WASSERMAN:  I'm still -- yeah.  I'm not seeing

11   where this goes to the weight of the evidence.  I mean, I

12   know what Mr. Ohm is going to argue, which is that there is

13   no evidence that the Defendant was aware of what was in the

14   bag.  I'm not sure I see how asking the officer about when

15   he received authorization to conduct the search is pertinent

16   to that.

17            The argument is, there was a gun in the bag.

18   Obviously, the Defendant was not in a position to see that

19   gun while it was in the bag.  That's the argument.

20            THE COURT:  Mr. Ohm, I'm not [indiscernible] a

21   suppression issue here.  I'm not seeing any strict argument

22   that you can make with respect to when precisely the officer

23   received the okay from his supervisor to conduct a search.

24            MR. OHM:  So, your Honor, I guess I'd prefer to

25   have a side-bar.

```
 1                    In terms of the --
 2              THE COURT:  Well, we can ask the officer to mute
 3    his phone.  Or I guess -- how does that work?  I don't know
 4    if we can do that.  We can mute him, but can he mute us?
 5    Maybe I can mute him.
 6              THE LAW CLERK:  This is Amanda.
 7              All he has to do is turn off the volume on his
 8    computer, Judge.
 9              THE COURT:  Oh, okay.  That's pretty smart.
10              Officer, we'll let you know when we want you to
11    send the volume back up.  Okay?
12              THE WITNESS:  Okay.
13              THE COURT:  Can you hear us now?
14              THE WITNESS:  (No response.)
15              THE COURT:  Go ahead, Mr. Ohm.
16              MR. OHM:  Thank you, your Honor.
17              So to this point, we have an undercover who's
18    essentially saying that he sees an item exchanged for money,
19    money which was never recovered, even though the individual
20    who had it was in the line of sight the entire time.
21              The only other thing that would supposedly save
22    the search was supposedly this -- what was described as a
23    grabbing, which, you know, might be a pat-down, which I
24    think is what he's trying to say.  But he doesn't
25    actually -- although he's narrating what he's doing here
```

1   with his superior officer and then ultimately asks if he's

2   good for a search, he doesn't mention that he feels anything

3   in the backpack.  So that's not something that he

4   immediately recognizes to be a gun, which is what he says in

5   the complaint.

6          So I'm bringing out the fact that he is saying

7   that he's good for a search, that he's asking for a search,

8   because he's directly reporting to his supervisor, but that

9   at no point in time does he actually tell his supervisor

10  that he believes this is a firearm.

11          THE COURT:  Mr. Wasserman?

12          MR. WASSERMAN:  That's an issue -- that's a

13  suppression issue.  I mean, the bottom line is the gun was

14  recovered.  I still just don't see how that pertains to

15  probable cause or the weight of the evidence.

16          And I would argue just as an aside that Mr. Ohm's

17  I don't think characterizing the evidence about line of

18  sight necessarily all that accurately.  The officer doesn't

19  really know what the UC was looking at at specific times.

20  But beyond that, I'm just not seeing how -- whether or not

21  the officer communicated or was radioed to a supervisor or

22  if the supervisor -- I don't even know if the supervisor was

23  standing right there; but how, you know, the timing of this

24  goes to anything but suppression.

25          THE COURT:  Well, I agree.  I'm not even going to

1    get [indiscernible] towards suppression.

2              In any event, I'm going to sustain the objection.

3              So do you have a different line of questions,

4    Mr. Ohm?

5              MR. OHM:  I have [indiscernible] questions --

6              THE COURT:  Okay.

7              MR. OHM:  -- but not very many more.

8              THE COURT:  I'm going to tell him to turn the

9    volume back up then.  All right.

10             How did I say I was going to do that?

11             MR. OHM:  Wave.

12             THE COURT:  I'll wave.

13   BY MR. OHM:

14   Q.  Okay, Officer.  I'm going to show you what I've marked

15   as Defense 1, which is I believe your body-worn camera of

16   the entire interaction.  Okay?

