**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 20-cr-121 (CJN)** |
| | : | |
| **THEODORE DOUGLAS,** | : | |
| | : | |
| **Defendant.** | : | |

**<u>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE</u>**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant's motion to suppress tangible evidence (ECF #31). In support of this opposition motion, the government relies on the points and authorities set forth below, and any additional points and authorities, which may be cited at a hearing on this motion.

**<u>FACTUAL BACKGROUND</u>**

On Wednesday, April 22, 2020, at approximately 2:59 p.m., members of the Metropolitan Police Department (MPD), Narcotics and Special Investigations Division (NSID), were conducting an observation post in the 2300 block of 15th Street, Northeast, Washington, D.C. An undercover officer (UC 2268) observed an individual, later identified as Theodore Douglas (Defendant Douglas), standing in the walkway between 2315 and 2317 15th Street, Northeast. An individual, later identified as Tavonte Williams (Defendant Williams), approached Defendant Douglas. Defendant Williams handed Defendant Douglas a black bag with shoulder straps. Defendant Douglas appeared to UC 2268 to be in a hurry to take off the blue jacket he was wearing, put the black bag just handed to him by Defendant Williams onto his back, and then put his blue jacket on over the black bag. After this, UC 2268 observed Defendant Douglas give Defendant

Williams an unknown amount of U.S. currency, completing the exchange with a handshake. UC 2268's training and experience, as well as what appeared to be Defendant Douglas's hurried attempt to remove his jacket and conceal the backpack under the jacket, led UC 2268 to believe that Defendant Douglas had just purchased something illegal from Defendant Williams.

UC 2268 alerted other officers in the area and officers moved in to stop both Defendant Williams and Defendant Douglas. Defendant Douglas was stopped by Officer Poupart and Defendant Williams was stopped by Officer Gabster. Both individuals stopped were later positively identified by UC 2268 as the individuals observed exchanging the backpack and U.S. currency. Defendant Douglas was wearing a backpack under his jacket, as observed by UC 2268. The body worn camera (BWC) footage confirms that Officer Poupart and his partner, who were both wearing police uniforms, approached Defendant Douglas, who was standing next to Defendant Williams and at least one other individual. *See BWC of Ofc. Poupart* (Exhibit A) at 19:02:25.[1] Officer Poupart approached Defendant Williams, greeted him in a conversational tone, placed his hand on Douglas's arm, and walked him several feet away from Defendant Williams and the other individual. *Id.* at 19:02:27 – 19:02:50. Officer Poupart can be heard advising Defendant Douglas that he wanted to speak to him in connection with an investigation. *Id.* Officer Poupart then placed Defendant Douglas in handcuffs for both officer safety and his safety. *Id.* UC 2268 can be heard over the radio reiterating that Douglas had been passed a "book bag" that he placed underneath his coat. *Id.* at 19:02:55.

Officer Poupart then conducted an external frisk of the backpack worn by Defendant Douglas and immediately felt what he recognized to be a firearm. *Id.* at 19:03:00; *See Transcript*

[1] A copy of Exhibit A will be emailed to chambers and has previously been disclosed to the defense in discovery.

*of Preliminary Hearing, U.S. v. Theodore Douglas, 20-MJ-068, May 27, 2020* (Exhibit B) at p. 16; lines 12-21.  As Officer Poupart was conducting the external frisk, Douglas claimed that the item was his glasses case.  Exhibit A at 19:03:16.  Officer Poupart stated over the radio that the book bag was underneath Douglas's sweatshirt, and then he and his partner proceeded to remove Douglas's coat and sweatshirt in order to be able to observe the book bag.  *Id.* at 19:03:28 – 19:03:52.  Officer Poupart then asked Douglas if he minded if he checked the book bag, and Defendant Douglas replied, "You [unintelligible] check it, but I told you it was my glasses case." *Id.* at 19:03:54 – 19:03:59.  Officer Poupart responded, "I don't know if that's glasses man."  *Id.* at 19:04:00.  Officer Poupart then voiced over the radio that he had the person in possession of the book bag, and asked whether he was "good for a search."  *Id.* at 19:04:57.  UC 2268 replied, "affirm," and advised that Douglas had given money to the person who handed him the book bag. *Id.* at 19:05:01.  Poupart opened the backpack, observed a firearm inside, and voiced over the radio, "1-800," which was the signal that a firearm had been recovered.  *Id.* at 19:05:06 – 19:05:13.

