UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| : | **Criminal No. 1:20-cr-121 (CJN)** |
| : | |
| **THEODORE DOUGLAS** : | |
| _____ | |

### DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE
### AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Mr. Theodore Douglas, the defendant, through undersigned counsel, pursuant to the Fourth Amendment to the United States Constitution, respectfully moves this Honorable Court to suppress the use as evidence at trial, all tangible objects seized and statements made as the result of the unlawful search and seizure by officers of the Metropolitan Police Department ("MPD") of Mr. Douglas on the 2300 block of 15th Street, NE on April 22, 2020. Mr. Douglas requests an evidentiary hearing on this motion. In support of this motion, counsel submits the following.

### Factual Background

Mr. Douglas is charged in a one-count indictment with unlawful possession of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). The charge arose out of an incident that occurred on April 22, 2020.

### Argument

I.  Officer Poupart arrested Mr. Douglas at the point of handcuffing him without probable cause.

The government claims that Officer Poupart acted reasonably by pulling Mr. Douglas

1

aside and handcuffing him because "they were aware that he had been given a backpack" and because "Douglas was standing in close proximity to two other men." ECF 34 at 8. This claim renders the Fourth Amendment meaningless, as demonstrated by the weight of the authority on the subject.

When Officer Poupart approached Mr. Douglas, he was standing on a sidewalk conversing with two individuals. The officer stated, "How's it going gentlemen" and said "Do me a favor and come talk to me for a minute." Mr. Douglas responded, "Me?" and Officer Poupart said "Just want to talk to you for a moment." Officer Poupart walked him several feet away and said "You're just being stopped as part of an investigation." Mr. Douglas was entirely cooperative and even placed his right hand behind his back as Officer Poupart cuffed his left hand. ECF 34 Exhibit 1 at 2:11-2:36. Within seconds, at least six officers surrounded Mr. Douglas. He remained cooperative. Officers then took off his jacket and searched the exterior of the backpack – all without probable cause.

Because Mr. Douglas was cooperative and did not attempt to flee, it was unreasonable for officers to place him in handcuffs absent probable cause. "In deciding what degree of force is permissible, courts must look to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *United States v. Dykes*, 406 F.3rd 717, 720 (D.C. Cir. 2005). In applying *Dykes* to these facts, the officer was not reasonable in handcuffing Mr. Douglas – indeed, given Mr. Douglas' cooperation and the multitude of officers mere feet away, he had no reason to do so.

At the time of the arrest, Officer Poupart did not know what crime Mr. Douglas was suspected of committing – other than the fact it was a possessory offense. Indeed, the officers

were conducting a narcotics operation to observe drug offenses. Officer Poupart had no information from the undercover that Mr. Douglas was suspected of having any weapon in his possession. Nothing that Mr. Douglas did indicated that he posed a threat to officer safety. He was cooperative with the officers, walked with them several steps away from the other individuals and was compliant with instructions. He did not raise his voice but followed all of the officers' commands. He did not resist any of the officer's actions. He made no gestures towards his backpack and no attempt to take off his backpack. As stated, the backpack was in fact inaccessible because it was underneath Mr. Douglas' jacket at the time he was handcuffed.

Once officers led Mr. Douglas away and placed him in handcuffs, it was an arrest requiring probable cause. For a stop to qualify as a *Terry* stop, it must employ "the least intrusive means reasonably available to verify or dispel the officer's suspicion." *Florida v. Royer*¸ 460 U.S. 491, 500 (1983). While "handcuffing a suspect is not ordinarily proper during an investigative stop, there are a variety of special circumstances that will make such a step permissible." *United States v. Smith*¸ 373 F.Supp 3d 223, 238 (D.D.C. Jan. 30, 2019) (citations and quotations omitted). "Officers can use handcuffs without converting a stop into an arrest only when specific circumstances make it reasonable to do so, such as 'when they reasonably fear for their safety or the safety of others.'" *United States v. Devaugh*, 422 F.Supp.3d 104, 114 (D.D.C. Nov. 2019).

