# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 20-cr-121 (CJN) |
| : | |
| THEODORE DOUGLAS, : | |
| : | |
| Defendant. : | |

## GOVERNMENT'S SUPPLEMENT TO THE OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this supplemental brief in opposition to defendant's motion to suppress tangible evidence (ECF #31). In support of this opposition motion, the government relies on the points and authorities set forth below, and any additional points and authorities, which may be cited at a hearing on this motion.

## PROCEDURAL BACKGROUND

On October 20, 2020, an evidentiary hearing in this matter was held on Defendant Theodore Douglas's motion to suppress tangible evidence. The government called two witnesses, Metropolitan Police Department (MPD) Officers Isaac Jackson and Maxwell Poupart, and Defendant Douglas called MPD Officer Brianna Taylor. After completion of the hearing, this Court ordered the parties to each file a supplemental brief to their respective pleadings on the motion to suppress in order to summarize the testimony adduced at the hearing and to synthesize this testimony with the legal arguments set forth in the previous filings.

1

## THE WITNESS TESTIMONY AT THE HEARING

  A. *Testimony of Officer Isaac Jackson*

 Officer Isaac Jackson testified that he has been a police officer with MPD for 20 years and has been assigned to the Narcotics Enforcement Unit, Narcotics and Special Investigations Division (NSID) for approximately 10 years. *10-20-20 Motion Hearing Transcript* ("Tr.") at 8. Ofc. Jackson further testified that prior to being assigned to NSID, he worked as a police officer in the Sixth Police District, where he worked on primarily narcotics investigations and prostitution cases. *Id.* at 9. Ofc. Jackson stated that in his current assignment with NSID he works on narcotics investigations. *Id.* Ofc. Jackson testified that during the course of his career he has received training in narcotics investigations from the Drug Enforcement Administration, as well as annual training to remain current with narcotics and firearms investigations. *Id.* Ofc. Jackson also testified that he has received "on-the-job" training. *Id.*

 Ofc. Jackson advised that during this career he has worked as an observation post ("OP") officer "more than 500" times. *Id.* at 12. Ofc. Jackson stated that in his training and experience, he was familiar with the behaviors exhibited by individuals engaged in hand-to-hand narcotics transactions. *Id.* at 14. He described some of those behaviors included individuals trying to be "discreet" or "secretive," when they reach "upon their person." Ofc. Jackson looks for the exchange of money, "someone going to a stash location" and then giving an item to another person, and "hand movement, secretive…" *Id.* at 14-15. Ofc. Jackson explained that beyond a hand-to-hand exchange, he looks for behavior such as the suspect "looking around" and for acts of concealment. *Id.* at 15. With respect to firearms possession, Ofc. Jackson testified that he looks for "hand/arm movement, person trying to conceal something up against their waistband and…pockets." *Id.* at 16. He further testified that in his training and experience it was "very

common" for drug traffickers to possess firearms. *Id.* Ofc. Jackson stated that in cases he has worked as an OP officer where there were bulk transfers of narcotics or transfer of a firearm, these transactions frequently occurred in a vehicle or the transfer of contraband was concealed inside of a "bag." Ofc. Jackson testified that he would not expect such transfers to occur out in the open. *Id.* at 17-18.

Ofc. Jackson testified that prior to April of 2020, he had worked in the Fifth Police District ("5D") "quite frequently." He stated that in his experience in 5D between 2015 and the present, the most frequent criminal offenses committed were "violent crimes, shootings…narcotics transactions…" *Id.* at 18. He further testified that these offenses were committed more frequently in 5D than in 1D, 2D, 3D, and 4D, and not as frequently as in 6D and 7D, but "somewhat…similar." *Id.*, 117-118. Ofc. Jackson testified that on April 22, 2020, shortly before 3:00 pm., he was working as an OP officer in the 2300 block of 15th Street, N.E., Washington, D.C. He stated that he was sitting in an unmarked vehicle. *Id.* at 20. Ofc. Jackson testified that he was familiar with the area of the 2300 block of 15th Street, N.E., and worked investigations in that area close to "200" times in the last five years. *Id.* Ofc. Jackson stated that in his training and experience, the 2300 block of 15th Street, N.E., is known as a high crime area, specifically narcotics sales and violent crimes. *Id.* at 23. Ofc. Jackson further stated that he has had prior investigations involving drug sales in the walkway located between the 2300 block of 15th Street, N.E., and the parking lot for the row houses across the street from the recreation center. *Id.* at 29.

