**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | :    **Criminal No. 1:20-cr-121 (CJN)** |
| | : |
| **THEODORE DOUGLAS** | : |
| _____ | |

**SUPPLEMENT TO DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

On the afternoon of April 22, 2020, the Narcotics and Special Investigation Division deployed an undercover operation to the 2300 block of 15th Street, NE Washington D.C.  Tr. at 20.  The operation had approximately four undercover officers and ten to fifteen uniformed officers on the arrest team.  Tr. at 89.  Officer Isaiah Jackson was one of a few officers observing activities from what he described as an "observation post."  Officer Jackson was not using binoculars and was seated in the driver's seat of a sedan. Tr. at 23-24. Officer Jackson testified that at some point near 3 pm, he saw a person with one or two individuals standing in the walkway. Tr. at 29.  He saw another individual (later identified as Tavonte Williams) hand one of them a backpack. Tr. at 29-30.  The recipient of the backpack, whom he later identified as Theodore Douglas, took off his jacket, put the backpack on, and then put the jacket on his back over the backpack.  Tr. at 30.  It appeared to Officer Jackson that the man who put on the backpack "could have given him some sort of U.S. currency, some money."  Tr. at 30.  The two men then exchanged "some sort of handshake."  Tr. at 30.  Officer Jackson believed that the exchange involved U.S. currency because the object was "light in color" but "that's pretty much all [he] can remember."  Tr. at 31.  The interaction lasted "close to 20 to 30 seconds – no more than a minute."  Tr. at 37.  At the time of the interactions "maybe one" other man was still standing in that area at the time of the exchange but the officer didn't observe any interactions between that third person and either of the men later identified as Mr. Douglas and Mr. Williams.  Tr. at 37-38.  After the exchange, Mr. Douglas "stood there for some

time. Then shortly after, walked out of [Officer Jackson's] sight." Tr. at 39. Mr. Williams "walked out of [Officer Jackson's] sight as well." Tr. at 39. The men remained in sight for "maybe 30 to 45 seconds" but "no more than a minute." Tr. at 39. By the time Mr. Douglas had walked out of Officer Jackson's line of sight, Officer Poupart had begun his approach. Exh. A attached.[1]

Officer Jackson suspected that he had observed a transaction involving "either a large quantity of narcotics or possibly a firearm." Tr. at 39. His suspicions were based upon the concealment of the backpack underneath the jacket and the possibility that money was exchanged. Tr. at 39. Officer Jackson acknowledged that he did not know if there was contraband in the backpack. Tr. at 90. He observed that the transaction involved a light-colored object but testified that he really couldn't say what the object was, one way or another. Tr. at 90-91.

Officer Jackson said that he broadcasted a lookout over the radio and waited until he saw enough officers initiate contact with Mr. Douglas in so that he could be confident that Mr. Douglas would be stopped. Tr. at 111.

Upon seeing Officer Stout's body worn camera footage, Officer Jackson agreed that at least seven officers and at least one police car were present during the initial stop of Mr. Douglas. Tr. at 112-113. Two of those officers were Officer Poupart and Officer Taylor. Officer Poupart estimated about eight officers were involved. Tr. at 163.[2]

Officers Poupart and Taylor approached Mr. Douglas, grabbed his arm, guided him aside and immediately placed him in handcuffs. Officer Poupart testified that once he put his hand on Mr. Douglas, that Mr. Douglas was not free to leave. Tr. at 162. The officer agreed that Mr. Douglas never tried to flee, was compliant with his directions and didn't resist at all. Tr. at 156. He said that he did not know

---

[1] Using the time where Officer Poupart finds the firearm and declares 1-800 (9:33 on the radio recording and 19:05:13 on Officer Poupart's body worn camera footage), counsel transposed the audio of the radio recording to Officer Poupart's camera to aid the Court in seeing what information was being shared during the initial moments of the stop.

[2] Body-worn camera footage shows that at least 18 uniformed officers were involved in the arrest of Messrs. Douglas and Williams.

Mr. Douglas to be armed and dangerous. Tr. at 158. He also agreed that as he approached, he could see both of Mr. Douglas' hands and he did not see any movements towards any other part of his body. Tr. at 159. Officer Poupart also acknowledged that the potential contraband that he was investigating was inside a zipped backpack and underneath a zipped jacket and would be "pretty hard" to access. Tr. at 159-160. Still, Officer Poupart testified that he was, and always is, concerned with officer safety. Tr. at 140. Here, he and Officer Taylor were the only officers on the scene when they arrived and three individuals were there. Tr. at 140. He later stated that other than the presence of the additional two men, there was nothing that he could articulate about the men or the encounter that made him concerned about his safety. He testified that he had no reason to actually suspect they were armed, other than the fact that he was not certain that they weren't. Tr. at 166-167. Because of that concern, he moved Mr. Douglas away from the men rather than ordering the men to move away. Tr. at 166.

This is what Officer Poupart observed as he approached the three men. Arrows show Mr. Douglas' hands.



Mr. Williams is paying no attention to the officer. Neither man shows any interest and hands are visible.



