**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 1:20-cr-00121 (CJN) |
| TAVONTE WILLIAMS, et al., | |
| *Defendants*. | |

## <u>MEMORANDUM OPINION</u>

Defendants Tavonte Williams and Theodore Douglas are each charged with one count of unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Currently before the Court are a series of pretrial motions from both Defendants and the government.  The government moves to admit other crimes evidence under Federal Rule of Evidence 404(b) and to impeach Defendants' testimony with their prior convictions under Federal Rule of Evidence 609.  *See generally* Government's Motion to Admit Other Crimes Evidence and To Impeach the Defendants' with their Prior Convictions ("Gov.'s Mot. to Admit Evid."), ECF 28.  Williams moves the court to sever his trial from Douglas's and to suppress an undercover officer's identification of him.  *See generally* Williams's Motion to Sever Defendants' Trials ("Williams's Mot. to Sever"), ECF 29; *see also generally* Williams's Motion to Suppress Identification ("William's Mot. to Supp. Id."), ECF 30.  Douglas moves to suppress tangible evidence and statements obtained from his arrest and to suppress an undercover officer's identification of him.  *See generally* Douglas's Motion to Suppress Tangible Evidence ("Douglas's Mot. to Supp. Evid."), ECF 31; *see also generally* Douglas's Motion to Suppress

Identification Testimony ("Douglas's Mot. to Supp. Id."), ECF 33.  The Court grants the government's motion in part and denies it in part, and denies Defendants' motions.

## I.    Background

On the afternoon of April 22, 2020, the Narcotics and Special Investigations Division ("NSID") of the Metropolitan Police Department ("MPD") conducted an undercover operation in the 2300 block of 15th Street, Northeast, Washington, D.C.  *See* Motions Hearing Transcript ("Tr.") at 20.  During this operation, an undercover officer, while sitting in an unmarked vehicle, observed an individual (later identified as Defendant Douglas) standing in a walkway between two buildings.  Tr. at 30.  Officer Jackson testified that he was about fifteen yards from the individual with a clear line of sight.  Tr. at 30.  Shortly thereafter, another individual (later identified as Defendant Williams) approached Douglas.  Tr. at 30.  According to Officer Jackson, Williams handed Douglas a black backpack in exchange for what appeared to be money, although Officer Jackson stated that he could not be sure that it was not some other light-colored object.  Tr. at 29–30.  Officer Jackson observed that Douglas quickly concealed the backpack, placing it on his back and putting his jacket on over it.  Tr. at 30.  Officer Jackson suspected that he had observed a transaction involving "either a large quantity of narcotics or possibly a firearm."  Tr. at 39.  He put a "lookout" over the police radio, describing what he had witnessed and asking for uniformed NSID officers in the area to respond.  Govt. Ex. 3.

Responding to Officer Jackson's lookout, two uniformed officers approached Douglas in the same general location where Officer Jackson observed the backpack exchange.  Tr. at 139–40.  Officer Poupart greeted Douglas and the two other men with whom he was talking, advised Douglas that he was being stopped as part of an investigation, and guided Douglas away from the other two individuals by touching his arm.  *See BWC of Ofc. Poupart*, ECF 34-1, at 2:11–2:36.  Officer Poupart then placed Douglas in handcuffs and frisked him to determine if he had

2

any weapons on his person.  *Id.*  Officer Poupart felt what he says he immediately knew to be a firearm in the backpack underneath Douglas's jacket.  Tr. at 169–71.  Officer Poupart then removed Douglas's jacket and searched the backpack, recovering a Sig Sauer, model P320, .40 caliber semiautomatic handgun with an obliterated serial number, loaded with a single round in the chamber and twelve rounds in a thirteen-round capacity magazine.  Shortly after Douglas was stopped, officers stopped Williams and, after receiving word that Douglas's bag contained a firearm, arrested him.  *See BWC of Ofc. Gabster*, ECF 35-3.

After being alerted that the suspects had been arrested, Officer Jackson drove to the parking lot where Williams and Douglas were detained.  *Id.* at 52–53.  From approximately twenty yards away, while remaining in his vehicle, Officer Jackson confirmed that Douglas and Williams were the individuals who had been engaged in the backpack exchange.  Gov.'s Ex. 3 at 10:28.

In July 2020, a grand jury returned an indictment that charged both Defendants with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g). The Parties filed various motions to admit or suppress evidence, and the Court held an evidentiary hearing on these Motions.

## II.      Government's Motion to Admit Other Crimes Evidence and Impeach Defendants with Prior Convictions

### A.      Rule 404(b) Evidence

In its Motion to Admit Other Crimes Evidence and Impeach Defendants with Prior Convictions, ECF 28, the government first asks the Court to admit certain Rule 404(b) evidence against both Douglas and Williams.  *See generally* Gov.'s Mot. to Admit Evid., ECF 28. Specifically, with regard to Douglas, the government seeks to introduce two prior gun possession

convictions; images and videos taken from Douglas's cellphone of him holding and shooting firearms; and two text message conversations, again taken from Douglas's cellphone, in which Douglas inquires about the price of certain firearms.  *See id.*  The government argues that this evidence is probative of the fact that Douglas knowingly and intentionally possessed the firearm recovered from the backpack he was wearing on the day of his arrest, and that his possession of the firearm was not the result of inadvertence, mistake, or accident.  *See id.* at 22.  The government also seeks to introduce a screenshot sent from Williams to Douglas, and recovered from Douglas's phone, of a masked man holding a gun while on a video call with Williams.  *See id.* at 19.  The government argues the screenshot demonstrates that Williams and Douglas had previously discussed and shared images of firearms, which tends to make it more likely that they engaged together in a firearm exchange.  *See id.* at 28–29.

    "Convictions are supposed to rest on evidence relevant to the crime charged, not on evidence of other, unrelated bad acts suggesting nothing more than a tendency or propensity to engage in criminality."  *United States v. McGill*, 815 F.3d 846, 878 (D.C. Cir. 2016).  Thus, under Rule 404(b), evidence of "other crimes, wrongs, or acts" is not admissible to prove a defendant's character.  However, that evidence is admissible for any non-propensity purpose, including to establish motive, intent, plan, knowledge, or absence of mistake.  *See United States v. Bowie*, 232 F.3d 923, 926, 930 (D.C. Cir. 2000) (citing Fed. R. Evid. 404(b)).  The rule against introducing character evidence is not based on the idea that a defendant's character is irrelevant.  Rather, it is based "on a fear that juries will tend to give it excessive weight, and on a fundamental sense that no one should be convicted of a crime based on his or her previous misdeeds."  *United States v. Daniels*, 770 F.2d 1111, 1116 (D.C. Cir. 1985).

