**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Cr. No. 20-cr-121-CJN** |
| | ) | |
| **THEODORE DOUGLAS** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## SENTENCING MEMORANDUM

THEODORE DOUGLAS, through undersigned counsel, respectfully submits this memorandum requesting that the Court consider his entire life and the various legal arguments made in this sentencing memorandum in determining a fair and just sentence.  Counsel requests that this Court impose a sentence of 1 year and 1 day of incarceration and one year of supervised release.  Such a sentence is no greater than necessary and would be consistent with the practice over several judges in the District who have reduced potential sentences for time served during the pandemic.

## Background

Mr. Douglas has pleaded guilty 18 U.S.C. § 922 (g), to the offense of Unlawful Possession of a Firearm.  Mr. Douglas has accepted responsibility in this case and is sincere about his contrition.  Since incarcerated, he has become a father to a baby girl. Because he was arrested on April 22, 2020, the entirety of his incarceration has been during a pandemic and for the past ten months, he has been locked down for 23 hours per day – effectively suffering solitary confinement, despite not having any disciplinary issues.

https://www.washingtonpost.com/dc-md-va/2021/04/19/dc-jail-lockdown-covid/ (last accessed on April 21, 2021).

**Introduction**

Three months ago, Mr. Douglas' daughter was born.  He missed this critical day in his life.  He has also missed the past year of his three year old son's life.  During his pretrial incarceration, Mr. Douglas has realized just what he had lost.  One of life's happiest moments - not taken away from him – but given away by him.

Instead, Mr. Douglas has been living under circumstances that has been described as "insane" and "very dangerous."  Mr. Douglas was arrested as the D.C. Jail put social distancing measures in place.  While the Jail has largely been successful in containing COVID-19, the impact has been to place residents of the jail in what amounts to solitary confinement – 23 hours/day on lockdown.  One hour is given to residents to accomplish all calls and showers and "recreation."  Sometimes that recreation time occurred in the middle of the night to achieve distancing.  He has lived for eleven months without once having been outside.

The consequences mount daily.  Because unlike times past, Mr. Douglas *still* hasn't met his daughter, three months later.  The coronavirus has made sure of that because social visits are suspended indefinitely.  Even the video social visits are no longer an option.  Every day, Mr. Douglas must grapple with the dueling truths – he has not met his daughter – she has never even seen his face.  In addition to that, he is completely gone from the lives of his young son.  He talks to his children nearly every day but a phone conversation without an infant is no substitute to holding her and helping to provide for them – something he reportedly does on his own.

### *The incident*

Mr. Douglas fully acknowledges the wrongfulness of his actions.  This case involves the transfer of a backpack to Mr. Douglas that contained a firearm.  Notably, Mr. Douglas was present when his friend was shot and killed in 2014.  Other acquaintances have been shot over

the past several years.  And while Mr. Douglas was found to be in possession of a firearm in this case, there is no evidence that he used or intended to use the firearm for anything other than self-defense.

Significantly, Mr. Douglas was entirely compliant during his interaction with the police. He made no effort to run and evade officers.

## ARGUMENT

### Sentencing Law

Twenty years ago, the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively *advisory*."  *United States v. Booker*, 543 U.S. 220, 245 (2005).  Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. " *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)).  While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a).   Overall, in light of *Booker*, courts must treat the Guidelines as one among several of the sentencing factors.

Pursuant to 18 U.S.C. § 3553(a) – as explicitly endorsed by the Supreme Court in *Booker* – sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

3

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).

In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.  *Id*. § 3553(a)(1).  In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth.  *Id.* § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added).  With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."  *Id*. § 3553(a) (emphasis added).

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the

4

Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007).  A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable. *Id.*  By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351.  It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

## I.   The guidelines calculation

The proper guideline range for Mr. Douglas is 15 to 21 months.

Base Offense Level                      14

Acceptance of Responsibility          -2

Total                                        12

     With a Criminal History Score of III, Mr. Douglas guideline range is 15 to 21 months. The plea agreement submitted limits the government's allocution to 15 months.