17   A.  Okay.

18             THE COURT:  Well, Mr. Ohm, is it Defense 1?

19   Haven't you already shown a few others?

20             MR. OHM:  I've shown him 1.  I paused.  I'm not

21   going to call it a still, because I didn't capture it.  But

22   I showed him a part of Defense 1.

23             THE COURT:  I see.  Got it.  Go right ahead.

24             MR. OHM:  For the record, your Honor, I'm starting

25   at the point when --

```
 1    BY MR. OHM:

 2    Q.  Officer, does it look like you in your car?

 3    A.  Yes.

 4    Q.  And is it fair to say that audio usually begins in two

 5    minutes?

 6    A.  Correct.

 7              MR. OHM:  So for the Court's -- for the Court's

 8    benefit, I'm forwarding up to a little bit before two

 9    minutes, which is at 19:02.

10    BY MR. OHM:

11    Q.  Officer, we're at 19:03 on the top right-hand timestamp.

12    Is that you grabbing the back of his backpack -- is that

13    what you were describing earlier under examination?

14    A.  Yes.

15    Q.  What are you feeling there?  Is it fair to say that it's

16    sort of like a rectangle that you're moving around?

17    A.  Part of it.

18    Q.  Well, is there any other part of it that -- well, let me

19    show you the video.  You can tell me if there's any other

20    part of it.

21              Did you see yourself grabbing any other part of --

22    anything other than the rectangle there?

23    A.  Where --

24              MR. WASSERMAN:  I'm going to object to the

25    characterization of that question.
```

 1                THE COURT:  Overruled.  He can describe however he

 2      wants to describe what he did.

 3                THE WITNESS:  Okay.  Where you see my fingers are

 4      also pressing into the bag and feel the object inside.

 5      BY MR. OHM:

 6      Q.  At any point in time, do you -- and during this time,

 7      you are communicating with your supervisor over the radio.

 8      Right?

 9      A.  Yes.  There's one point where people are talking and I

10      can't get over and I'm essentially just waiting.  It's not

11      that -- I really don't talk that much over the radio.

12      [Indiscernible] on the unit.

13      Q.  But the unit is all sort of focused on the arrest you're

14      about to make.  Right?

15      A.  Correct.

16      Q.  And you're the person that has the most information

17      about it.  Right?

18      A.  Aside from the undercover.

19      Q.  At that point, you started tugging on the zipper.

20      Right?

21      A.  Uh-huh.

22      Q.  And you asked if you mind if -- if he minds if you check

23      it.  Right?

24      A.  Correct.

25      Q.  And he essentially said, No; they're glasses.  Right?

1    A.  Right.

2    Q.  Okay.  And just for the record, we're at 19:04:29.

3           MR. WASSERMAN:  Your Honor, if I can interject for

4    just a second.

5           THE COURT:  Stop the video.

6           MR. OHM:  I'm sorry.  I didn't understand that he

7    was talking.

8           MR. WASSERMAN:  Your Honor, I just would note,

9    there is audio on this video that is being played.  And I'm

10   going to object to Mr. Ohm playing it without the audio and

11   then asking the officer to describe what he was saying to

12   the Defendant or was saying at all when what he said is on

13   the video that's being played with no sound.  I just think

14   it's mischaracterizing it for the record.

15          THE COURT:  We cannot hear the sound.  The

16   transcript was issued yesterday.  I don't know if you want

17   to attempt.  It was somewhat better yesterday.  It still

18   wasn't great.

19          MR. OHM:  I'm sorry.  I may have --

20          MR. WASSERMAN:  I mean, I just -- I was

21   [indiscernible] to that.  I didn't hear any sound.

22          THE COURT:  Well, it is a technical issue.

23          What did you do yesterday, Mr. Ohm?  Did you --

24          MR. OHM:  I basically had the phone -- the audio

25   feed through the phone, which I think I can do right now.

```
 1              THE COURT:  Well, let's try that.  It wasn't
 2   great, Mr. Wasserman, but we can try it.
 3              MR. WASSERMAN:  Okay.
 4              MR. OHM:  If Mr. Tran is still there, are we still
 5   at the 877-336-1839 number?
 6              THE COURT:  Mr. Tran?
 7              MR. OHM:  I can hear the Court through the phone,
 8   so I think this must be working.  So for the record, I'll
 9   just go back.
10              Mr. Wasserman, did you have a particular point
11   that you wanted me to go back to?
12              MR. WASSERMAN:  Wherever you were was fine.
13   BY MR. OHM:
14   Q.  Officer, did you hear yourself say, "Mind if I check
15   that?"
16              THE COURT:  You still can't hear it, Mr. Ohm.  I'm
17   happy to view the video myself if there's some point you
18   want to make with what was actually being said.  I don't
19   think it is fair to have this officer, you know, without
20   having heard the video, being asked what the video is
21   saying.  He can't remember at every point in time what he
22   said during the video.
23              MR. OHM:  Certainly, your Honor.
24   BY MR. OHM:
25   Q.  Well, do you have a recollection, an independent
```

1    recollection, of this case, Officer?