Defendant Williams and Defendant Douglas were placed under arrest. Defendant Douglas was also determined to have a bench warrant.  The firearm that was recovered from the backpack was determined to be a Sig Sauer, model P320, .40 caliber semiautomatic handgun with an obliterated serial number.  When the firearm was recovered, it was loaded with one (1) round in the chamber and twelve (12) rounds in a thirteen (13) round capacity magazine.  During a search incident to arrest of Defendant Williams, officers recovered two iPhones.  Officers did not recover any money from Williams' person at the time of his arrest.

On July 21, 2010, a grand jury returned an indictment that charged the defendants with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).

The defendant now moves to suppress the evidence recovered from his person as the fruit of an illegal arrest, asserting in conclusory fashion that the defendant was arrested "at the point the police officer stopped and immediately handcuffed him." Def. Mot. (ECF. #31) at 2. The defendant further argues that the evidence and any statements should be suppressed as the fruit of a warrantless search for which no exception to the warrant requirement applies. *Id.* at 3. Again, the defendant cites to no facts in support of his assertion that the evidence was the fruit of an illegal search. The defendant further asserts that police did not have reasonable suspicion to justify a stop of the defendant, nor any "reasonable articulable suspicion that Mr. Douglas was armed" at the time a protective frisk was conducted. *Id.* Although the government disclosed to defense counsel both the police reports and the BWC footage related to this case shortly after the defendant's arrest, the defendant's motion contains no reference to any of these materials or other facts in support of his motion. Accordingly, the government submits that the in light of the BWC footage submitted as Exhibit A to this opposition, and the defendant's failure to assert any facts in support of his motion to suppress that would warrant an evidentiary hearing, this Court should decide this motion on the pleadings. *United States v. Gaston*, 357 F.3d 77, 80 (D.C. Cir. 2004) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978) (defendant is entitled to evidentiary hearing where attack on search warrant affidavit is "more than conclusory" and 'accompanied by an offer of proof.'"); *United States v. Thorton*, 454 F.2d 957, 967 n. 65 (D.C. Cir. 1971) (noting that an "evidentiary exploration is not required as a matter of course, but only upon factual allegations which, if

established, would warrant relief.") (citation omitted); *United States v. Williams-Davis,* No. 91-0559, 1992 WL 38449 *1 (D.D.C. Feb. 5, 1992) (denying an evidentiary hearing where defendants' motions to suppress search warrants "consists of pages and pages of legal argument devoid of any application to the facts.").

## ARGUMENT

*i. The Initial Stop and Frisk of Defendant Was Based Upon Reasonable Articulable Suspicion and the Use of Handcuffs Did Not Convert Stop Into an Arrest.*

A seizure occurs only when an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968). A citizen's liberty is only restrained if "a reasonable person would have believed that he was not free to leave[.]" *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). The question is not what the subjective belief of the defendant was at the time but whether "a reasonable man, innocent of any crime" would have believed himself free to leave. *United States v. Goddard*, 491 F. 3d 457, 460 (D.C. Cir. 2007) (per curiam). In determining whether reasonable suspicion exists, officers are to consider whether all the facts "taken together [warrant] further investigation" and may consider behavior that would normally be innocent conduct. *Terry*, 392 U.S. at 22. Officers are permitted to take into account a wide range of factors in making the reasonable suspicion determination. *Id.* (officers can take account of strange or atypical behavior).[2] Furthermore, the subjective motivations of the police in making a stop or a frisk are irrelevant; the test is whether the facts known to the police established a reasonable articulable suspicion in an objective matter. *Whren*

[2] *See also Wardlow v. Illinois*, 528 U.S. 119, 125 (2000) (officers may take account of the fact that an individual is in a high crime area because they need not "ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"); *United States v. Laing*, 889 F.2d 281, 286 (D.C. Cir. 1989) (time of day, the "high crime" nature of an area, and furtive hand movements are all relevant to the reasonable suspicion inquiry).