In *Smith*, Judge Moss recently held that a full blown arrest occurred when the police handcuffed an individual who was not "uncooperative" and did not "pose[] a flight risk." *Smith*, 373 F.Supp 3d at 238.. Finding no evidence that supported a reasonable conclusion that the defendant "posed an immediate threat to the safety of the officer or others" the Court determined that handcuffing the defendant was unreasonable. *Id.* The government's attempt to distinguish

3

this case from *Smith* falls back on the very same facts to justify articulable suspicion. ECF 34 at 11. The government asks the Court to expand the basis of reasonable suspicion to include the *possibility* that the backpack "could have easily contained a weapon." ECF 34 at 11 ("While the officers could not be certain that Douglas was armed, the hand-to-hand transaction involving a backpack that easily could have contained a weapon…"). But the government's argument for reasonable articulable suspicion consumes its argument for reasonableness. In essence, the government argues that if reasonable articulable suspicion exists, it follows that officers may handcuff individuals. That is not the test. Here, the government cannot articulate any reason that "immediate threat" that would justify handcuffing Mr. Douglas without converting the interaction to a full blown stop.

The government's attempts to distinguish *Devaugh* similarly fail. Although the two officers who initially approached Mr. Douglas had not drawn weapons, they were both visibly armed. The government is incorrect in stating that Officer Poupart and his partner "were the only officers in the immediate vicinity of Douglas at the time he was cuffed and patted down." Within six seconds of when the handcuffs are secured (at 2:32 of Government Exhibit 1), one can see at least three officers approaching, only a short distance away.



Finally, at the time of the arrest, there appear to be at least 5 and up to 9 police officers surrounding Mr. Douglas, further demonstrating that Mr. Douglas posed no threat, much less an immediate one. "[S]ometimes the magnitude of such police activity will compel the conclusion an arrest had occurred." *Id.* at 115.

The government does not and cannot argue that Officer Poupart had probable cause to search and seize Mr. Douglas at the point he was handcuffed. The fruits of the illegal seizure must thus be suppressed.

II. Officer Poupart did not have reasonable articulable suspicion to even stop Mr. Douglas.

Even if the Court determines that the initial interaction with Mr. Douglas was a mere *Terry* stop, Officer Poupart did not have reasonable articulable suspicion at that point.

"No right is held more sacred, or is more carefully guarded, by common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*,

5

329 U.S. 1, 9 (1968).  However, "[u]pon suspicion that the person may be armed, the police should have the power to 'frisk' him for weapons." *Id.* at 10.  "And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id. at 27.*

The government asks the Court to accept "unparticularized suspicion or 'hunches'" in order to justify what it incorrectly describes as a *Terry* stop.  In doing so, it acknowledges that lack of particularity to the officers' hunch. ECF 34 at 7 ("such observations are consistent with an illegal transaction for contraband, most likely for firearms and drugs"); ECF 34 at 9 ("the backpack easily could have contained a firearm or other dangerous weapon").  In short, the government argues that Officer Poupart could articulate reasonable suspicion for a stop for three reasons:  1) that the incident occurred in the Fifth District; 2) that there was a hand to hand transaction for money; and 3) that the Mr. Douglas placed his jacket over his backpack.  All of these factors are dubious, either as a matter of evidence or as a logical basis for a reasonable belief that the actions are suspicious.

According to the government, one of the reasons that Officer Poupart had reasonable articulable suspicion to stop Mr. Douglas because Mr. Douglas was in the Fifth District.  ECF 34 at 7 fn 3.  This argument is remarkable in its overbreadth as it suggests that any individual would invite an unwanted interaction with police, simply by his geographical location.  The Fifth District, encompasses a substantial part of the District, as demonstrated by the colored areas here.

6



If accepted, the government is advocating for a position that any individual stopped in the 5th District (or 6th and 7th Districts) is inherently more suspicious than an individual stopped in First, Second, Third and Fourth District.[1]

The Fifth, Sixth and Seventh Districts are bordered in black here.

---

[1] To amplify the harm of this approach, the U.S. Attorney's Office has chosen only to prosecute individuals in the 5th, 6th and 7th District in federal court. These districts also happen to be the districts that have a substantial African-American population. "D.C. crackdown on gun crime targeted Black wards, was not enforced citywide as announced." https://www.washingtonpost.com/local/legal-issues/dc-crackdown-on-gun-crime-targeted-black-wards-was-not-enforced-citywide-as-announced/2020/09/03/f6de0ce2-e933-11ea-970a-64c73a1c2392_story.html (last accessed Sept. 18, 2020). By logical extension, the government is advancing a position that it is reasonable for law enforcement to consider an African American resident of the District more dangerous and should also be subject to harsher penalties.