Ofc. Jackson advised that his OP vehicle was a sedan, that the windows were not tinted, and that he was seated in the driver's seat. He also stated that he was not using binoculars or other visual aids, that he did not have a prescription for eyeglasses or contact lenses, and that he was not experiencing any problems with his vision on April 22, 2020. *Id.* at 24. Ofc. Jackson drew a green

circle on Government's Exhibit 2 to identify the location of his OP vehicle in the 2300 block of 15th Street, N.E., which was visible on Ofc. King's body worn camera (BWC) shortly after Jackson observed the book bag exchange between the two defendants. *Id.* at 24-25; Attachment A (Govt. Ex 2). Ofc. Jackson advised that the vantage point from where Govt. Ex. 2 was taken was located in the walkway where he observed the hand-to-hand exchange between the defendants. He also stated that the location of his vehicle as depicted in Govt. Ex. 2 was where the OP vehicle was located at the time he made his observations of the book bag exchange. *Id.* at 26. Ofc. Jackson was also shown Government's Exhibit 1A, which is an overhead view of the 2300 block of 15th Street, N.E., including the walkway where the book bag exchange between the defendants occurred. Ofc. Jackson made a green circle on Govt. Ex. 1A to mark the approximate location of his vehicle at the time he made his observations. *Id.* at 26-27; Attachment B (Govt. Ex. 1A).

     Ofc. Jackson testified that while in his vehicle, he focused on two separate locations—the area near the recreation center, which was closer to the passenger side (right) of his vehicle, and the walkway between 15th Street and the parking lot for the row homes in the 2300 block of 15th Street, which was across 15th Street from where he was parked and to his left side. *Id.* at 28. Ofc. Jackson stated that shortly before 3:00 p.m., he observed an individual standing in the walkway with one or two other people, when he saw another male appear and hand one of the individuals in the walkway a "book bag." Ofc. Jackson stated he observed the individual who received the book bag take off his jacket, place the book bag on his person by putting the straps over his shoulders, and put his jacket back on over the top of the book bag. *Id.* at 30, 103. Ofc. Jackson stated that "[i]t appeared this individual was trying to conceal whatever was in that book bag, trying to hide the book bag on his person by covering it up with his jacket." *Id.* Ofc. Jackson further characterized the action of the male taking his jacket off, placing the bag over his shoulders,

and putting the jacket over the bag as occurring "quickly." *Id.* at 102-103. Ofc. Jackson testified that the individual who received the book bag handed the individual some money. Ofc. Jackson advised that he believed the item handed by the individual who received the book bag to the individual who gave it to him was money, due to the color of the item and how the person "cuffed" his hand. Ofc. Jackson testified that he could not be certain that the item was U.S. currency. *Id.* at 30-31.

Ofc. Jackson testified that the individual who received the book bag was wearing a "bluish jacket, blue coat," and dark colored pants. He also advised that when the individual in the blue coat was taking off his coat and placing the book bag on his person he could see him from the back. *Id.* at 31-32, 96. Ofc. Jackson testified that the other person who handed the book bag off had "bushy-ish sort of hair, and he had a grayish pattered coat…and an orange hood. *Id.* at 32.[1] Ofc. Jackson testified that he was able to see the left side of the individual who handed off the book bag at the time of the hand-off. He further stated that at the time of the exchange of the suspected money, he was able to see the right side of the individual wearing the blue coat and the left side of the individual wearing the gray coat with the orange hood. *Id.* at 32, 96, 116. Ofc. Jackson was shown Government's Exhibit 1B and drew a green circle around the approximate location of where he observed the exchange of the book bag and currency. *Id.* at 36-37; Attachment C (Govt. Ex. 1B). Officer Jackson confirmed that there were no obstructions to his view of the exchange, and nothing that distracted his attention away from his observation of the

---

[1] Officer Jackson provided a detailed description of each defendant in the radio run played at the hearing and admitted as Government's Exhibit 3. Ofc. Jackson's testimony was consistent with the lookout description he provided over the radio after he observed he exchange. It is also clear from the BWC video of Ofc. Poupart (Govt. Ex. 4 and 4A) that both defendants matched the lookout description. This radio transmission was included as Exhibit A to the government's opposition to the defendants' motion to suppress identification (ECF #35).

exchange.  *Id.* at 37, 63, 124-125.  Ofc. Jackson testified that the only individuals he observed engaging in the exchange of the book bag and money were the two defendants.  *Id.* at 38, 122.

Ofc. Jackson testified that based upon what he observed, including the attempts to conceal the book bag, the exchange of what appeared to be money, and Ofc. Jackson's knowledge of the location as a high crime area, including for narcotics, he suspected that he had just observed the transfer of a large quantity of narcotics or a gun.  *Id.* at 38-39, 129.  Ofc. Jackson further testified that when he broadcast his initial lookout description, there were no obstructions of the two males he observed engage in the exchange.  *Id.* at 40.