Despite Officer Poupart's claim that he handcuffed Mr. Douglas because he was fearful of the two other individuals, the officers immediately turned their backs on the two men as they lead Mr. Douglas away.



Officer Poupart knew that there were at least eight officers on the arrest team and that he expected, correctly, that they would be momentarily joining him and Officer Taylor in stopping of Mr. Douglas.  Tr. at 161.  Officer Poupart said that because this was a narcotics investigation, he was concerned that Mr.

Douglas or another individual was armed. Tr. at 142. He placed Mr. Douglas in handcuffs because he didn't "know at that moment what their capability is of harming us or someone else." Tr. at 142. However, Officer Poupart acknowledged that during drug operations, he handcuffed individuals "pretty much" "all of the time." Tr. at 157.

After handcuffing Mr. Douglas, Officer Poupart testified that he noticed a bulge under Mr. Douglas' jacket to feel and determine what was in the backpack. Tr. at 142. During the course of that action, Officer Poupart thought he recognized a firearm from the "shape, weight of the object, the length and the grip" of the firearm. Tr. at 143. He distinguished the object that he can feel from another object in the backpack – which he could not identify. Tr. at 145.

When viewing the "first time [he] touched Mr. Douglas' back," "[i]t looks like I am feeling part of the sunglass case and my thumb either is or is about to be pressed up against the grip of the firearm." Tr. at 168. Unable to immediately identify the contents of the bag, the officer is "trying to articulate what's there" or "trying to figure out what it is." Tr. at 168. "On that second," "I can't say exactly what my finger was on." Tr. at 168.

During his testimony, Officer Poupart broke down what he felt from second-to-second while feeling the outside of the backpack. While reviewing his bodyworn camera footage, he testified that he first believed he was feeling a gun at 19:03:05. Tr. at 170. Specifically, he said, "I am suspecting that it's a gun and I am furthering that I am continuing to frisk his bag." Tr. at 171.

This picture captures 19:03:01 of his footage.



This picture captures 19:03:03.



This picture captures 19:03:05.



After several seconds of manipulating the contents of the backpack, Officer Poupart requested, but did not receive, consent from Mr. Douglas. Tr. at 150. Officer Poupart testified that he asked for consent because he likes "to give people the opportunity to be honest." Tr. at 151. He then asked over the radio if he was "good for a search." According to Officer Poupart, the question about being "good for a search" was a covert way to ask the other officers if the other suspect had been stopped. Tr. at 152. However Officer Poupart agreed that he never asked any of the other officers if the other individual had been stopped. Tr. at 183. Officer Briana Taylor testified that when Officer Poupart asked if he was "good for

a search" the purpose was "To do a search." Tr. at 197. She also testified that Mr. Douglas was compliant throughout the encounter and that none of the other individuals in the area did anything threatening towards the officers. Tr. at 198.

**Argument**

"The Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Minnesota v. Dickerson*, 508 U.S. 366, 379 (1993) (Scalia, J. concurring). These words especially apply where a police officer, apparently unaware of the constitutional limitations of his practices, acknowledges that he regularly handcuffs individuals as a matter of course. From his description, Officer Poupart presumably routinely handcuffs individuals without probable cause, or any particularized suspicion of weapons or flight or any enhanced concern about officer safety. Thus, notwithstanding that Officer Poupart ultimately discovered a firearm in this case, his actions in handcuffing Mr. Douglas without any risk of flight or particularized danger violates Mr. Douglas' constitutional rights. And suppressing this evidence is necessary so that Officer Poupart ceases his practice of handcuffing individuals that he investigates – both for Mr. Douglas' benefit but also to protect the rights of all of those that Officer Poupart handcuffs without reason.

I. Officer Poupart handcuffs people he is investigating "pretty much "all of the time" and by doing so regularly converts investigatory stops into arrests requiring probable cause.

Officer Poupart agreed that his normal practice, at least in drug operations, is to handcuff everyone that he is investigates. *See Devaugh v. United States*, 422 F.Supp.3d 104, 115 (D.D.C. 2019) ("Officers can use handcuffs without converting a stop into an arrest only when specific circumstances make it reasonable to do so…."). Even granting Officer Poupart the hunch that Mr. Douglas was involved in a drug transaction, the assumption that all individuals involved in possible drug transactions have weapons is a "factually unanchored justification for placing [in individual] in handcuffs [that] is generalizable to virtually *every* investigatory stop initiated upon an articulable suspicion of drug trafficking." *United States v. Acosta-Colon*, 157 F.3d 9, 19 (1st. Cir. 1998).

Officer Poupart approached Mr. Douglas with two other individuals.  There was no reason to suspect that Mr. Douglas could be an immediate threat.  *Devaugh,* 422 F.Supp.3d at 116 (declining to give the general "'gun-drug' nexus much weight" where there is no evidence that the police had reason to believe these particular suspects had weapons).  There was no concern he was on a violent drug like PCP. *United States v. Smith*, 373 F.Supp.3d 223, 241 (D.D.C. 2019).  He made no motions to his waistband and had no suspicious bulges on his body.  He did not shift his body away from the police.  His arms were casually swinging as he stood conversing.  He did not flee or give any indication that he was attempting to flee.  And at the time Officer Poupart was approaching, he did not know what crime Mr. Douglas may have committed – other than to know that it was a possessory offense.  Finally, whatever hypothetical risk that existed, that risk was inert because access to that risk would require unzipping a jacket, taking off a backpack, opening that backpack and removing the threatening object.  Under the test set forth in *Graham v. Connor*, Officer Poupart's actions were unreasonable and required probable cause 490 U.S. 386, 396 (1989).  Because probable cause didn't exist, the contents of the backpack should be suppressed.