Despite Rule 404(b)'s "restrictive[]" framing, the D.C. Circuit has noted that it is actually "quite permissive." *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (*en banc*). It only prohibits the admission of other crimes evidence in "one circumstance"—when the evidence is being introduced to demonstrate that the defendant's acts conformed with his character. *Id.*; *see also United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) ("[A]ny purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character.").

A two-prong test determines whether evidence of prior crimes is admissible under Rule 404(b). First, the evidence must be "probative of a material issue other than character." *United States v. Miller*, 895 F.2d 1431, 1435 (D.C. Cir 1990). Second, the evidence is subject to the Rule 403 balancing test, in which the evidence's probative value must not be "substantially outweigh[ed]" by its prejudicial effect. *Id.* The government is allowed to admit 404(b) evidence in the government's case-in-chief in anticipation that a defendant will deny intent or knowledge. *See United States v. Inserra*, 34 F.3d 83, 90 (2d Cir. 1994) (noting that Rule 404(b) other crime evidence "is admissible during the government's case-in-chief if it is apparent that the defendant will dispute the issue").

### 1.    Evidence Pertaining to Douglas

Before turning to the specific evidence that the government seeks to introduce against Douglas, the Court addresses Douglas's threshold argument that all of the government's 404(b) evidence against him should be excluded. *See* Douglas's Opp'n to Gov.'s Mot. to Admit Evid., ECF 39, at 4. Douglas insists that the evidence is "irrelevant" because he is willing to stipulate to the fact that he was previously convicted of a crime punishable by imprisonment for a term exceeding one year. *See id.* Douglas relies on *Old Chief v. United States*, 519 U.S. 172 (1997), in which the Supreme Court held that a district court abused its discretion when it rejected a

5

defendant's offer to stipulate to the element of a prior felony conviction and instead admitted the full record of the prior judgment, despite the fact that the full record raised the "risk of a verdict tainted by improper considerations." *Id.* at 174.

Douglas's reliance on *Old Chief* is inapposite and his argument lacks merit.  In *Old Chief*, the government sought to introduce the facts of a prior conviction "solely to prove the element of prior conviction." *Id.* at 174.  Here, in contrast the government seeks to introduce 404(b) evidence not to demonstrate the existence of a prior conviction, but to demonstrate that Douglas knowingly possessed the firearm, another necessary element in a felon-in-possession case involving constructive possession of a firearm, *see United States v. Cassell*, 292 F.3d 788, 792–94 (2002)—and an element to which Douglas has *not* offered to stipulate.  The D.C. Circuit has held that prior convictions and evidence of other wrongs are admissible as probative of this knowledge element, even if they would not be admissible simply to prove the element of a prior conviction.  *See United States v. McCarson*, 527 F.3d 170, 173 (2008).  The 404(b) evidence that the government seeks to introduce is probative of the fact that Douglas knowingly and intentionally possessed the gun.

Turning to the specific evidence that the government seeks to introduce against Douglas, the government first asks the Court to admit evidence related to two prior convictions.  *See* Gov.'s Mot. to Admit Evid., ECF 28, at 5.  In one, Douglas pleaded guilty and admitted to possessing a loaded .22 caliber revolver in April 2013; the gun was recovered from his jacket as he fled police near the same location he was arrested in the instant case.  *See United States v. Douglas*, No. 2013-CF2-006028, Dkt. May 23, 2013 (D.C. Super. Ct. 2013).  In the other, Douglas pleaded guilty on April 7, 2010, and admitted to possessing a .357 caliber firearm recovered from his person on February 17, 2009.  *See Maryland v. Douglas*, No. CT090351X,

Dkt. April 7, 2010 (Md. Prince George's Cir. Ct. 2009).  The government states that it will present evidence of these two prior convictions through the judgment and conviction orders in each case and the transcripts of Douglas's plea hearings.  *See id.* at 6.

The D.C. Circuit has consistently allowed the admission of other crimes evidence relating to possession of drugs and firearms under Rule 404(b) to demonstrate knowing possession and absence of mistake.  *See, e.g.*, *McCarson*, 527 F.3d at 174 (holding two prior possession with intent to distribute convictions and two firearm convictions "were not only relevant; they were also highly probative of . . . his constructive possession of the gun and the drugs"); *United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) (holding that evidence of a prior conviction for distribution of cocaine from a defendant's car "made it substantially more likely that [the defendant] knew that there was (and intended that there be) crack in the console [of his car]"); *see also United States v. Moore*, 75 F. Supp. 3d 444, 451–52 (D.D.C. 2014) (finding prior unlawful possession of a firearm evidence admissible under Rule 404(b) to show intent or lack of mistake).  A prior gun possession conviction is certainly relevant to demonstrate that Douglas was familiar with guns, and that his possession of a gun at the time of his arrest was not an inadvertent mistake.

But Douglas's 2010 conviction lacks the requisite probative value because the ten-year-old conviction is stale under *United States v. Sheffield*, 832 F.3d 296 (D.C. Cir. 2016).  Admitting this conviction would therefore unfairly prejudice Douglas.  With respect to his 2013 conviction, however, Douglas has failed to show "compelling or unique" evidence of prejudice that would warrant exclusion.  *See United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995).  And any potential residual risk of prejudice to Douglas can be minimized through the issuance of a limiting instruction to the jury.  *See United States v. Douglas*, 482 F.3d 591, 601 (D.C. Cir.

2007) (emphasizing the significance of the district court's instructions to the jury on the permissible and impermissible uses of evidence).  Douglas's most recent gun possession conviction is therefore admissible, while the conviction stemming from his 2009 arrest is inadmissible.