## II.     The Appropriate Sentence is 1 year and one day and one year of supervised release.

     When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007). Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). This Court should not presume that a Guidelines sentence is reasonable and should, instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a) considerations and whether "the case warrants a different sentence regardless." *Id.* at 351. Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range. *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.). Recently, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate

6

sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. *Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.*

*United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020) (emphasis added).

### A. The History and Characteristics of Mr. Douglas

Mr. Douglas is a 30 year old father of two who has lived in the Washington D.C. area for nearly all of his young life. He is described as a "respectable and responsible" and a good father. He has aspirations to work as an Electrician.

Mr. Douglas is an individual who has never committed an assaultive act. He has no convictions for any remotely violent conduct.  And though he has experience with the criminal justice system, he has never been charged with offenses that were not merely possessory in nature.

Although Mr. Douglas's Criminal History Score is high at 5 criminal history points, this score overstates the seriousness of Mr. Douglas's past conduct.  See USSG § 4A1.3, Application Note 3 ("This policy statement authorizes the consideration of a departure from the guidelines in the limited circumstances where reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's criminal history or likelihood of recidivism, and provides guidance for the consideration of such departures."  A variance is thus appropriate here where Mr. Douglas is in Category III even though he does not have so much as a simple assault on his record.

### B.   The Nature and Circumstances of the Offense

Moreover, this is not a violent offense, as a matter of fact or law, as "[n]either the act of possessing a weapon nor the fact of being a felon is in itself a crime of violence." *United States v. Gloster*, 969 F. Supp. 92, 98 (D.D.C. 1997); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2197 (2019)("possession of a gun can be entirely innocent."); *Johnson v. United States*, 135 S. Ct. 2551, 2563 (2015) (J. Thomas, concurring)("Under conventional principles of interpretation and our precedents, the offense of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under the residual clause of the Armed Career Criminal Act (ACCA)."); *Staples v. United States*, 511 U.S. 600, 611 (1994).  Therefore, imprisonment for the purpose of incapacitation is similarly not necessary or warranted.

The crime of gun possession is not a crime of violence.[1]  In 2018, 21% of this District's court docket were felon in possession cases,[2] compared to 10% nationwide.[3]  Unlike the often egregious conduct that has been prosecuted in federal court, Mr. Douglas's case is one that had been in Superior Court without exception until last year.  His conduct did not involve violence or involvement in a drug ring.  He is not a member of a gang or a leader of a drug organization.

### C.   The Need for the Sentence Imposed

18 U.S.C. § 3553(a) directs the Court to consider four objectives of federal sentencing to

---

[1] "The federal court for the District handled 392 criminal cases of all kinds in 2018, including 83 felon-in-possession gun cases and 16 gun-related interstate robbery cases, according to court records and prosecutors." Washington Post Article, also available at https://www.washingtonpost.com/local/legal-issues/us-to-prosecute-districts-armed-ex-convicts-in-federal-court-in-surge-against-gun-violence/2019/02/05/1f518926-2363-11e9-90cd-dedb0c92dc17_story.html (last viewed on April 23, 2021).

[2] See footnote 1, supra.

[3] Nationwide, gun possession offenses represented approximately 10% of the crimes reported to the U.S. Sentencing Commission in FY 2018.  See U.S. Sentencing Commission Quick Facts Felon in Possession FY 2018, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Felon_In_Possession_FY18.pdf (last viewed March 9, 2020).

impose a sentence that is "sufficient, but not greater than necessary" to achieve those goals.  The

first purpose is to "reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

Another purpose of sentencing is to "afford adequate deterrence." *Id.* at § 3553(a)(2)(B).

While "[p]rison is an important option for incapacitating and punishing those who commit

crimes," evidence shows that lengthy prison sentences do not have a "chastening" effect and

"produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst.

Justice, U.S. Dep't of Justice (May 2016) at 1-2.  Research shows conclusively that "[t]he

*certainty* of being caught is a vastly more powerful deterrent than the punishment," that

"[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime,"

and that "[i]ncreasing the severity of punishment does little to deter crime."  *Id.* (emphasis in

original).  Significantly, "the crime prevention benefit falls far short of the social and economic

costs," *id.* at 2, especially in light of the fact that U.S. Sentencing Commission "research has

demonstrated that reductions to sentence length and time served do not harm public safety,"

*Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections,

Urban Inst. (Jan. 2016) at 21.  *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative*

*Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardoza J. Conflict Resolution

421, 447-48 (2007) ("Certainty of punishment is empirically known to be a far better deterrent

than its severity.