2    A.  Yes.

3    Q.  And have you had an opportunity to look at your

4    body-worn camera video?

5    A.  Yes.

6    Q.  Was that somewhat recently?

7    A.  Yes.

8    Q.  So it seemed like when you were [indiscernible] yourself

9    on the video, you remember asking a question and sort of

10   stopping.  Right?

11   A.  Yes.

12   Q.  Okay.  And when you looked at the video, were you able

13   to hear the video when you recently were looking at the

14   video?

15   A.  Yes.

16           MR. OHM:  The Court's indulgence, your Honor.

17           THE COURT:  I have a question.

18           The gun was in the bag.  Correct?

19           THE WITNESS:  Yes, your Honor.

20           THE COURT:  Was there anything else in the bag?

21           THE WITNESS:  Yes.  I believe there was like a

22   glasses case.

23           THE COURT:  Anything else?

24           THE WITNESS:  Not that I recall.

25           THE COURT:  I don't remember which photo was

1      presented by the Government.  One of the screen shots

2      presented by Mr. Wasserman showed the gun inside the bag.

3      At least that's what I understood it to be a photo of.  Do

4      you recall that?

5                  THE WITNESS:  Yes, your Honor.

6                  THE COURT:  Do you know if anything was taken out

7      of that bag before that video was shot?

8                  THE WITNESS:  I don't recall.  I don't believe

9      anything was taken out of the bag before it was

10     photographed.

11                 THE COURT:  Thank you.

12                 Mr. Ohm, sorry.

13                 MR. OHM:  Thank you, your Honor.

14     BY MR. OHM:

15     Q.  Was there anything about the bag itself that allowed you

16     to tell who owned the bag?

17     A.  There weren't any identifiers on it.

18     Q.  And there wasn't any pieces of paper or anything like

19     that in the bag?

20     A.  No.

21                 MR. OHM:  Your Honor, I don't have anything

22     further.

23                 THE COURT:  Anything further, Mr. Wasserman?

24                 MR. WASSERMAN:  Just briefly, your Honor.

25

44

```
1                         REDIRECT EXAMINATION

2    BY MR. WASSERMAN:

3    Q.  Officer Poupart, looking back at Government's Exhibit 3,

4    can you see that?  Can you see that, Officer Poupart?

5    A.  Yes.  Now I can.

6    Q.  So where is -- is the bag underneath his coat?

7    A.  Yes.

8    Q.  And so in other words, he was not wearing a

9    backpack-type bag?

10   A.  Yes.

11   Q.  So he's actually got the backpack underneath his coat as

12   opposed to slung over it.  Is that accurate?

13   A.  Yes.

14   Q.  And you indicated on cross-examination that the

15   Defendant claimed his glasses were in the bag?

16   A.  His glasses case.

17   Q.  His glasses case was in the bag.  Okay.

18            So just so we're clear, you [indiscernible] that

19   there was anything in the bag?

20   A.  Yes.

21   Q.  And his response was what?

22   A.  The glasses case.

23   Q.  Okay.

24            MR. WASSERMAN:  I don't have anything else, your

25   Honor.
```

1          THE COURT:  Thank you very much, Officer.  You're

2    free to go.  So you can turn off your camera.

3          THE WITNESS:  I'm sorry.  I didn't hear that.

4          THE COURT:  I just wanted to say you're free to

5    go.  Thank you for your time.  You can terminate the

6    session.  You can turn off your camera.

7          THE WITNESS:  Okay.  Thank you, your Honor.  Thank

8    you for your time.

9          THE COURT:  Sure.

10          (Witness excused.)

11          THE COURT:  I'll hear the parties on probable

12    cause.

13          Mr. Wasserman.

14          MR. WASSERMAN:  Yes, your Honor.

15          So this is a fairly, I think, straightforward case

16    where an undercover officer in an observation

17    [indiscernible] observes a hand-to-hand transaction.  In

18    this case, it happens to be a backpack in exchange for

19    money.

20          The undercover officer, based on the sworn

21    statement, observes this fairly quick transaction and sees

22    Defendant Douglas in particular hurriedly take off his coat

23    and then put the black backpack on and put his coat over the

24    bag, you know, a backpack that slings over your shoulders.