*v. United States*, 517 U.S. 806 (1996); *see also Devenpeck v. Alford*, 543 U.S. 146 (2004); *United States v. Hensley* 469 U.S. 221, 231 (In addition "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.") (Quoting *United States v. Robinson*, 536 F.2d 1298, 1300 (1976)).

"Although the D.C. Circuit has suggested that 'simply receiving an object from another person' is a common occurrence for which there may many explanations," where a hand-to-hand transaction is coupled with other behaviors, such as "furtive conduct," such circumstances may give rise to reasonable suspicion that illegal activity is afoot. *United States v. Lovelace,* 357 F. Supp. 2d 39, 43-44 (D.D.C 2004) (quoting *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000). In *Lovelace,* Judge Richard J. Leon concluded that police had reasonable suspicion to stop Lovelace and remove him from his vehicle after observing him engage in a hand-to-hand transaction while sitting in his vehicle with another man in an area known for narcotics activity. *Id.* at 41. Officers approached the vehicle, smelled the odor of marijuana emanating from the vehicle, and observed Lovelace making furtive movements towards his waistband. *Id.*; *See United States v. Devaugh*, 422 F. Supp. 3d 104, 110-111 (D.D.C 2019) (officers' observation of Devaugh engage in hand-to-hand transaction in high crime area, walking to a vehicle after being advised of police presence in the area, and appearing to adjust his waistband established reasonable suspicion to conduct investigatory stop).

In the instant case, based upon the authority cited *supra*, it is clear that police had reasonable articulable suspicion that a crime had been committed by Defendants Douglas and Williams, and therefore, were justified in conducting a *Terry* stop. The undercover officer was in

a high crime area[3] and observed Douglas engage in a hand-to-hand transaction by receiving a backpack from Williams in exchange for money. The UC further observed Douglas appear to quickly remove his jacket, place it over his shoulders, and place his coat over the backpack in an apparent attempt to conceal it. The government anticipates that at any hearing on this matter, police witnesses will testify that in their training and experience, such observations are consistent with an illegal transaction for contraband, most likely for firearms or drugs. As the Supreme Court noted in *Adams v. Williams*, 407 U.S. 143, 145 (1972), "[t]he Fourth Amendment does not require a [police officer] who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." Instead, the police may briefly detain or stop an individual and, if circumstances warrant, frisk him or her, even in the absence of probable cause. *See Terry*, 392 U.S. at 30 (stating that police can subject someone to a pat down for guns during a *Terry* stop if the police suspect weapons in order to protect the officers and other people nearby).

In the instant case, there is no dispute that Defendant Douglas was seized by police for Fourth Amendment purposes once they took a hold of his arm and placed him in handcuffs. "It is well settled that 'the right to make… [an] investigatory stop necessarily carries with it the right to

[3] The government anticipates that at any evidentiary hearing on the motion, police witnesses would testify that the location where the offense occurred, which is in the Fifth Police District (5D) is known as a high crime area, including for narcotics and firearms offenses. Furthermore, crime data from the District of Columbia government establishes that between August 28, 2019 and August 27, 2020, there were 27 homicides in 5D, as compared to 22 homicides during the same period from the previous year. *See* *http://crimemap.dc.gov/Report.aspx* (August 28, 2020). During the same period over the last year, there were 131 robberies with a gun, up from 123 during the previous year, and 129 assaults with a dangerous weapon, up from 85 during the previous year. *Id.* While these numbers are somewhat lower than for the same offenses committed in the Sixth and Seventh Police Districts, they are substantially higher than the rate at which these same offenses are committed in 1D, 2D, 3D, and 4D. *Id.* The District of Columbia does not appear to maintain statistics by district for narcotics related offenses.