Next, the government argues that Mr. Douglas' actions were suspicious because he exchanged cash for the backpack in a transaction with Mr. Tavonte Williams. But officers arrested Mr. Williams almost immediately and he did not have any cash in his possession.

Finally, the government's 4th Amendment analysis then points to anticipated officer testimony that Mr. Douglas removed his jacket, placed the backpack over his shoulders and placed his coat over the backpack – contending that it anticipates that these actions are consistent with an illegal transaction for "most likely … firearms or drugs." ECF 34 at 7. The government fails to articulate how the officer's training and experience would help an officer reasonably determine that the bag contained a firearm or drugs, as opposed to any item that inherently had value.

8

In sum, although the handcuffing of Mr. Douglas, the removal of his jacket and the search of the exterior of his backpack amounted to a search requiring probable cause, the officers did not even have the reasonable articulable suspicion justifying a *Terry* stop.

III.     The actions of the officers constituted a search requiring probable cause

The government characterizes the removal of Mr. Douglas' jacket and the exterior search of his backpack as a "frisk." Because those actions constituted a search requiring probable cause, the evidence must be suppressed.

First, the officer's conduct in this case, a repeated manipulation of the backpack both from outside and then inside the jacket, constitutes a search. The government's reliance on the "plain feel doctrine" is misplaced because neither a firearm, nor any sort of contraband was apparent to the officers when they felt the exterior of the bag. Government's Exhibit 1 of ECF 34 illustrates that the character of the object was not immediately apparent to officer. Officer Poupart begins to manipulate the object at 2:43 of Exhibit 1. At 3:00 he repeats, "this is a glasses case?" At 3:11, he radios, "bookbag is underneath his sweatshirt." At 3:22, he then removes Mr. Douglas' jacket. At 3:36, Officer Poupart requests consent to search. When he is refused, another officer begins to feel the bookbag to determine its contents. At 4:41, Officer Poupart requests permission to search. At 4:56, he searches and locates the firearm.

As a factual matter Government's Exhibit 1, from 3:40, demonstrates that officers were not frisking the exterior of the bag but rather were manipulating its shape and contour.

9



In order to fall within the scope of the "plain feel" doctrine, an extension of the "plain view" doctrine, a patdown cannot involve "impermissible manipulation or palpation to determine the exact contents of the pocket." *United States v. Williams*, 38 Fed.Appx. 26 at 27 (D.C. Cir. 2002). "If a police officer pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity as contraband immediately apparent the seizure of such an item whose identity is already known occasions no further invasion of privacy." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

*Dickerson*'s facts illustrate the limit of the plain feel doctrine:

> Although the officer was lawfully in a position to feel the lump in respondent's pocket, because *Terry* entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was not immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or

10

by any other exception to the warrant requirement. *Dickerson*, 508 U.S. at 379.

This search spanned over a minute, an eternity within the context of the plain feel doctrine. It involved two officers manipulating the contents of the bag and was an unquestionable attempt to determine its contents because the content was not "immediately apparent" to the officer. Notably, officers are relaying information over the radio, determining when it would be proper to search. Neither officer ever states that they feel what they suspect to be a firearm.

Next, the offices impermissibly removed Mr. Douglas' jacket in the course of their search. ECF 34, Exhibit 1 at 3:23. At the time, Mr. Douglas had a reasonable expectation over the inside of his jacket – indeed, the government appears to argue that he used the jacket in order to protect his privacy. "[W]hat [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States*, 389 U.S. 347, 351 (1967). Because the search was made without a warrant, and no warrant exceptions apply, the removal of the jacket was impermissible and any fruits from that search should be suppressed.

## Conclusion

For the reasons set forth above, and for such other reasons as this Court may determine at a hearing on this motion, Mr. Douglas respectfully requests that this motion be granted and that the Court suppress the use as evidence of all items seized and all statements made on April 22, 2020.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

12