          B.       *Testimony Officer Maxwell Poupart*

Ofc. Maxwell Poupart testified that he has been a police officer with MPD for nearly five years, and was assigned to the Narcotics Enforcement Unit of NSID from approximately late January of 2020 until June of 2020.  *Id.* at 132-133.  Ofc. Poupart stated that in his experience at NSID as well as the other assignments he has had with MPD, he has worked on narcotics investigations and participated in the seizure of multiple firearms.  *Id.* at 133-134.  Ofc. Poupart testified that in his training and experience, he was familiar with the size, shape, weight, and other physical characteristics of most handguns and that he would be capable of recognizing the presence of a firearm through sense of touch even if he could not see the firearm.  *Id.* at 134-135.  He also stated that in his training and experience it was common for individuals engaged in narcotics trafficking to possess firearms.  *Id.* at 141.

Ofc. Poupart further testified that on April 22, 2020, he was part of the arrest team for an operation targeting narcotics sales.  *Id.* at 135, 158.  He stated that during his tour of duty he received a radio transmission from Ofc. Jackson to respond to the 2300 block of 15th Street, N.E.,

to stop two individuals who had engaged in the transfer of a book bag for money.[2] *Id.* at 136-137, 159.  Ofc. Poupart explained that he and his partner were the first officers on the scene when they encountered Defendant Douglas, who was standing next to Defendant Williams and another unidentified male (UM) as they approached.  *Id.* at 139-140.  Ofc. Poupart stated that for officer safety he approached Defendant Douglas, lead him away from the two males he was standing next to, and placed him handcuffs.  Ofc. Poupart cited the safety reasons for doing so were based on the following: (1) the fact that he and his partner were the first on the scene to encounter Douglas; (2) there were three males in the immediate vicinity (including the Defendant Douglas); (3) he was aware from the lookout that the OP officer had observed a suspected illegal transaction and his knowledge that narcotics traffickers are commonly armed; (4) there was a second subject (in addition to Douglas) that was involved in that transaction; and (5) he and his partner were in a housing complex where it was possible that more people could come on the scene.  *Id.* at 140-142, 165, 185-186, 187.

     Ofc. Poupart testified that during his external frisk of the rear of Defendant Douglas's jacket, he recognized a hard object, which he recognized as a firearm.  Specifically, he advised that he recognized during the frisk the handle or butt of the gun, which was pointed upwards, and the slide of the gun that was positioned horizontally facing towards Douglas's right arm.[3]  *Id.* at 143-144, 148-150.  Ofc. Poupart explained through use of his BWC footage (Govt. Ex. 4 and 4B) how he recognized the firearm during the external frisk.  *Id.*, 169-171.  Ofc. Poupart further

---

[2] During direct examination, Ofc. Poupart listened to a portion of the radio run (Govt. Ex. 3) and identified the lookout description from Ofc. Jackson as the one he responded to, which included the description of the exchange that had occurred between the defendants.  *Id.* at 137-138.

[3] Ofc. Poupart acknowledged that he was also able to detect the presence of another object inside the book bag during the frisk, but that he could not determine identity of the object.  The additional object turned out to be the defendant's glasses case.  *Id.* at 145.

testified that after recognizing the presence of the firearm during the frisk, he proceeded to request consent to search the book bag, because it was his practice to give individuals the opportunity to be honest about their conduct. He stated that his request to consent to search was not based on any uncertainty about the identity of the item that he felt as being a firearm. *Id.* at 151, 177. Ofc. Poupart testified that after he recognized the gun during the frisk, he asked over the radio whether Douglas was "good for a search," because he wanted to ensure that the scene was secure and that the other suspect had been secured prior to conducting the search for the firearm. *Id.* at 152, 180-182.

## ARGUMENT

> A. *The Testimony of Officer Jackson and Officer Poupart Established Reasonable Articulable Suspicion that Criminal Activity was Afoot and that Defendant Douglas was Armed.*

Officer Jackson's unimpeached testimony summarized above established that he was operating an OP in an area known for high crime, including for narcotics trafficking and gun violence, that he observed a hand-to-hand transaction between the two defendants of a book bag for suspected money, and that Defendant Douglas exhibited behavior that appeared to be an effort to conceal the book bag when he quickly placed his jacket over the bag. Ofc. Jackson testified that in his training and experience, he suspected that the illegal contraband, most likely narcotics and/or a firearm were inside. Both Officers Jackson and Poupart testified that in their training and experience, drug traffickers commonly possess firearms.[4] *See Wardlow v. Illinois*, 528 U.S. 119, 125 (2000) (officers may take account of the fact that an individual is in a high crime area because they need not "ignore the relevant characteristics of a location in determining whether the

---

[4] It is axiomatic that "guns and drugs go together." *United States v. Johnson,* 592 F.3d 164, 169 (D.C. Cir. 2010).