In *United States v. Dykes*, the D.C. Circuit repeated the reasonableness test employed by *Graham:*

> In deciding what degree of force is permissible, courts must look to 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
>
> 406 F.3d 717, 720 (D.C. Cir. 2005) (quoting *Graham*, 490 U.S. at 396) (employing test to determine whether handcuffing went beyond the permissible scope of a *Terry* stop).

Applying this test, this Court has little choice but to suppress.  Officer Poupart did not know the severity of the crime Mr. Douglas was suspected of at the time he handcuffed him, other than that it was likely a possessory offense for drugs or firearms and that the contraband was stowed inside his jacket on his back.  Mr. Douglas gave no indication that he was armed and was entirely compliant during the entire stop.  And Officer Poupart saw and knew that at least eight but as many as eighteen police officers were converging on Mr. Douglas seconds after the initial stop.  Tr. at 163.

The government attempts to convince the Court to expand the *Graham* test to include other bystander individuals that may pose a threat.  The government points to no authority for this shift but

under these facts, such a proposal would offer no help.  A *Terry* stop "must employ the least intrusive means reasonably available to verify or dispel the officer's suspicion."  *Florida v. Royer¸*460 U.S. 491, 500 (1983) (plurality opinion).  Here, Officer Poupart's suspicions could have been addressed by less intrusive means by walking Mr. Douglas farther away or ordering the other individuals to back away.  Moreover, the officer had no reason to believe that these particular individuals were actually dangerous.  As he testified, his claim that he was concerned about the other individuals was based on conjecture, not fact: "The possibility that they could be armed, what their intentions are or are not.  The possibility of flight and things like that." Tr. at 166.  Officer Poupart was then asked "And you had no reason to suspect that they were – actually suspect they were armed other than the fact that you did not know that they weren't." Tr. at 178.  He agreed that he did not. Tr. at 178.

In other words, Officer Poupart's actions on April 21, 2020 were not even based upon hunches.  They were based upon a principle that does not exist in Fourth Amendment jurisprudence – that with reasonable articulable suspicion, an officer can commit any intrusion necessary to conclusively determine that s/he is safe.  Officer Poupart acknowledged in his testimony that he handcuffed Mr. Douglas because: 1) he couldn't be certain that he would flee (despite expressing no desire to do so); 2) he couldn't be certain that he could reach a weapon (despite no movements or words indicating that he would try); and 3) he couldn't be certain the other men wouldn't flee or be dangerous (despite no evidence suggesting that they would do either).[3]

In addition, Officer Poupart's "external frisk" was in fact an impermissible search that went well beyond a permissible frisk. Officer Poupart's description of the search demonstrated that it was not "immediately apparent" that he was feeling a gun.  *Minnesota v. Dickerson¸*508 U.S. 366, 375 (1993) (quoting *Horton v. California*, 496 U.S. 128, 136-137 (1990).  While viewing his body worn camera

---

[3] While it is not necessary to find Officer Poupart incredible to grant the defense Motion, it should be noted that despite Officer Poupart's claimed concern about the other men, he never asked them if they were armed, did not request that they show their hands or waistbands and turned his back on those men when he was leading and then handcuffing Mr. Douglas.

footage, he was asked if he could feel the gun when he is manipulating the backpack at 19:03:01. He responded, "At this point, no." Tr. at 170. He did not believe he felt he was feeling a gun until 19:03:05. Tr. at 170. At 19:03:10, he is "suspecting that it's a gun and [he is] furthering that as [he is] continuing to frisk his bag," Tr. at 171. Officer Poupart is then squeezing to figure out if something else is in there. Tr. at 172.

Taken as a whole and even crediting his entire testimony, it is at least clear that the existence of the firearm was not "immediately apparent."[4] The plain feel doctrine does not apply as Officer Poupart's successful manipulation of the backpack is not analogous to exception created by the plain view doctrine.

**Conclusion**

Theodore Douglas respectfully requests that for all of the reasons argued in this Supplement, in his Reply to the Government's Opposition, in his initial Motion, and for any other reasons that appear to the Court, that this Honorable Court grant his Motion to Suppress.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

---

[4] Officer Poupart's testimony that he recognized he was touching a firearm should not be credited. According to the government's theory, he identified a firearm after the initial frisk. None of his actions support that recognition. Officer Poupart did not communicate the existence of a firearm to the numerous officers with whom he was communicating, including the partner standing next to him. He did not use the predetermined codeword for firearm. He then asked for consent for a search of the backpack. And when Mr. Douglas refused, he asked over the radio if he was "good for a search."