The government also seeks to introduce images, videos, and text messages recovered from Douglas's phone and Apple iCloud account.  *See* Gov.'s Mot. to Admit Evid., ECF 28, at 4–5.  The first is a picture, dated November 19, 2019, of Douglas holding a firearm.  *See id.* at 7.  The second is a video that Douglas sent in a text message on May 8, 2019, with the caption "My New toy like dat," and which depicts Douglas shooting a firearm.  *Id.* at 8.  The third is an image that Douglas received in a text message on August 4, 2019, which depicts Douglas with a firearm in one hand and holding up his middle finger to the camera with the other.  *Id.*  Douglas responded to that message by writing, "Man this like 06," *id.* at 10, which both parties construe to mean that the picture was taken in 2006.  *Id.* at 28.

The government argues that these images demonstrate Douglas's familiarity with guns, thereby making it more likely that Douglas knowingly possessed the firearm found in the backpack.  Gov.'s Mot. to Admit Evid., ECF 28, at 24.  To be sure, the video of Douglas shooting a gun and the picture of him holding a gun from 2019 are probative of knowledge and absence of mistake.  *See McCarson*, 527 F.3d at 174.  Both tend to make it more likely that Douglas knew of the firearm in his backpack.  And because Douglas has not demonstrated that the probative value of the image is "substantially outweigh[ed]" by the prejudicial effect, these images are admissible.  *Miller*, 895 F.2d at 1435.

In contrast, the image from 2006 lacks the same probative value.  Much like his 2010 conviction, this image is stale under *Sheffield*.  A picture from 14 years ago does little to

demonstrate that Douglas is *currently* familiar with firearms and thus does little to show knowledge or the absence of mistake, especially when the more recent videos and images demonstrate the same thing.  *See Sheffield*, 832 F.3d at 308.

Finally, the February 2020 text message conversations are admissible.  *See* Gov.'s Mot. to Admit Evid., ECF 28, at 12–18.  In each conversation, a contact sent Douglas a photograph or photographs of firearms for sale.  *Id.* at 15–16.  Douglas responded by either inquiring about the cost or offering a price for the weapon.  *Id.* at 13, 15.  The Court agrees with the government that these messages are probative of knowledge or absence of mistake because they establish that within two months of his arrest, Douglas was seeking to purchase a firearm—the very act that Officer Jackson believes he witnessed.  *See id.* at 25.  And because Douglas has not shown that he will suffer unfair prejudice from their admission, the Court finds that the text message exchanges are admissible under Rule 404(b).

### 2.      Evidence Pertaining to Douglas and Williams

The final piece of 404(b) evidence that the government seeks to introduce pertains to both Williams and Douglas.  *See* Gov.'s Mot. to Admit Evid., ECF 28, at 28.  On February 26, 2020, at Douglas's request, Williams sent a screenshot of himself on a video call (such as Facetime).  *See id*.  Williams's face appears in a small box on the left-hand corner of the image, and he appears to be speaking to a masked individual holding a handgun with several accessories.  *See id.*  The government argues that this exchange demonstrates a relationship between Williams and Douglas that includes communicating about firearms and therefore makes it more likely that they would be involved in an intentional exchange of a firearm.  *See id.* at 6.

For their part, Defendants argue that the texted screenshot is insufficiently similar to the charged offense.  *See* Williams's Opp'n to Gov's Mot. to Admit Evid., ECF 38, at 6.  A primary requirement when seeking to establish knowledge or intent with prior bad acts is that the

evidence must meet a threshold level of similarity to be admissible.  *See United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003); *see also Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 494 (7th Cir. 1998) ("The other act must be similar enough and close enough in time to be relevant to the matter at issue.").  "Otherwise, the evidence would lack probative value of intent, and instead would be more in nature of propensity."  *Mazloum v. D.C. Metro. Police Dep't*, 517 F. Supp. 2d 74, 81 (D.D.C. 2007) (finding that defendant's violent verbal threats against his wife two days prior to the alleged assault and battery on another person were not admissible because they were offered as propensity evidence, and verbal threats are "fundamentally different" than actual physical force).  Defendants argue that the image is too dissimilar from the alleged criminal activity because it is not the same gun (or type of gun) and neither Williams nor Douglas is even depicted holding the gun.  *See* Williams's Opp'n to Gov's Mot. to Admit Evid., ECF 38, at 6.

The Court concludes that this texted screenshot survives the similarity requirement of Rule 404(b).  The message is close enough in time to the alleged crime to be relevant; after all, it was sent just two months before the alleged exchange.  *See* Gov.'s Mot. to Admit Evid., ECF 28, at 28.  And, most significantly, the texted screenshot demonstrates that the same people, Williams and Douglas, have had prior conversations about firearms—the subject of the alleged exchange.  The probative value of the image is also not "substantially outweigh[ed]" by the prejudicial effect.  *Miller*, 895 F.2d at 1435.  Although Defendants argue that a photo depicting a masked figure with a menacing gun is "highly inflammatory," the image is important to the government's case.  Williams's Opp'n to Gov's Mot. to Admit Evid., ECF 38, at 6.  It establishes that Defendants had previously discussed firearms and makes it more likely that both Defendants intentionally possessed the firearm that was allegedly exchanged.  The best way of

10

ensuring that any risk of prejudicial effect is minimized is not by exclusion, but by issuing a limiting instruction to the jury.  *See Douglas*, 482 F.3d at 601.

### B.    Rule 609 Evidence

Rule 609 of the Federal Rules of Evidence permits the admission of a defendant's prior convictions for purposes of impeachment, as long as the "crime . . . was punishable by death or by imprisonment for more than one year" and "the probative value of the evidence outweighs its prejudicial effect."  Fed. R. Evid. 609(a)(1)).  The Rule sets a higher bar for felonies where "more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later."  Fed. R. Evid. 609(b).  In those instances, admission is appropriate only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect."  Fed. R. Evid. 609(b)(1).

With respect to Williams, the government seeks to impeach his testimony with two prior convictions, both from 2017—one for distribution of a controlled substance and another for unlawful possession of liquid PCP.  *See* Gov.'s Mot. Admit Evid., ECF 28, at 31.  Williams does not oppose the government's use of these prior convictions.  Both convictions fall within the ten-year period of William's arrest, and the probative value of the convictions outweighs any prejudicial effect from their admission.  The government may therefore use these two convictions for the purpose of impeaching Williams's testimony.