Still, Mr. Douglas has learned a harsh lesson in the past year.  His poor judgment has led

to the harshest form of modern day incarceration – essentially universal solitary confinement.

He has missed out on a father's proudest day – the birth of daughter.  And he remains in legal

jeopardy because he must still face the Parole Commission.

**D.  Sentence Below the Guideline is Not an Unwarranted Sentencing Disparity**

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

Over the last five years, courts have been increasingly imposing non-government sponsored below guideline sentences in firearm cases.  *See* Quick Facts, Felon in Possession of a Firearm  https://www.ussc.gov/research/quick-facts/section-922g-firearms. In 2017, courts imposed non-government sponsored below guideline sentences in nearly 25 percent of these cases.  *Id.*  Of those offenders who received a non-government sponsored below guideline sentence, the average reduction was approximately 33%.  *Id.*

Recently, judges in this Court have varied substantially from the Guidelines, particularly in 922 (g) cases.  In *United States v. Simmons¸*19-cr-409 (KBJ), the Court varied and sentenced the defendant to time-served (approximately two weeks) in a 922 (g) case where the guideline range was 12 to 18 months and the defendant agreed he possessed an actual firearm.  In *United States v. Juamal Carroll,* 19-cr-407 (ABJ), the Court varied and sentenced the defendant to 18 months, concurrent to a expected nine month sentence for violation for supervised release where the guideline range was 30 to 37 months.  And in *United States v. Christopher Carroll*, 20-cr-16

(JEB), the Court varied and sentenced the defendant to a sentence of a year and one day where the guideline range was 30 to 37 months.  In *United States v Tyeree Young¸*19-cr-366 (TSC), the Court varied to a time-served sentence (approximately two weeks) where the Probation Office had calculated an 18 to 24 months guideline range.  All of these sentences were for 922 g offenses.  A year and a day sentence would not create a sentencing discrepancy for a 922 g case during the pandemic.

While courts have not come up with a formula for the oppressive nature of time served during the abysmal conditions if the pandemic, some judges in this District have found that half time or more may be appropriate.  Judge Amy Berman Jackson was confronted with such an individual in a sentencing for three bank robberies:

> But you have to factor into the analysis the fact that 6 months of the 12 he served were served during the pandemic.  So that wasn't any regular jail sentence.  That was a hard six months.  I can't ignore the fact that the time he spent awaiting sentence in D.C. Jail was not the same experience he would have had a year or even six months ago when defendants who were involved in programming there asked me to delay their sentences so they could stay and complete them.
>
> Almost his entire experience has been overshadowed by the specter of the virus, the need for isolation, less contact with counsel, less contact with family, less opportunity to move within the facility, and constant worry.  And the worry has been particularly acute for this defendant with his history of mental health issues and anxiety, and his worst fears came true when he was diagnosed with the virus while detained in what was at that time a petri dish for the spread of infection.
>
> In other words, this defendant has experienced harsher conditions and more limited opportunities while he was incarcerated, and that's analogous to when we depart for immigrants who weren't allowed to participate in programs.  And so I feel like if I'm giving him credit for that portion of the time he already served, those six months should count more, maybe even double.

*United States v. Michael Cowan¸* 18-cr-208 (ABJ) (Transcript of Sentencing Hearing, Sept 18, 2020 at 30-31); *see also United States v. Chris Carroll,* 20-cr-16 (JEB) (opining that crediting defendant for double the time served is appropriate when incarceration is during the pandemic.).