25    And he sees a transaction where Douglas hands him money.

1          This is the type of transaction that results in

2     stops routinely in DC.

3          So there's clearly a reasonable suspicion to

4     believe that a transaction for contraband has occurred.

5     There's a lookout.  The Defendant, Mr. Douglas, is

6     [indiscernible] consistent with that lookout.  He's wearing

7     a baggy or puffy blue coat and he's standing in the area

8     where the undercover indicates he was later positively

9     identified.  And the officer pats him down, feels what he

10    recognizes is a gun and then of course finds it.

11         So the only issue is really knowledge by

12    Mr. Douglas of what's in the bag.  Officer Poupart

13    interestingly testifies that the Defendant claims to know

14    what's in the bag or at least part of the bag.  He says a

15    glass case.

16         So if this is a situation where Mr. Williams is

17    selling the Defendant a bag that has nothing in it, there

18    would be no reason for Mr. Douglas to have any

19    [indiscernible], not to mention obviously a gun.

20    Particularly this type of gun is fairly heavy, and it would

21    be a fair inference that somebody taking possession of this

22    bag would know that there was something heavy inside.  And

23    obviously, he's paying for the bag that apparently already

24    has Mr. Douglas's glass case in it.  That doesn't make

25    sense.

1          The fact that Mr. Douglas appears to be trying to

2     conceal the bag by wearing it or the backpack from how you

3     would typically [indiscernible] that type of bag is also, I

4     think, consistent with not only inference of knowledge of

5     what's inside the bag.

6          And then I think the Court also can consider, as

7     you're able to consider at a trial, the Defendant's two

8     prior possessory firearms convictions, raising the inference

9     that he knew what was in the bag.  Obviously, in a

10    constructive possession case such as this, a jury with the

11    permission of the Court would be permitted to consider those

12    possessory offenses for -- to infer the Defendant's

13    knowledge of what was in that bag; and this instance is no

14    different.  The Court can and should consider those two

15    prior firearms convictions to infer that the Defendant knew

16    what was in the bag and knowingly and voluntarily possessed

17    that firearm.

18          So for all of those reasons, the Government

19    submits that there's probable cause that's been established.

20          THE COURT:  Thank you.

21          Mr. Ohm?

22          MR. OHM:  Thank you, your Honor.

23          Your Honor, what makes the Government's case here

24    is the allegation that there is money exchanged for -- that

25    this is actually a transaction, that there was money

1    exchanged for [indiscernible].  And the evidence that the

2    Government presented for that is in our view just highly --

3    completely unsupported and weak.

4         The Government didn't put on evidence about the

5    opportunity of the undercover to observe.  I mean, these

6    people could be a mile away; they could be looking through a

7    telescope; they could be 15 feet away.  But we have no idea

8    because the Government has not brought that information.

9    [Indiscernible] it's the Government's burden.

10        What the evidence is of it being a transaction is

11   this idea that money was exchanged.  And as the officer

12   testified, no money was recovered from Mr. Williams.  This

13   is a very short interaction.  He was arrested very quickly

14   afterwards.

15        Mr. Wasserman tried to suggest under examination

16   that maybe he could have passed that money off to two other

17   individuals.  We'd submit if that were the case, then the

18   undercover would have told the officers.  And the Court

19   could see that there were [indiscernible] there, searched

20   the two individuals with them to see if there's evidence

21   consistent with "what I think I saw."

22        The hand-to-hand transaction of money is not

23   something like one [indiscernible] sees.  I think that is

24   something that the Government has to buttress with evidence

25   of an opportunity to observe.  And they in this case just

1    chose not to.

2          The Government also wants to [indiscernible] the

3    firearm was heavy.  We have no evidence of that.  There was

4    no testimony about that.  It was just something that the

5    Government wants the Court to decide.

6          There's no other indicia -- your Honor, I don't

7    think that there's -- I think this is a very unusual case,

8    because if the Government is correct that Mr. Williams --

9    Mr. Douglas is sitting there with a firearm that he knows

10   that he purchased, and he doesn't act at all.  He doesn't

11   react when the police come towards him.  He doesn't react

12   when the police pull him aside.  And he just sits there and

13   stands there and lets them search without seemingly having

14   any idea of what's going on.