use some degree of physical coercion or threat thereof.'" *United States v. Smith*, 373 F. Supp. 3d 223, 238 (D.D.C. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989). "In deciding what degree of force is permissible, courts must look to the 'facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005). Furthermore, the use of handcuffs during a *Terry* stop does not automatically convert the stop into an arrest. *Id.*.; *See United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989) (holding that "amount of force used to carry out the stop and search must be reasonable, but may include use of handcuffs…"); *United States v. Tilman,* 19 F.3d 1221, 1227-28 (7th Cir. 1994) (upholding use of handcuffs during an investigative detention where the suspect matched the description of an armed bank robber). "'Courts have consistently upheld the reasonable use or show of force during investigative stops in order to protect police officers in potentially dangerous situations.'" *Moore v. Volpe*, 177 F. Supp. 3d 409, 415 (D.D.C. 2016) (citation omitted) (holding that police officers who drew their weapons and pointed them at Plaintiff, and then handcuffed him until his identification was confirmed did not convert investigative stop into arrest where Plaintiff matched the description of armed robbery suspect).

The stop of Defendant Douglas by police and his placement in handcuffs prior to the external frisk did not convert an otherwise lawful *Terry* stop into an arrest. At the time Officer Poupart and his partner approached Douglas, they were aware that he had been given a backpack. At the time, Douglas was standing in close proximity to two other men (one of which was Defendant Williams). Unlike a more typical hand-to-hand transaction involving small objects where there would ordinarily not be a basis to believe had involved the transfer of a weapon, here

the backpack easily could have contained a firearm(s) or other dangerous weapon(s).[4] The lookout for Defendant Douglas also made clear that he was in possession of the backpack, and therefore, had immediate access to its contents. Furthermore, Officer Poupart and his partner were not able to observe Defendant Douglas between the time of the initial lookout and the time they encountered him in the parking lot, so at the time they approached him it certainly would have been possible for Douglas to gain access to any weapon that may have been inside the backpack.

Based upon this backdrop and the aforementioned authority, the officers were more than justified in securing Douglas in handcuffs at the time of the encounter. The recent decisions in *Devaugh* and *Smith*, cited *supra*, are distinguishable from the instant case and do not compel the conclusion that Douglas was under arrest when he was placed in handcuffs. In *Devaugh*, an undercover officer observed the defendant engage in a hand-to-hand transaction, which involved the exchange of money for a small object. *Devaugh*, 422 F. Supp. 3d at 108. The UC then overheard someone tell Devaugh that the police were in the area and Devaugh then walked to a vehicle while appearing to adjust his waistband. *Id.* The arrest team arrived in unmarked cruisers, activated their emergency lights, and three officers approached Devaugh who was inside the vehicle. *Id.* at 108-109. Additional officers also arrived on scene to assist. *Id.* at 109. The officers issued a series of commands for Devaugh to show his hands, and one officer drew his weapon and displayed it against the glass of the vehicle. *Id.* The officers ordered Devaugh out of the vehicle and once he exited, an officer took Devaugh's arm and placed him in handcuffs. *Id.* A subsequent search of the vehicle resulted in the recovery of a firearm. *Id.*

[4] There was also a basis to believe that the backpack may have contained drugs in addition to weapons. It is axiomatic that "guns and drugs go together." *United States v. Johnson*, 592 F.3d 164, 169 (D.C. Cir. 2010).