8

circumstances are sufficiently suspicious to warrant further investigation"); *United States v. Laing,* 889 F.2d 281, 286 (D.C. Cir. 1989) (time of day, the "high crime" nature of an area, and furtive hand movements are all relevant to the reasonable suspicion inquiry); *see also United States v. Lovelace,* 357 F. Supp. 2d 39, 43-44 (D.D.C 2004) (quoting *United States v. Johnson,* 212 F.3d 1313, 1316 (D.C. Cir. 2000) ("Although the D.C. Circuit has suggested that 'simply receiving an object from another person' is a common occurrence for which there may many explanations," where a hand-to-hand transaction is coupled with other behaviors, such as "furtive conduct," such circumstances may give rise to reasonable suspicion that illegal activity is afoot.); *United States v. Devaugh,* 422 F. Supp. 3d 104, 110-111 (D.D.C 2019).

> B. *Ofc. Poupart's Testimony Established that it was Reasonable to Place Defendant Douglas in Handcuffs for Officer Safety and that the External Frisk was Lawful under Terry.*

As summarized above, Ofc. Jackson testified that the area where Defendant Douglas was stopped was a high crime area, and both Officers Jackson and Poupart testified that narcotics traffickers commonly possess firearms. Based upon the radio transmission, officers Poupart and Taylor knew that they were responding to stop individuals suspected of having engaged in a drug transaction involving a book bag and they were the first officers on the scene at the time they encountered Defendant Douglas. Under the circumstances, it was entirely reasonable to believe Douglas was armed. Officers Poupart and Taylor were also aware that there was one other suspect who had not yet been stopped, and that Defendant Douglas was standing in close proximity to two other males, one of whom was later identified as co-defendant Williams. When Officers Poupart and Taylor approached Douglas, neither were aware of whether the two males standing with Douglas were the second suspect in the transaction observed by Ofc. Jackson.

The use of handcuffs during a *Terry* stop does not automatically convert the stop into an arrest. *United States v. Smith,* 373 F. Supp. 3d 223, 238 (D.D.C. 2019); *United States v. Laing,* 889 F.2d 281, 285 (D.C. Cir. 1989) (holding that "amount of force used to carry out the stop and search must be reasonable, but may include use of handcuffs…"); *United States v. Tilman,* 19 F.3d 1221, 1227-28 (7th Cir. 1994) (upholding use of handcuffs during an investigative detention where the suspect matched the description of an armed bank robber). "'Courts have consistently upheld the reasonable use or show of force during investigative stops in order to protect police officers in potentially dangerous situations.'" *Moore v. Volpe,* 177 F. Supp. 3d 409, 415 (D.D.C. 2016) (citation omitted) (holding that police officers who drew their weapons and pointed them at Plaintiff, and then handcuffed him until his identification was confirmed did not convert investigative stop into arrest where Plaintiff matched the description of armed robbery suspect).

In addition, Ofc. Poupart's external frisk of Defendant Douglas's jacket was also reasonable and within the scope of a lawful *Terry* frisk. The external frisk was minimally invasive and lasted only a matter of seconds—sufficiently long enough to allow Ofc. Poupart to distinguish between two separate items inside the book bag and identify one of the items as a firearm based upon his recognition of the handle and slide. There is no credible evidence from which to conclude that Ofc. Poupart did not feel the presence of the firearm. Finally, upon recognizing the presence of the firearm based upon the "plain feel" doctrine, there was probable cause to place Defendant Douglas under arrest and search the book bag incident to his arrest.

## CONCLUSION

**WHEREFORE** for the reasons stated above the United States respectfully submits that the defendant's motion to suppress tangible evidence should be denied.

Respectfully submitted,

MICHAEL R. SHERWIN
United States Attorney
N.Y.S. Bar No. 4444188

By:            /S/
STEVEN B. WASSERMAN
D.C. Bar No. 453251
Assistant United States Attorney
555 Fourth Street, N.W., Fourth Floor
Washington, D.C. 20530
Telephone: (202) 252-7719
E-mail: steve.wasserman@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served via ECF on counsel for Defendant, on this 3rd day of November 2020.

        /S/
Steven B. Wasserman
Assistant United States Attorney