With respect to Douglas, the government seeks to impeach his testimony with the same convictions that it seeks to introduce under Rule 404(b).  *See* Gov.'s Mot. to Admit Evid., ECF 28, at 31.  The Court has already decided that the jury may hear about the 2013 conviction under Rule 404(b), but not the 2010 conviction, and thus need not reconsider that analysis in connection with Rule 609.  *See United States v. Moore*, 75 F. Supp. 3d 444, 456 (D.D.C. 2014) (collecting cases in which courts declined to find prejudice based on the Government's

additional use of a prior conviction for Rule 609 purposes when the court had already permitted the prior conviction for use in the Government's case-in-chief under Rule 404(b)).  The government may therefore use Douglas's 2013 conviction, but not his 2010 conviction, to impeach his testimony under Rule 609.

### III.   William's Motion to Sever

Williams moves the Court to sever his trial from Douglas's.  *See generally* Williams's Mot. to Sever, ECF 29.  Williams first argues that the trials should be severed because Douglas has agreed to provide exculpatory testimony for Williams if the trials are conducted separately and Williams's trial happens second.  *See* Williams's Mot. to Sever, ECF 29, at 1.  Williams also contends that because the evidence against Douglas is so "damning and vivid," a jury would be unable to appropriately compartmentalize the evidence introduced against Douglas, and its introduction would unfairly prejudice Williams.  *See id.*

Federal Rule of Criminal Procedure 8(b) permits joinder of both offenses and defendants. *United States v. Perry*, 731 F.2d 985, 989 (D.C. Cir. 1984).  The Rule directs that "[t]wo or more defendants may be charged in the same indictment . . . if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  The D.C. Circuit construes Rule 8(b) broadly in favor of joinder.  *United States v. Nicely*, 922 F.2d 850, 853 (D.C. Cir. 1991).  And it has cautioned that it is "difficult to prevail on a claim that there has been misjoinder under Rule 8(b)."  *Id.*

But even if joinder of defendants and offenses is proper under Rule 8(b), Federal Rule of Criminal Procedure 14(a) allows a court to sever defendants or counts, if the joinder "appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a).  The decision to sever is within the discretion of the trial court, though the balance is "struck in favor of joint trials." *United States v. Bruner*, 657 F.2d 1278, 1289–90 (D.C. 1981) (quoting *United States v. Hines*,

455 F.2d 1317, 1334 (D.C. Cir. 1972)).  This presumption is especially strong where "the respective charges require presentation of much the same evidence, testimony of the same witnesses, and involve two defendants who are charged, *inter alia*, with participating in the same illegal acts." *United States v. Sutton*, 801 F.2d 1346, 1363 (D.C. Cir. 1986).

As a result, Rule 14 severance should be granted only "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 540 (1993).  Serious risks identified by the Supreme Court include circumstances where essential exculpatory evidence available to a defendant tried alone is unavailable in a joint trial, where defendants with drastically different degrees of culpability are tried together in a complex case, and where highly prejudicial evidence that is probative of a defendant's guilt is only technically admissible against a codefendant.  *Id.*

As to Williams's first argument, in deciding whether to sever on the basis of an expected co-defendant's testimony, courts in this circuit first determine whether the moving co-defendant has established a *prima facie* case for severance, which requires showing:  "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) the likelihood that the co-defendant will testify if the cases are severed." *United States v. Kayode*, 254 F.3d 204, 210 (D.C. Cir. 2001) (quoting *United States v. Ford*, 820 F.2d 729, 731 (D.C. Cir. 1989)).  "A failure to demonstrate any one of these elements is dispositive." *United States v. Washington*, 12 F.3d 1128, 1133 (D.C. Cir. 1994).  And once a movant has made this showing, courts must then "(1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider the effects on judicial administration and economy; and

(4) give weight to the timeliness of the motion." *Kayode*, 254 F.3d at 210–11 (quoting *Ford*, 870 F.2d at 731). When conducting this balancing analysis, courts also consider "the extent to which proffered exculpatory testimony could be impeached." *Ford*, 870 F.2d at 732–33.

Williams has failed to demonstrate the fourth prong of the *prima facie* inquiry. To meet his burden Williams must demonstrate by "a reasonable probability" that the proffered exculpatory evidence from Douglas will be forthcoming. *Id.* Williams claims that he has met this burden because Douglas assured Williams's counsel that Douglas "will unequivocally testify if Mr. Williams is tried separately, and after Mr. Douglas' case is completed." Williams's Mot. to Sever, ECF 29, at 8.

But courts, including the D.C. Circuit, have consistently held that a movant fails to meet this burden if the offer is conditioned on a specific order in which the defendants will be tried. *See, e.g.*, *Ford*, 870 F.2d at 731; *United States v. Blanco*, 844 F.2d 344, 353 (6th Cir. 1988). In *Ford*, the movant's co-defendant stated through counsel that he would testify in favor of the movant, but, as here, the offer was conditioned on the co-defendant being tried first. The D.C. Circuit found severance inappropriate, reasoning that Rule 14 should not be read "as a mechanism for alleged co-conspirators to control the order in which they are tried." *Ford*, 870 F.2d at 731 (quoting *Blanco*, 844 F.2d at 353).

Douglas's offer to testify is similarly conditioned on Douglas's trial occurring first. Williams admits that "while Mr. Douglas will not testify at a joint trial (or it seems any other trial prior to resolution of his case), Mr. Douglas has agreed to testify at a separate trial for Mr. Williams." Williams's Mot. to Sever, ECF 29, at 4. The conditional nature of this promise fails to establish a reasonable probability that Douglas will actually testify. *Ford*, 870 F.2d at 732.