In addition to the below guideline sentences that have been imposed, the U.S. Sentencing

Commission (U.S.S.C.) has also identified stark racial discrepancies in sentences that cannot be attributed to differences in criminal history or crime characteristics.  The U.S.S.C. attributes a significant amount of the discrepancy to judicial discretion, finding that the court grants White defendants sentences that are below their guideline range at a higher rate than Black defendants. According to the U.S.S.C., "Black male offenders received longer sentences than similarly-situated White male offenders" by an average of 19.1 percent.  *See* U.S. Sentencing Comm'n, DEMOGRAPHIC DIFFERENCES IN SENTENCING: AN UPDATE TO THE 2012 *BOOKER* REPORT, 2 (2017), found at https://www.ussc.gov/research/research-reports/demographic-differences-sentencing

For firearms offenses since 2012, Black men received sentences that were on average 19.3 percent longer than similarly positioned White men.  *Id.* at 29.  The U.S.S.C. found that "non-government sponsored departures and variances" were a major contributor to the discrepancy, stating that "Black defendants were 21.2 percent *less* likely to receive a non-government sponsored downward departure or variance." *Id.* at 2.  When Black defendants did receive a variance, their sentences were was 16.8% longer than those of similarly situated white male offenders.  Therefore, consistent with the higher rates of downward departures given to similarly situated White defendants for similar violations, Mr. Douglas should receive a variance – a sentence below the calculated guideline range.

In addition, this case represents police action targeted at the Black population (officers in the GRU have acknowledged under oath that they primarily deploy in the 6th and 7th Districts) and a prosecution targeted at the Black population (under the aforementioned FIP initiative). While it is certainly true that Mr. Douglas should not carry firearms as a felon, it is also true that he does not have any prior convictions for any other offense.  Remarkably, if Mr. Douglas was

raised ten miles away in any direction, he would have been able to legally register, possess and

carry a firearm at the age of 18 and he would have no criminal record at all.

    **E.  Mr. Douglas will be required to serve additional prison time because local District of Columbia sentences are overseen by the Bureau of Prisons and the U.S. Parole Commission.**

       After an individual like Mr. Douglas is sentenced in local court, he is imposed a period of

supervised release.  Parole does not exist in the District.  So after Mr. Douglas had served 85%

of his sentence (when it was determined that he was sufficiently well-behaved to earn that

credit), Mr. Douglas was placed on a period of supervised release.

       Mr. Douglas is currently on supervised release and a detainer has lodged against him so

that he cannot be released.  However, the Parole Commission alone determines when Mr.

Douglas' warrant is executed and when proceedings against him begin.  As a matter of practice,

the Parole Commission does not act until individuals like Mr. Douglas *complete* their sentence

for the underlying law violation.  Mr. Douglas will then be seen by the Parole Commission in

whatever jurisdiction he serves his federal sentence or in Philadelphia.

       This practices leads to additional incarceration in two ways.  First, Mr. Douglas has not

begun serving whatever time he will incur for violating his period of supervised release.

Secondly, even if Mr. Douglas' parole time amounts to "time served" for the violation, he will

still effectively remain incarcerated for up to another four months while the Parole Commission

transports him to Philadelphia or his BOP prison and then determines and implements a "Release

Plan."  https://www.justice.gov/sites/default/files/uspc/legacy/2010/08/27/uspc-manual111507.pdf at 210 (last accessed April 23, 2021).

       As a result, it is a certainty that Mr. Douglas will have to serve additional time beyond

the time of this sentence because of the Parole Commission's decision to handle his supervised

release violation *after* the completion of his sentence, rather than concurrently with this case.

And as a result from this practice, the District of Columbia incarcerates its residents at a higher

rate than any other jurisdiction in the nation.  https://www.prisonpolicy.org/profiles/DC.html

(last accessed April 23, 2021).



Source: https://www.prisonpolicy.org/global/2018.html

### III.  The Kind of Sentence Available and the Sentencing Range Hinge on Overstated Guidelines Calculations and Thus Warrants a Sentence Lower than Recommended.

#### A.  Reliance on Guideline Calculations Needs to be Adjusted to Meet the Needs of Society During this Time of Crisis in Our Country.