15         And then at the same time, the Government has no

16   evidence as to where this bag came from, whether it could be

17   somebody saying, "Hold onto this bag" or -- but it's

18   certainly not a normal thing to have a leather Coach

19   backpack, which seems like it has value, I think -- the

20   officer described it as a designer backpack -- as a vehicle

21   of transporting contraband when the backpack was probably --

22   would be more valuable than the contraband that it could

23   carry.

24         There's too many holes in the Government's theory

25   for the Court to be able to find probable cause.  So I'd ask

1     the Court not to do so.

2              THE COURT:  Mr. Wasserman?

3              MR. WASSERMAN:  Your Honor, with reference to the

4     money issue, there's no indication that the undercover had

5     eyes on Mr. Williams continuously from the time that he

6     completed the transaction to the time that he

7     [indiscernible].

8              Officer Poupart did testify that the Defendant --

9     excuse me -- Mr. Williams was standing in close proximity to

10    the individuals near a vehicle on 15th Street, a distance

11    away from where the transaction had occurred, a fair

12    distance away.  You know, there was plenty of opportunity

13    for Mr. Williams to have disposed of that money in between

14    the time of the transaction and the stop.  That's something

15    that happens in cases involving drug transactions all the

16    time with stash locations or transferring money from one

17    person to another.

18             The officers would not have had a basis to search

19    anybody else on the scene to check if they had

20    [indiscernible].  I'm not sure if that would have revealed

21    anything anyway, even if they did have some money, because

22    this was not prerecorded funds or anything like that.

23             So I think this is a very straightforward matter.

24    Probable cause, as the Court's aware, is a low standard.

25    And there's more than sufficient evidence to draw the

1       inference -- a reasonable inference that the Defendant knew

2       what was in that backpack and intended to possess that

3       firearm.

4                   THE COURT:   Thank you.

5                   I am going to find probable cause in this case.  I

6       do think that there's some interesting features to the case

7       with respect to this incident and that the Government does

8       have to show knowledge.  And this is a case where it would

9       ask the finder of fact to draw an inference based on what

10      the officers were able to observe.

11                  And moreover, this is a case where there's the

12      missing money and the Defendant didn't resist or run when he

13      was approached by the officers.

14                  That said, given what the Government was able to

15      show at this hearing, I do find probable cause in fact to

16      the possession of the gun for the reasons [indiscernible]

17      here.

18                  I would just highlight that the -- the complaint

19      states with respect to the actions of this Defendant, when

20      he was what appears to be -- certainly we can infer -- was

21      seeking to hide or conceal [indiscernible] with his coat as

22      well as his knowledge of at least one of the items that

23      appears to have been inside the bag.  I think it would be

24      inconsistent with the idea that he either purchased the bag

25      or had no knowledge of what was inside of the bag.

1          So I do find that the Government's demonstrated

2     probable cause in this case.

3          Mr. Douglas, you should know that this is just an

4     intermediate step.  I'm not finding you guilty.  That's

5     going to be the jury who will make the decision with respect

6     to whether you're guilty or not.  [Indiscernible] be told

7     about my finding here today with respect to probable cause.

8     That is all I'm finding, is probable cause.  It's a low

9     standard, as the Government said.  The Government will have

10    a much higher burden of proof at trial, and you will have

11    the presumption of innocence like you do today at the

12    beginning and throughout that trial.  The Government has to

13    prove the case at trial.

14         But I do find probable cause now and I will

15    further bound the case over to -- for further action by the

16    [indiscernible].

17         Any further things we need to do today,

18    Government, in this case?

19         MR. WASSERMAN:  No, your Honor.

20         THE COURT:  Mr. Ohm?

21         MR. OHM:  I think we have a date [indiscernible].

22         THE COURT:  Good enough, then.  Thank you,

23    everyone.  I think it was a good hearing, and we were able

24    to overcome the various technical difficulties.  So I

25    appreciate everyone's work to make this happen and patience

1    during this proceeding here today.

2              The parties are excused.

3              MR. OHM:   Thank you, your Honor.

4              MR. WASSERMAN:   Thank you, your Honor.

5              (Proceedings concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8

9

10                    Dated this 15th day of June, 2020.

11

12                 <u>/s/ Lisa Edwards, RDR, CRR</u>
                   Official Court Reporter
13                 United States District Court for the
                     District of Columbia
14                 333 Constitution Avenue, NW, Room 6706
                   Washington, DC 20001
15                 (202) 354-3269

16

17

18

19

20

21

22

23

24

25