Judge Rudolph Contreras held that while the officers were justified in conducting an investigatory stop of Devaugh, under the circumstances of that case, the use of handcuffs transformed the detention into an arrest. *Id.* at 114. Judge Contreras noted the following factors that in their totality, converted the stop into an arrest: (1) one officer's display of his firearm; (2) the use of handcuffs to restrain Devaugh; and (3) the large number of responding officers (six) and police vehicles (two) that surrounded Devaugh and prevented him from leaving. *Id.* at 114-115. Judge Contreras further noted that one of the officers testified that "he and the arrest team did not believe Mr. Devaugh was armed." *Id.* at 115. In the case of Defendant Douglas, and as confirmed by the BWC, Officer Poupart and his partner maintained a calm and conversational demeanor, they were the only officers in the immediate vicinity of Douglas at the time he was cuffed and patted down, and no officer drew a weapon or threatened Douglas in anyway. An '"officer need not be absolutely certain that an individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *United States v. Gorham*, 317 F. Supp. 3d 459, 467 (D.D.C. 2018) (quoting *Terry*, 392 U.S. at 27).

In the *Smith* case, Judge Moss held that the handcuffing of the defendant who was standing between an open driver's side door of a parked car and the car itself, and where officers smelled PCP, but were unable to determine if the odor was coming from the defendant or that he was under the influence of PCP, converted a permissible *Terry* stop into an arrest. *Smith*, 373 F. Supp. 3d at 239. While noting that it would be reasonable for a police officer to handcuff a person whom he reasonably believed to be under the influence of PCP, Judge Moss held that there was an insufficient basis for the police to believe such was the case in *Smith*. *Id.* As discussed *supra*, the officers who stopped Douglas were reasonable in believing that he may have been armed and

presently dangerous. While the officers could not be certain that Douglas was armed, the hand-to-hand transaction involving a backpack that easily could have contained a weapon, along with the defendant's presence in a high crime area and his attempts to conceal the backpack, certainly justified the officer's use of handcuffs to pursue the investigation safely. *See Gorham,* 317 F. Supp. 3d at 467.

*ii. Probable Cause to Arrest the Defendant Arose After Discovery of the Firearm During the Pat Down.*

The arrest of the defendant was supported by probable cause. It is axiomatic that the police may arrest someone without first obtaining an arrest warrant where the police have probable cause to believe that person is committing or has committed a criminal offense. *Florida v. White*, 526 U.S. 559 (1999). Probable cause must be evaluated in terms of the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his or her training and experience that would lead the officer to believe that a criminal offense had been or is being committed. *See United States v. Green*, 670 F.2d 1148 (D.C. Cir. 1981); *Brinegar v. United States*, 338 U.S. 160 (1949).

In the instant case, after Defendant Douglas was stopped, the attached BWC footage shows Officer Poupart conduct a brief pat down of the rear of his jacket, when he immediately felt what he recognized as a firearm. *See Exhibit A* at 19:03:00; *Exhibit B* at p. 16, lines 12-21. "Under the 'plain feel doctrine,' a weapon discovered during a frisk may be seized if its 'contour or mass makes its identity immediately apparent.'" *United States v. Spriggs*, No. 09-0361, 2010 WL 917709, *2 (D. Md. March 10, 2010) (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 373–75 (1993)). After recognizing the presence of the gun during the pat down, probable cause existed to place the defendant under arrest and execute a search of the backpack to recover the gun. It is of no moment that Officer Poupart, after feeling the presence of the firearm, requested permission

over the radio to conduct the search of the backpack. Probable cause to arrest the defendant and conduct a search of the backpack found on his person arose upon Officer Poupart's recognition of the presence of the firearm inside of the backpack during the external frisk. Accordingly, the officers' search of the interior of the backpack was supported by probable cause, and therefore, was a lawful search.

## CONCLUSION

**WHEREFORE** for the reasons stated above the United States respectfully submits that the defendant's motion to suppress tangible evidence should be denied.

Respectfully submitted,

MICHAEL R. SHERWIN
United States Attorney
N.Y.S. Bar No. 4444188

By: ___________/S/________________
STEVEN B. WASSERMAN
D.C. Bar No. 453251
Assistant United States Attorney
555 Fourth Street, N.W., Fourth Floor
Washington, D.C. 20530
Telephone: (202) 252-7719
E-mail: steve.wasserman@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served via ECF on counsel for Defendant, on this 4th day of September 2020.

________/S/__________________
Steven B. Wasserman
Assistant United States Attorney