Even if Douglas had made an unconditional promise to testify, Williams cannot meet his burden to establish the third prong of the *prima facie* inquiry—that the testimony would be exculpatory.  This third requirement "demands more than conclusory statements by counsel; rather the showing must be sufficiently definite in nature to allow the court reasonably to conclude that the testimony would in fact be 'substantially exculpatory.'"  *Ford*, 870 F.2d at 732 (quoting *United States v. DeLuna*, 763 F.2d 897, 920 (8th Cir. 1985)).  Williams asserts that Douglas will testify that, despite knowing Williams and talking with him on occasion, the two had not talked or texted on the day of their arrest, nor had Douglas planned to see Williams on that day.  *See* Williams's Motion to Sever, ECF 29, at 7.  Instead, they came across one another by happenstance, and Williams walked up to Douglas and asked to borrow his phone.  *See id.* Douglas would therefore apparently testify that he simply allowed Williams to borrow his phone after unexpectedly bumping into him and that their interaction had nothing to do with the backpack or its contents.  *See id.*

On its face, this proposed testimony seems sufficiently exculpatory.  After all, Douglas will attest that Williams had nothing to do with the backpack.  But Williams ignores the extent to which Douglas could be impeached, which the D.C. Circuit has found to be an important consideration when evaluating this factor.  *See Ford*, 870 F.2d at 732.  The government has proffered Douglas's prior conviction, which will likely harm his credibility as a witness.  Most importantly, the government is prepared to show that Douglas's testimony would be directly contradicted by the call logs on Douglas's cellphone, which reveal that a short time before their arrest Douglas and Williams exchanged two FaceTime calls.  *See* Gov.'s Opp'n to Mot. to Sever, ECF 36, at 10.  The Court therefore concludes that Williams's testimony will not be sufficiently exculpatory to warrant severance.

15

Williams also argues that a joint trial in which "damning and vivid evidence against Mr.
Douglas" is presented will improperly prejudice a jury against Williams.  *See* Williams's Mot. to
Sever, ECF 29, at 1.  Williams notes that Douglas was caught, on police body camera, wearing a
backpack containing a gun and ammunition, and that Douglas made statements indicating that he
had some idea about the contents of the backpack.  *See id.*  Williams, in contrast, was not in
possession of the backpack, nor was he found with the cash that Officer Jackson believed he saw
Douglas give to Williams.  Additionally, Williams argues that the government's Rule 404(b)
evidence against Douglas is far stronger and more "vivid" than the Rule 404(b) evidence against
Williams.  *See id.* at 10.

But even with these disparities in evidence, Williams has failed to meet his "heavy
burden" under Rule 14.  *United States v. Berg*, 714 F.3d 490, 496 (7th Cir. 2013).  The D.C.
Circuit has consistently cautioned that severance is only appropriate when the moving party
shows that the evidence against his co-defendant is "far more damaging than the evidence
against [the movant]."  *United States v. Tarantino*, 846 F.2d 1384, 1398 (D.C. Cir. 1980).
"Absent a dramatic disparity of evidence, any prejudice caused by joinder is best dealt with by
instructions to the jury to be given individual consideration to the defendant."  *Bruner*, 657 F.2d
at 1290.  The critical question is "whether a jury could reasonably compartmentalize the
evidence introduced against each individual defendant." *United States v. Halliman*, 923 F.2d
873, 884 (D.C. Cir. 1991).  Here, the risk of jury confusion is minimal.  And Williams has not
presented any compelling reason why a jury instruction would be insufficient to ensure that the
jury compartmentalizes the evidence against Douglas from the evidence against Williams.

### IV.    Douglas's Motion to Suppress Tangible Evidence

Douglas seeks to suppress all tangible objects seized and statements made as a result of
his arrest on April 22, 2020.  *See generally* Douglas's Mot. to Supp. Evid., ECF No. 31.  Douglas

16

argues that those objects and statements were the fruits of a warrantless search for which no exception to the Fourth Amendment's warrant requirement applies. *See id.* at 2.

### A.      Whether Reasonable Suspicion Existed to Conduct an Investigatory Stop

The Parties first disagree whether Officer Poupart had reasonable, articulable suspicion that a crime had been committed when he stopped Douglas. *See* Douglas's Mot. to Supp. Evid., ECF 31, at 3. Under *Terry v. Ohio*, 392 U.S. 1 (1968), an "officer may, consistent with the Fourth Amendment conduct a brief, investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). In determining whether reasonable suspicion exists, courts ask whether a reasonable officer would ascertain that all facts "taken together [warrant] further investigation." *Terry*, 392 U.S. at 22. A reasonable officer can consider a wide range of factors when making that determination. *See id.*; *see also United States v. Laing*, 889 F.2d 281, 286 (D.C. Cir. 1989) (holding that the time, the "high crime" nature of the area, and the defendant's furtive movements were relevant to the reasonable suspicion inquiry). The reasonable suspicion test is an objective test, and the subjective motivations of a particular officer are irrelevant to the analysis. *Whren v. United States*, 517 U.S. 806, 814 (1996). Ultimately, "it is the government's burden to provide evidence sufficient to support reasonable suspicion justifying a stop." *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016).

Especially relevant here, an officer making an investigatory stop need not have "direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion." *United States v. Ramirez*, 473 F.3d 1026, 1033 (9th Cir. 2007). Instead, an officer "may act on 'a directive or request from another officer or agency.'" *United States v. Gorham*, 317 F. Supp. 3d 459, 470 (D.D.C. 2018) (quoting Wayne R. LaFave, 2 Search and Seizure: A Treatise on the Fourth Amendment, § 3.5(c) (Oct. 2017 update)). Therefore, even though Officer Poupart did

not observe the backpack exchange himself, if Officer Jackson "reasonably suggest[ed] that fellow officers investigate" the individuals engaged in the backpack exchange, Officer Poupart is said to have reasonable suspicion to conduct a stop through the collective knowledge rule. *United States v. Devaugh*, 422 F. Supp. 3d 104, 133 (D.D.C. 2019). The reasonable suspicion inquiry in this case therefore turns on whether the exchange that Officer Jackson observed and the surrounding circumstances gave rise to reasonable suspicion, justifying Officer Jackson's order to other officers to stop the participants in the backpack exchange.