Over one year into the COVID-19 pandemic, and this Court's fifty-third or so week into

limited operations, requiring little to no in-person court proceedings, COVID-19 continues to

spread and kill thousands in this country.  It is clear that our lives will not return to normal for a

long time.  Mr. Douglas's reality is that he is among the demographic that has most been affected

- he represents the low-wage, high risk, African-American that has consistently been reported to

14

be among those at highest risk of contraction.   https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html (last accessed August 11, 2020).

The Courts have responded to this pandemic.  Vulnerable inmates required to serve long sentences based on guideline calculations and statutorily-mandated sentences have been granted compassionate release reducing their sentences by years.  *See e.g., United States v. Curtis*, Case No. 03-cr-00533(BAH), ECF No. 238, Memorandum and Order (D.D.C. April 22, 2020) (granting compassionate release for vulnerable inmate who served 17 years of his life sentence); *United States v. Jennings*, Case No. 18-cr-00017 (TSC), ECF No. 30, Memorandum and Order (D.D.C. April 22, 2020) (granting compassionate release for vulnerable inmate who served 33 months out of a 60 month sentence).

Initially, Congress has approved the reduction of the prison population to lessen the dangers of COVID-19.  The purpose of the CARES Act, which was passed by Congress with unanimous bipartisan support and signed into law by the President on March 27, 2020, is to "[p]rovid[e] emergency assistance and health care response for individuals, families and businesses affected by the 2020 coronavirus pandemic."  In the Act, Congress expressed its view that, in response to the pressures of the pandemic, the federal prison population should be reduced by expanding BOP's authority to release inmates to home detention.[4]  In response to discomfort about the accuracy of BOP's reporting of numbers, senators have also responded by introducing legislation called the "Corrections Data Transparency Act."

https://www.warren.senate.gov/imo/media/doc/COVID-

---

[4] *See United States v. Copeland*, 2:05-cr-135-DCN (D.S.C. March 24, 2020) ("Congress has expressed its desire for courts to 'use all available powers and authorities … to reduce the number of federal prisoners in . . . prisons,' especially individuals like defendant" who had underlying conditions).

19%20in%20Corrections%20Data%20Transparency%20Act%20(ALB20B54)%208.5.20.pdf.

**B.  A sentence of incarceration in a Bureau of Prisons facility is inappropriate for Mr. Douglas, particularly during the pandemic.**

In addition, a sentence of incarceration would subject Mr. Douglas to a much more punitive sentence than is contemplated by 18 U.S.C. 3553.  If the Court follows the government's recommendation, a substantial portion of Mr. Douglas's next several months (assuming time already served) will effectively be in solitary confinement.  Although Probation dutifully points out the importance of programs such as the Federal Prisons Industries Program, the Occupational Education Program, the Drug Abuse Education Program, and the Bureau Literacy Program, access to these programs are unlikely to be provided any time soon.  He will live in fear – fear of infection every time he gets a meal, every time a correctional officer approaches him, every time he showers, uses the phone or has his one hour of recreation time.

In addition, Mr. Douglas will have to repeat his trauma of COVID-19.  He will enter a new facility under quarantine.  He would then enter yet another facility.  And he would start anew the grave risk of contracting COVID-19. He will face the same anxieties through which he has suffered, the lack of social distancing, the shared toilets, sinks, showers and phones.  And this time, he would do it far from his loved ones.  These conditions have fueled the spread of COVID-19 throughout BOP facilities – 210 people have died and 45,788 individuals have the virus.  https://www.bop.gov/coronavirus/ (last accessed Jan. 29, 2021).  Nationwide, more than 1700 people have died in prisons and at least 275,000 incarcerated people have tested positive.  https://time.com/5924211/coronavirus-outbreaks-prisons-jails-vaccines/ (last accessed Jan. 21, 2021).

A Forbes report illustrates how the BOP has bartered safety from the virus for hard time:

According to a recent report by Unlock The Box, the United Nations Revised Standard Minimum Rules for the Treatment of Incarcerated People "Mandela Rules" identify solitary beyond 15 days as a form of cruel, inhumane, and degrading treatment that often rises to the level of torture. One would probably assume that the use of solitary confinement, no matter how cruel, would be reserved for the most hardened criminals who have resorted to violence in prison. But men and women in federal prison camps, who have done nothing more than be exposed to Covid-19, are now being locked up for extended periods of time.