The government has identified three facts that it argues, when considered in their totality, establish the "minimum level of objective justification" necessary to justify a *Terry* stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). First, the government submits that the area where Officer Jackson witnessed the exchange was a high crime area. *See Wardlow*, 528 U.S. at 124 (noting that "the fact that the stop occurred in a 'high crime area' among the relevant contextual consideration in a *Terry* analysis."). Officer Jackson testified that he had "quite frequently" worked in the Fifth Police District, where "violent crimes, shootings, [and] narcotics transactions" were the most frequent criminal offenses and occurred more frequently than some neighboring police districts. Tr. 18; 117–18. And, specifically with regard to the 2300 block of 15th Street, Officer Jackson stated that he had worked investigations in the area more than 200 times in the last five years and that that block is a high crime area, known for narcotics sales and violent crime. Tr. at 23. Officer Jackson did not merely testify that the area "suffers from general, undifferentiated 'crime,' but that it is home to the precise type of infraction[]" that Officer Jackson suspected Douglas was committing. *Edmonds*, 240 F.3d at 60.

Second, the government points to the hand-to-hand transaction that Officer Jackson witnessed. *See* Gov.'s Opp'n to Douglas's Mot. to Supp. Evid., ECF 34, at 7. Officer Jackson

testified that based on his experience as a police officer, he was familiar with how individuals engaged in hand-to-hand narcotics transactions, and that in his experience bulk transfers of narcotics or firearms frequently involve contraband concealed in a bag, such as a backpack.  Tr. at 17–18.  Of course, "simply receiving an object from another person . . . is a common occurrence for which there could be many innocent explanations."  *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000).  "But even so, the observation [of a hand-to-hand exchange] would certainly contribute to a reasonable officer's suspicion."  *Devaugh*, 422 F. Supp. 3d at 111.

Finally, the government relies upon Officer Jackson's observation of Douglas's attempt to conceal the backpack under his jacket.  *See* Gov.'s Opp'n to Douglas's Mot. to Supp. Evid., ECF 34, at 7.  Officer Jackson testified that the person who received the backpack (later identified as Douglas) acted "quickly" to "conceal whatever was in that book bag" and "tried to hide the book bag on his person by covering it up with his jacket."  Tr. at 30; 102–03.  In Officer Jackson's experience, individuals engaged in hand-to-hand narcotics transactions often attempt to be "discreet" or "secretive" and engage in acts of concealment.  Tr. 14–15.  "Furtive movements . . . have been consistently recognized as grounds for reasonable suspicion, justifying a stop and frisk."  *See United States v. Lovelace*, 357 F. Supp. 2d 39, 43 (D.D.C. 2004) (citing *Wardlow*, 528 U.S. at 124).

Based on these factors, Officer Jackson suspected that he had observed either the transfer of a large quantity of narcotics or a weapon.  Tr. at 38–39, 129.  The Court concludes that, looking at the facts and circumstances in their totality, Officer Jackson's suspicion that criminal activity was afoot was reasonable.  *See Wardlow*, 528 U.S. at 123 (holding that reasonable suspicion only requires a "minimal level of objective justification for the stop").

**B.      Whether the Investigatory Stop was Transformed into an Arrest**

Second, Douglas argues that, even if Officer Poupart had reasonable suspicion to conduct

an investigatory stop, his immediate use of handcuffs converted the stop into an arrest before the

police developed probable cause. *See* Douglas's Reply Mot. to Supp. Evid., ECF 42,  at 1.  The

government concedes that Officer Poupart did not have probable cause to arrest Douglas when

he placed him in handcuffs, and thus the question is whether Officer Poupart's immediate use of

handcuffs converted the stop into an arrest. *See Wong Sun v. United States*, 371 U.S. 471, 484

(1963).

"The point at which an investigative stop becomes an arrest is not marked with a bright

line." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017).  But two general

principles govern a *Terry* stop and ensure that it does not ripen into an arrest.  The stop must

"last no longer than is necessary to effectuate the purpose of a stop" and the officer "must

employ the least intrusive means reasonably available to verify or dispel the officer's suspicion."

*Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion).  If a stop is "unduly prolonged or

intrusive," it "transforms from an investigative stop into an arrest requiring probable cause."

*Hall*, 867 F.3d at 153.

Although handcuffs are "generally recognized as a hallmark of a formal arrest," *United

States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (collecting cases), their use does not

automatically convert a *Terry* stop into an arrest.  *United States v. Smith*, 373 F. Supp. 3d 223,

238 (D.D.C. 2019); *see also Laing*, 889 F.2d at 285 (holding that "amount of force used to carry

out the stop and search must be reasonable, but may include use of handcuffs").  However,

officers can only use handcuffs to effectuate a *Terry* stop "when specific circumstances make it

reasonable to do so."  *Devaugh*, 422 F. Supp. 3d at 114.  One such set of circumstances is when

an officer "reasonably fear[s] for [his] safety and the safety of others."  *Smith*, 373 F. Supp. 3d at

238; *see also United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (holding that, where it was "reasonable for officers to fear that [the suspect] had a weapon in his waistband," the use of handcuffs did not convert a *Terry* stop into an arrest).  After all, "a policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect."  *Id*.

Here, the government contends, and Officer Poupart testified, that he placed Douglas in handcuffs because he feared for his safety and the safety of others.  *See* Gov.'s Opp'n to Douglas's Mot. to Supp. Evid., ECF 34, at 8–10.  Officer Poupart identified in his testimony a number of reasons for his safety concerns, including that:  (1) two unidentified men were in close proximity to Douglas; (2) the second suspect involved in the backpack transaction remained unaccounted for; (3) the transaction he was responding to involved a bag, capable of concealing a weapon; and (4) the reported transaction sounded like a narcotics transaction and in Officer Poupart's experience drug traffickers are often armed.  Tr. at 140–42, 165, 185–86, 187.  These factors made it reasonable for Officer Poupart to fear for his safety and the safety of others.  An "officer need not be absolutely certain that an individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  *United States v. Gorham*, 317 F. Supp. 3d at 467 (quoting *Terry*, 392 U.S. at 27).

Douglas argues that two recent decisions from courts in this circuit—*United States v. Devaugh*, 422 F. Supp. 3d 104 (D.D.C. 2019), and *United States v. Smith*, 373 F. Supp. 3d 223 (D.D.C. 2019)—both of which found that the use of handcuffs was a factor transforming a *Terry* stop into an arrest, compel the conclusion that Douglas was arrested here.  *See* Douglas's Reply Mot. to Supp. Evid., ECF 42, at 4.  But these cases are distinguishable.