FCI Otisville (New York) satellite camp has had its minimum security camp inmates locked up in cells since mid-June, already twice the United Nations standard for cruel and inhumane. It is also the second such lock-up these inmates have experienced since April 2020 when the camp put people in quarantine after being told that they would be transferring to home confinement. After weeks locked in cells, many of them were told that they would not be going home but would resume their sentence back at the camp which was declared Covid-19-FREE. A few weeks later, a positive Covid-19 test led to the return to quarantine in the higher security prison cells. In situations like this, it means that if one other thing goes wrong it could spell disaster ... which made the hardship of a water-main break at the facility on July 15 that much more difficult. Men locked in those cells had no ability to flush the toilets for part of the day. This also meant that they could not drink the water from the sinks in the cells, but most would not do so anyway because of the filth of the plumbing and the uncertainty of the water's quality (inmates are given two 16-ounce bottled waters each day.

https://www.forbes.com/sites/walterpavlo/2020/07/16/bureau-of-prisons-using-solitary-confinement-as-a-means-to-curb-covid-19-contagion/#620449e1193a

In at least acknowledging the principle that the prison population needs to be reduced in light of the pandemic, even the Department of Justice has taken some action. On March 26, 2020, Attorney General William Barr directed that the Bureau of Prisons (BOP) prioritize the use of home confinement in response to the COVID-19 pandemic. *See* Memorandum for Director of Bureau of Prisons, April 3, 2020, available at https://www.justice.gov/file/1262731/download (last viewed on April 30, 2020). Eight days later, on April 3, 2020, Attorney General William Barr requested that the BOP *increase* the use of home confinement for inmates most affected by COVID-19. *See* Memorandum for Director of Bureau of Prisons, April 3, 2020, available at https://www.justice.gov/file/1266661/download (last viewed on April 30, 2020).

17

Despite the modest efforts of the DOJ, the Bureau of Prisons ("BOP") face a growing number of patients and deaths.  To date, according to the BOP, there have been 111 federal inmate death.  114 BOP facilities and 53 Residential Reentry Centers have confirmed active cases.  The Families Against Mandatory Minimums describe existence at the BOP as an "ongoing, slow massacre."  https://www.buzzfeednews.com/article/zoetillman/coronavirus-prison-release-rules-inconsistency.

To be clear, all correctional institutions have become hotbeds for the spread of the virus, simply because of their very nature and the inabilities of inmates to maintain social distancing and to acquire protective equipment.  But another main reason that the BOP has suffered from increased numbers is because of the BOP's internal policies:

> The BOP ignored health guidelines. Correctional officers who had been exposed to the virus were required to work despite a dearth of protective equipment. The BOP transfers inmates around the country, potentially spreading the virus. BOP labor factories, in which prisoners work for as little as 86 cents a day, are operational.

 Natalie Chwalisz, "*The Federal Bureau of Prisons Response to the coronavirus has been disastrous and deadly.*"  https://www.washingtonpost.com/opinions/local-opinions/the-federal-bureau-of-prisons-response-to-the-coronavirus-has-been-disastrous-and-deadly/2020/08/06/3d30464c-d65b-11ea-aff6-220dd3a14741_story.html

Due to the developing nature and effect the COVID-19 pandemic, the Courts, the Department of Justice, and Congress have acted to reduce the prison population.  The Sentencing Commission should yield as well.  This Court can impose a different sentence if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  18 U.S.C. § 3553(b).  The COVID-19 pandemic presents a mitigating circumstance not adequately taken into consideration by the

Sentencing Commission in formulating the guidelines.

For these reason, Mr. Douglas requests a downward variance. The kind of time that the Bureau of Prisons has to offer is not correctional or rehabilitative – indeed, the programs that could theoretically be used for rehabilitative purposes, do not presently exist. Incarceration is wholly unnecessary given both the current realities of the Bureau of Prisons and the lessons that Mr. Douglas has already learned. Mr. Douglas has demonstrated that he accepts responsibility and can comply with conditions of supervision and would not violate supervised release if imposed.