In *Devaugh*, an undercover officer observed a suspect engage in a hand-to-hand transaction, involving the exchange of money for a small object.  *Devaugh*, 422 F. Supp. 3d at 108.  After the suspect was alerted to police presence in the area, he quickly walked to a vehicle while appearing to adjust his waistband.  *Id.*  An arrest team arrived in unmarked police cruisers with activated emergency lights.  *Id.* at 108–09.  Officers approached the vehicle that the suspect was now sitting in and one officer drew his weapon, touching it to the window of the suspect's vehicle.  *Id.* at 109.  After the suspect, in compliance with police orders, exited the vehicle, he was immediately handcuffed.  *Id.*  A subsequent search of the vehicle resulted in the recovery of a firearm.  *Id.*

In a decision suppressing evidence of the recovered gun, Judge Contreras held that a number of factors increased the intrusiveness of the stop beyond what was reasonable.  In addition to the use of handcuffs, Judge Contreras noted that the overwhelming number of officers (six) responding to stop the suspect and the fact that one officer brandished his weapon transformed the *Terry* stop into an arrest.  *Id.* at 114–15.  Furthermore, one of the arresting officers testified that "he and the arrest team did not believe Mr. Devaugh was armed."  *Id.* at 115.

Here, in contrast, the responding officers did not draw their weapons, did not yell orders at Douglas, and did not surround Douglas in large numbers.  Officer Poupart and his partner were the only officers interacting with Douglas, and they maintained a calm and conversational demeanor throughout the interaction.  *See* Gov. Ex. 4 and 4B.  Officer Poupart also testified about a number of factors that led him to conclude that Douglas was armed.   Tr. at 140–42, 165, 185–86, 187.

In *Smith*, Judge Moss found that handcuffing a suspect standing by the open driver's side door of a parked car, where the officers could smell PCP but were unable to determine whether the suspect was under the influence, converted a *Terry* stop into an arrest.  *Smith*, 373 F. Supp. 3d at 239.  Judge Moss noted that it would have been reasonable for officers to handcuff a person whom they reasonably believed to be under the influence of PCP to ensure officer safety, but there was an insufficient basis for such a belief in that case.  *See id.*  Here, in contrast, Officer Poupart testified why he believed that Douglas was armed, together with the other reasons he was concerned for his safety and the safety of others.  Tr. at 140–42, 165, 185–86, 187.

### C.       Whether Officer Poupart Exceeded the Scope of a *Terry* Frisk

Finally, Douglas argues that even if Officer Poupart had reasonable suspicion to conduct a *Terry* stop, and even if his use of handcuffs did not transform the stop into an arrest, evidence of the firearm should be suppressed because the manner in which Officer Poupart felt the exterior of Douglas's jacket exceeded the scope of a lawful frisk under *Terry*.  *See* Douglas's Reply in Support of Mot. to Supp. Evid., ECF 42, at 1.

When an officer conducting a *Terry* stop reasonably believes the subject is armed and a threat to his safety or the safety of others, the officer is permitted to conduct a limited protective search "to determine whether the person [being stopped] is in fact carrying a weapon."  *Terry*, 392 U.S. at 24.  The purpose of a *Terry* frisk "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."  *Adams*, 407 U.S. at 146. "Under the 'plain feel doctrine,' a weapon discovered during a frisk may be seized if its 'contour or mass makes its identity immediately apparent.'"  *United States v. Spriggs*, 2010 WL 917709, *2 (D. Md. March 10, 2010) (quoting *Minnesota v. Dickerson*, 508 U.S 366, 3723–75 (1993)). In order to fall within the scope of the "plain feel" doctrine, a pat down cannot involve an impermissible manipulation or palpitation of the contours of an object to determine its exact

contents. *See Dickerson*, 508 U.S. at 375. But when a "protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993).

As discussed above, Officer Poupart reasonably believed that the subject was armed and posed a threat to his safety and the safety of others. Conducting a protective frisk for weapons was therefore reasonable under *Terry*. The only remaining question is whether Officer Poupart's frisk went beyond what was necessary to determine whether Douglas was armed. The footage from Officer Poupart's body worn camera and Officer Poupart's testimony demonstrates beyond serious question that the search was minimally invasive and did not exceed what is permissible in a protective frisk. *See* Gov. Ex. 4 and 4B; Tr. at 169–71. The camera footage shows that Officer Poupart lightly touched the back of Douglas's jacket just a few times, with the total sequence of events lasting only a few seconds, before Officer Poupart recognized the presence of a firearm. Tr. at 169–171. And Officer Poupart testified that the shape and weight of the object made it immediately apparent that he was touching a firearm. Tr. at 169–71. This brief and minimally invasive protective frisk did not exceed the bounds established in *Terry* and *Dickerson*.

## V.     Defendants' Motion to Suppress Identification

Williams and Douglas move the Court to suppress Officer Jackson's identification of them after they were stopped and any subsequent in-court identification. *See generally* Williams's Mot. to Supp. Id., ECF 30; *see also* Douglas's Mot. to Supp. Id., ECF 33.

Beginning with their due process argument, both Defendants argue that Officer Jackson's show-up identification—the identification procedure where a single suspect is presented for the witness to identify as the perpetrator—was unduly suggestive and unreliable. *See* Williams's Mot. to Supp. Id., ECF 30, at 5; *see also* Douglas's Mot. to Supp. Id., ECF 33, at 2. In

determining whether to suppress a witness's identification under the Due Process Clause, the Court performs a two-step analysis.  *See United States v. Rattler*, 475 F.3d 408, 411 (D.C. Cir. 2007).  First, the Court must determine "whether the identification procedure 'was impermissibly suggestive.'"  *Id.* (quoting *United States v. Washington*, 12 F.3d 1128, 1134 (D.C. Cir. 1994)).  If the Court finds that the procedure was impermissibly suggestive, the Court must next decide whether the identification was nonetheless "sufficiently reliable to preclude 'a very substantial likelihood of irreparable misidentification.'"  *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)).  This determination involves a balancing test in which courts weigh the degree of suggestiveness against the strength or weakness of factors indicating reliability.  *Manson*, 432 U.S. at 114.  The reliability factors include the "opportunity of the witness to view the criminal at the time of the crime, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."  *Neil v. Biggers*, 409 U.S. 188, 192 (1972).  Additionally, courts have noted that if a trained law enforcement officer, who is "expert" in observing criminals, is the individuals making the identification, that bolsters the reliability of the identification.  *United States v. Dring*, 930 F.2d 687, 693 (9th Cir. 1991); *Singleton v. United States*, 702 F.2d 1159, 1165–66 (D.C. Cir. 1983).