    **B.**    **U.S.S.G. § 2K2.1 Does Not Embody § 3553(a) Considerations or Result in Sentences That Might Achieve § 3553(a)'s Objectives.**

When the Guidelines were first promulgated in 1987, to create a guideline for unlawful firearm possession, the Sentencing Commission attempted to "synthesiz[e] a coherent rationale that generally explain[ed] and [was] reasonably consistent with current sentencing practice." USSC, *Supplementary Report on The Initial Sentencing Guidelines and Policy Statements*, 18 (1987). The Commission acknowledged that there were not enough statistically-significant patterns for sentencing prohibited firearm possession to create a clear guideline, noting that its "detailed statistical analyses . . . were of little value in explaining or rationalizing current sentences." *Id*. Although the Commission found that pre-Guidelines sentences had statistically-irrelevant ranges likely because of "the wide variety of circumstances under which these offenses occur," the Commission found that the "*actual or intended use* of the firearm was probably the most important factor in determining the sentence." U.S.S.G. § 2K2.1, cmt. background (1987). The Commission created guideline § 2K2.1 with a base level of 9 points, reduced to 5 if the firearm was possessed for lawful sporting use, or enhanced if the firearm was used in another offense. *See* U.S.S.G. § 2K2.1(a) (1987). Today, because of amendments made in 1991, a

defendant's actual or intended use of the firearm plays no role in determining the Guideline range. Instead, prior criminal history and type of weapon are largely determinative. Moreover, under today's guidelines, a base offense level of 14, which is in Zone D, rarely allows a defendant to be sentenced to serve a non-prison term.

In 1989, the Commission increased the base offense level by 3 points, from 9 to 12, U.S.S.G. § 2K2.1(a) (1989), to reflect an increase in the statutory maximum penalty for unlawful firearm possession, which Congress doubled from 5 to 10 years in the Anti-Drug Abuse Act of 1988, *see* U.S.S.G. app. C, amend. 189, 100-101 (1989).

Then, in 1991, against the weight of empirical evidence collected from 1987 to 1990, the Commission completely erased and replaced the firearms guidelines. Similar to the now-discredited drug guidelines, the Commission dramatically increased the penalties proscribed under § 2K2.1 "in light of the Congressional sanction of a minimum 15 years for a prohibited person with three prior felonies of violence or controlled substance offenses." 1990 Commission Report 19. To create a framework "proportional" to the ACCA, the Commission doubled the base offense level for a defendant with two prior crimes of violence or controlled substance offenses, from 12 to 24, effectively increasing the penalties prescribed for such defendants six-fold. *See id.* 19-23.

Since the Commission looked to the mandatory minimum ACCA sentence to create the firearm guidelines, and ignored "empirical data and national experience," the § 2K2.1 provisions "do not exemplify the Commission's exercise of its characteristic institutional role" or "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109 (internal quotation marks and citations omitted); *see also Gall*, 552 U.S. at 46 & n. 2. Instead, as demonstrated in this case, the Guidelines drastically overstate the seriousness of the

offense by ignoring relevant considerations, such as the nature and circumstances of Mr. Douglas's arrest, the nature of his convictions, the current pandemic, and the need for society to have individuals like Mr. Douglas support their family, with all kinds of assistance to his children, his parents and financially, with child care, particularly during an economic crisis.

Like in *Gall*, "[a]ny term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who . . . understands the consequences of his criminal conduct and is doing everything in his power to forge a new life."  552 U.S. at 44 (citation omitted) (quoting district court).  Mr. Douglas requests a sentence of one year and one day so that he can optimize his chances of returning to his family and to see his children while they are still young.  The requested sentence is not greater than necessary, and is sufficient for the purposes of sentencing.

## Conclusion

A sentence of one year and one day followed by a term of supervised release is a serious consequence that will more than adequately punish Mr. Douglas for his particular conduct and will also adequately deter any future wrongful conduct.  Thus, for the reasons stated above, including Mr. Douglas's history and characteristics, together with the other goals of sentencing, Mr. Douglas respectfully requests that the Court impose a sentence below the calculated guidelines range to be followed by a term of supervised release.

Respectfully submitted,


A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500