The government admits, as it must, that courts have held that show-up identifications, such as those used here, are inherently suggestive.  *See* Gov.'s Opp'n Mot. to Supp. Id., ECF 35, at 8.  *See, e.g.*, *Singleton*, 702 F.2d at 1165–67; *Russell v. United States*, 408 F.2d 1280, 1284 (D.C. Cir. 1968).  But despite their inherent suggestiveness, "immediate on-the-scene showup identifications . . . have long been upheld" as reliable by the D.C. Circuit.  *Singleton*, 702 F.2d a 1165–66.

Here the indicia of reliability all point in favor of admitting Officer Jackson's identification.  First, Officer Jackson had an opportunity to view the suspects at the time of their actions.  Officer Jackson testified that he was in a parked car fifteen yards away from the alleged exchange with a clear line of sight, and that he witnessed the entire exchange of the backpack and had ample time to observe both suspects.  Tr. at 26–30.  Second, Officer Jackson's descriptions of the suspects, captured on the Radio Run, accurately described the suspects that were eventually stopped.  Gov. Exhibit 3.  Third, Officer Jackson did not express any doubts about his identification.  Finally, the identification occurred from a distance of about twenty yards, less than five minutes after Officer Jackson observed the backpack exchange.  Tr. at 53, 73.

Furthermore, Officer Jackson is a trained law enforcement officer, who is expert in observing criminals.  Officer Jackson has over twenty years of experience working as a police officer and ten of those years were spent working for the NSID—the division responsible for the undercover operation here.  Tr. at 8.  Officer Jackson further testified that during the course of his career he has worked as an observation post officer "more than 500" times.  Tr. at 12.  Officer Jackson's experience strengthens the reliability of the identification.  *See Dring*, 930 F.2d at 693; *see also Singleton*, 702 F.2d at 1165–66.

Defendant's principal attack against the identifications is that Officer Jackson's description of the events was inaccurate or incomplete.  Defendants argue that Officer Jackson's initial description of the person who handed over the backpack (later identified as Williams) was generic and only became more specific after another officer, sensing the insufficiency of the description, filled in the blanks.  *See* Williams's Mot. to Supp. Id., ECF 30, at 5.  Defendants allege that this second officer "suggested [to Officer Jackson the] additional identifying factor of

26

[the] 'orange hood'" on Williams's jacket and that "it appears [that Officer Jackson] affirmed and added 'orange hood' to his own now-evolving description." *See id.* at 3.

Defendants are correct that Officer Jackson's descriptions evolved and became more detailed with each lookout.  The initial broadcast lookout stated that the person who turned over the backpack was a "black male with a gray coat," *see* Radio Run, April 22, 2020 ("Radio"), ECF 35-1, at 6:00–6:29; the next description was "a black male with a gray coat with puffy hair" that was "real messy," *id.* at 6:53–7:08; and the third was that the black male with the gray coat had an "orange hood." *Id.* at 7:24–7:39.

But Defendants are wrong to argue that Officer Jackson's descriptions were influenced by any other officer.  Instead, body worn camera footage conclusively shows that Officer Jackson provided his descriptions of Williams's orange hood before Williams was handcuffed and the second officer mentioned the orange hood. *See BWC of Ofc. Gabster*, ECF 35-3, at 19:04:26–19:04:35.  Officer Jackson also testified that nobody told him Williams was wearing an orange hood, and that his lookout descriptions were the product of his own observations.  Tr. at 44.

Defendants make much of the fact that Officer Jackson stated in his initial lookout that the backpack was exchanged for money, but no money was found on Williams when he was arrested. *See* Radio, ECF 35-1, at 6:00–6:29; *see also* William's Mot. to Supp. Id., ECF 30, at 3. Defendants insist that makes Officer Jackson's observation inaccurate and thus unreliable. *Id.* But as the government points out, Williams was out of sight of Officer Jackson immediately after the exchange and had ample time to dispose of any cash. *See* Gov.'s Opp'n to Williams's Mot. to Sever, ECF 36, at 3.  In any event, even if Officer Jackson misidentified the object being

27

exchanged for the backpack, this inaccuracy is insufficient to render Officer Jackson's identification testimony unreliable.

Finally, if a show-up identification occurs while the subject is in custody following an illegal stop, the identification must be suppressed as the fruit of the illegal stop. *See United States v. Crews*, 445 U.S. 463, 472–73 (1980). A stop is illegal if the officers did not have a "reasonable, articulable suspicion that 'criminal activity may be afoot.'" *Edmonds*, 240 F.3d at 59 (quoting *Terry*, 392 U.S. at 30). An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those fact, support a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016). The government bears the "burden to provide evidence sufficient to support reasonable suspicion." *Id.* at 634.

Here, Williams argues, much like Douglas in his Motion to Suppress Tangible Evidence, that the government has not demonstrated that the police had reasonable suspicion. He argues that Officer Jackson's observation of a hand-to-hand transaction did not create "reasonable, articulable suspicion that 'criminal activity may be afoot.'" *Edmonds*, 240 F.3d at 59 (quoting *Terry*, 392 U.S. at 30). As discussed above, however, an examination of the totality of the circumstances demonstrates that the government has indeed met its burden. Officer Jackson witnessed a hand-to-hand exchange in a high crime neighborhood, known for drug and firearm activity. During the exchange, Douglas acted strangely, quickly placing the backpack under his jacket, as if to hide it. Tr. at 29–30. These factors provided Officer Jackson with reasonable suspicion that a crime was occurring. Furthermore, Officer Jackson gave an accurate description of Williams, including supplementing his original description without prompting from other

officers.  The police therefore had reasonable suspicion to conduct an investigatory stop of Williams.

### VI.    Conclusion

For the reasons discussed above, the Court grants in part and denies in part the government's motion, and the Court denies the Defendants' motions.  An Order will be issued contemporaneously with this Memorandum Opinion.

DATE:  December 10, 2020

CARL J. NICHOLS
United States District Judge