```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

 * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,       )  Criminal Action
                                )  No. 20-MJ-68-2
vs.                             )
                                )
THEODORE B. DOUGLAS,            )  July 17, 2020
                                )  1:02 p.m.
              Defendant.        )  Washington, D.C.
                                )
 * * * * * * * * * * * * * * *
```

## TRANSCRIPT OF HEARING
### BEFORE THE HONORABLE BERYL A. HOWELL,
### UNITED STATES DISTRICT COURT CHIEF JUDGE

**APPEARANCES**:

FOR THE UNITED STATES:   STEVEN B. WASSERMAN
                         U.S. Attorney's Office
                         For the District of Columbia
                         555 Fourth Street, NW
                         Washington, DC 20530
                         (202) 252-7719
                         Email: Steve.wasserman@usdoj.gov

FOR THE DEFENDANT:       EUGENE OHM
                         Federal Public Defender
                         For the District of Columbia
                         625 Indiana Avenue, NW, Suite 550
                         Washington, DC 20004
                         (202) 208-7500
                         Email: eugene_ohm@fd.org

ALSO PRESENT:            CHRISTINE SCHUCK, Pretrial Services


Court Reporter:          Elizabeth Saint-Loth, RPR, FCRR
                         Official Court Reporter

*This hearing was held via videoconference and telephonically and is therefore subject to the limitations associated with the use of technology, static interference, etc.*

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Matter before the Court,
 3     Magistrate Case No. 20-68-2, United States of America versus
 4     Theodore B. Douglas.
 5              Counsel, please state your names for the record,
 6     starting with the government.
 7              Your Honor, just for the record, Ms. Christine
 8     Schuck from pretrial is present on the phone.
 9              THE COURT:  Thank you, Ms. Schuck.
10              MR. WASSERMAN:  Good afternoon, Your Honor.
11     Steven Wasserman on behalf of the United States.
12              THE COURT:  Yes.  Good afternoon, Mr. Wasserman.
13              MR. OHM:  Eugene Ohm on behalf of Mr. Douglas.
14     Good afternoon, Your Honor.
15              THE COURT:  Good afternoon, Mr. Ohm.
16              Mr. Douglas, there you are.
17              Mr. Douglas, do you consent, after consulting with
18     counsel, to appear at this hearing via teleconference or
19     videoconference?
20              THE DEFENDANT:  Yes, I am, Your Honor.
21              THE COURT:  I'm sorry.  Could you say that again.
22              THE DEFENDANT:  Yes, Your Honor.
23              THE COURT:  Okay.  Thank you.
24              Okay.  Well, I have read the papers that have been
25     filed in connection with this appeal from the magistrate
```

1     judge's detention order.
2             It's the defendant's appeal.  So, Mr. Ohm, is
3     there any additional argument or evidence that you wish to
4     present to the Court?
5             MR. OHM:  Briefly, Your Honor.
6             Mr. Douglas has now been detained for close to 90
7     days.  When the Bail Reform Act was put into place, along
8     with the Speedy Trial Act, I don't think that anyone could
9     have conceived of a pandemic that would shut down trials for
10    an indefinite period of time.  And Mr. Douglas is now faced
11    with a case that's been around for almost three months that
12    hasn't been indicted yet.  There is really no end in sight
13    in terms of a trial date.
14            Mr. Douglas -- I know the Court has seen my
15    arguments; but we feel like we have a very strong case, both
16    for suppression and trial, which I think goes to the weight
17    of the evidence factor --
18            THE COURT:  Mr. Ohm, let me just speak.  I will
19    pause you there for a second.
20            Do you understand that a detention hearing is
21    different from a suppression hearing?
22            I mean, we have gone through this before in
23    another case.  I know you may anticipate having a
24    suppression hearing; but, for right now, we're in a
25    detention hearing where the admissibility of the evidence is

1       not the issue before me.
2               MR. OHM:  Yes, Your Honor.
3               But I do think that when the Court is considering
4       all of the different factors considering -- Your Honor, I am
5       making arguments specific to Mr. Douglas in terms of any
6       conditions that he has that make the COVID-19 situation
7       particularly dangerous to him.  I would like to point out
8       for Mr. Douglas -- over the last four months of him being
9       incarcerated, it isn't standard time.  It is -- essentially,
10      the amount of time -- it is the kind of time that he would
11      be getting as if he was in solitary confinement, which is
12      punishment, because he is restricted to his cell for 23
13      hours a day.  He only gets one hour of recreation time to
14      make his family calls, his legal calls, a shower.  It's
15      exceptionally difficult.
16              To make matters more difficult, he doesn't -- he
17      has turned down a plea offer in this case, and he does
18      anticipate going to trial.  I think, from a psychological
19      perspective for Mr. Douglas, not knowing when that trial is
20      going to be and not knowing when his case is going to be
21      resolved, it really, sort of, defeats the purpose of the
22      Speedy Trial Act when it's in perpetuity.
23              Again, I am not saying it's anybody's fault; but
24      given the weight of the evidence in this case, I would ask
25      the Court to place Mr. Douglas on heightened supervision.

1         I do want to make one quick mention --
2         THE COURT:  But you are suggesting putting
3    Mr. Douglas in HISP, which is the most stringent set of
4    conditions that -- most stringent program that the Court has
5    available for pretrial release and yet, from my review of
6    the record, Mr. Douglas actually cut off his electronic
7    bracelet in 2015 when he was on pretrial release on a drug
8    felony case and was -- absconded -- in absconsion status for
9    five years until he was arrested in this case.
10        So are there more stringent conditions than HISP
11   that you think are even available to this Court when HISP
12   plainly failed once before?
13        MR. OHM:  Your Honor, so my response to that is,
14   number one, that was five years ago and Mr. Douglas is a
15   different person.  I think the five years is a little bit of
16   a -- it's one of those factors which the only reason he was
17   in absconsion for five years -- obviously he could have
18   turned himself in.  But he didn't have any contact with law
19   enforcement in those five years when they ran a warrant
20   check in the areas where Mr. Douglas resided.  For him to
21   not have contact with law enforcement is something, I think,
22   that demonstrates that he has stayed out of trouble.  So I
23   would ask the Court not to really take into account the fact
24   that -- the five-year period is, sort of, a mixed bag for
25   those reasons, Your Honor.

1       THE COURT: But doesn't that also cut a different
2  way, Mr. Ohm, in terms of me thinking he was able to get
3  away with it for five years, he got pretty good at it; so
4  that he might think his chances of having another really
5  good -- more than five years of putting off potential facing
6  of penalties for a criminal offense -- for criminal
7  conduct -- he might want to take his chances again?
8       MR. OHM: I can only assure the Court that that's
9  not the case. Now -- and I don't -- in terms of contacts
10 with law enforcement in Southeast, Washington, D.C., it's
11 not something that you can get good at.
12      THE COURT: I'm sorry. Mr. Ohm. Mr. Ohm, could
13 you just slow down a little bit.
14      MR. OHM: Sure.
15      THE COURT: Okay. I missed the last thing you
16 said.
17      MR. OHM: I said avoiding contacts in Southeast,
18 Washington, D.C., is not the kind of thing that you can get
19 good at. There are just routine policing where individuals
20 are approached and are asked for their name; but, in any
21 case, I understand the Court's point.
22      I think I was frank in our motion in terms of what
23 our goal is for this release. And ultimately it will -- it
24 will be very unlikely to end up in Mr. Douglas's actual
25 release. What our goal is is for Mr. Douglas's warrant to

1    drop in his supervised release case so that he can begin to
2    accrue time that would otherwise not be accounted for in
3    Mr. Douglas's case.
4            I think Mr. Wasserman raised in his pleading just
5    how does that apply to the Bail Reform Act.  Well, Your
6    Honor, it applies because release in this case would not
7    increase in any way a potential danger to the community that
8    the government is arguing because he, in fact, wouldn't be
9    released.
10           But what would be -- and, Your Honor, in our view
11   very fair, is while he's collecting or accruing this time in
12   the pandemic -- unlike a judge in district court who would
13   account for time, the U.S. Parole Commission doesn't do that
14   automatically.  So I would ask that the Court consider
15   releasing Mr. Douglas in this case so that his parole
16   warrant will drop which we believe is bound to happen and
17   then he can begin accruing time in that case.
18           THE COURT:  Okay.  So, Mr. Ohm, I know that there
19   is an issue with the parole commission executing its
20   warrants so that time spent in one case can also accrue for
21   a parole commission warrant.  Isn't there another way --
22   can't you go directly to the parole commission and ask them
23   to do something about that?
24           MR. OHM:  I have done so in other cases, Your
25   Honor.  And I have been informed that unless the government,

1   I guess, joins in the request -- what I was led to believe
2   was that it was in cooperation cases that they would do
3   that.  But I was told they would not do that --
4               THE COURT:  Well, is that something that is part
5   of any -- well, I am not going to -- all right.
6               Mr. Ohm, it gets a little complicated for the
7   Court to make a decision -- to be confronted with a decision
8   in one case being asked to actually consider the effect in
9   yet another case because I have also had situations where I
10  have been presented with a situation where, oh, just release
11  the defendant here because then the parole commission will
12  then execute his warrant.  What if the parole commission
13  doesn't execute its warrant? -- then I have made the
14  wrong -- a decision that I don't want to in my own case
15  depending on a third-party agency to figure out what it's
16  going to do.  It gets very complicated.
17              I think, I mean, if you have got an issue with how
18  the parole commission is dealing with its warrants -- and I
19  will appreciate that -- then bring a lawsuit against the
20  parole commission, by goodness, and have them stand up in a
21  federal court and explain how they're executing their
22  warrants and how they're figuring out their time on
23  warrants; you know, do it directly where the issue can be
24  properly framed and evaluated.
25              Let me just say also that I do appreciate the

1    circumstances that the pandemic has generated with
2    suspension of grand juries for a period of time, but the
3    grand juries are now operating.
4              Mr. Wasserman, when are you planning on presenting
5    this case to the grand jury?
6              MR. WASSERMAN:  Your Honor, I expected to have it
7    presented soon.  I am aware that members of the unit that
8    were involved in the defendant's arrest are -- were on a
9    14-day quarantine because members had been exposed to COVID,
10   so they have not been available in the last couple of weeks.
11             THE COURT:  Why can't they appear by -- I have set
12   up situations where the grand jury can hear some
13   videoconference evidence.
14             Now, we've set it up so there can be
15   videoconference evidence from one courtroom -- remote from
16   the grand jury courtroom.  But what about having them -- we
17   could set up a videoconference where they could testify
18   before the grand jury remotely to get this done and moving
19   along.
20             MR. WASSERMAN:  Yes --
21             THE COURT:  Because if they're in quarantine, you
22   are right, we definitely don't want them coming into the
23   courthouse.  We don't want them coming in physically to the
24   grand jury, but why can't we be more creative here?
25             MR. WASSERMAN:  I mean, I am not the one, Your

1  Honor, quite frankly, that's in charge of the grand juries.
2             THE COURT:  So you are telling me I just have to
3  call John Crabb and tell him to get on the stick here?
4             MR. WASSERMAN:  I mean, I would have to ask the
5  folks that coordinate the grand jury if they're capable of
6  setting that up.  I mean, that's certainly a possibility, to
7  have the officer testify by video conference; it's just not
8  something that anybody has addressed yet.
9             So I don't know when they're supposed to come out
10 of quarantine.  This case was actually supposed to be
11 indicted, I want to say, last week but wasn't because of the
12 quarantine.
13            THE COURT:  Quarantine.  I am aware of that
14 situation.  I didn't know it pertained to this case in
15 particular, but I am aware of the MPD officer who tested
16 positive.
17            MR. WASSERMAN:  Right.  So I'd have to -- they may
18 be already out of quarantine or coming out of quarantine.
19 Either way, I expect that this case will be indicted within
20 the next week or two.  If I have to go about seeing if we
21 can get the officer to testify by videoconference, we'll go
22 ahead and do that.  But I don't anticipate any kind of
23 significant delay in having the case indicted beyond --
24            THE COURT:  All right.  And, then, I have to say,
25 Mr. Ohm, I think the magistrate judges have quite

1    successfully done preliminary hearings, evidentiary

2    hearings, with videoconference so that once this case is

3    indicted -- depending on which judge the case is assigned

4    to, you may be able to do an evidentiary suppression hearing

5    via videoconference to also move that along.  But I

6    appreciate that this is a very difficult and challenging

7    situation for the defendant, who was initially arrested in

8    April 23, 2020, and due to the pandemic circumstances has

9    not yet been indicted and able to move his case along.

10             Anything further from you, Mr. Ohm, about the

11   motion?

12             MR. OHM:  No, Your Honor.

13             THE COURT:  Mr. Wasserman, is there anything that

14   you would like to add to your papers?

15             MR. WASSERMAN:  Your Honor, unless the Court has

16   any specific questions, I don't have anything to add.

17             THE COURT: All right.  Okay.  So I will issue my

18   ruling now.

19             The Bail Reform Act requires release of a

20   defendant prior to trial unless a judicial officer

21   determines after a hearing that no condition or combination

22   of conditions will reasonably assure the appearance of the

23   person as required and the safety of any other person in the

24   community.  See 18 U.S.C. Section 3142(e)(1).

25             The government bears the burden to establish by a

preponderance of the evidence that the defendant poses a flight risk -- see *U.S. v Simpkins*, 826 F.2d 94, jump cite 96, D.C. Circuit 1987 -- and to establish by clear and convincing evidence that the defendant poses a risk to the safety of the community; see 18 U.S.C. Section 3142(f)(2).

In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person in the community, the Court must consider, pursuant to 18 U.S.C. 3142(g), the available information that touches upon the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug; the weight of the evidence against the person; the history and characteristics of the person; and the nature and seriousness of the danger to any person in the community.

On appeal of a magistrate judge's order of pretrial detention, the district court must conduct a *de novo* review. In conducting its analysis, the Court examines the available information that touches upon the four statutory factors I have just listed.

I am going to start and combine the first two factors, the nature and circumstances of the charged offense and the weight of the evidence. Both of these factors, to my mind, favor detention; so I agree with the magistrate

1  judge on that.
2          The defendant is charged in a complaint with a
3  single count of unlawful possession of a firearm as a
4  convicted felon, in violation of 18 U.S.C. Section 922(g);
5  this is a serious offense.
6          Even though this offense does not trigger a
7  rebuttable presumption of detention, illegal gun possession
8  clearly carries with it the possibility of violence and a
9  threat to the community.
10          As the government has pointed out, gun violence is
11  a serious concern in this city, one which has sadly been
12  thrust into the spotlight yet again over the July 4th
13  weekend.
14          While, as the defendant points out, there is no
15  indication that the defendant, brandished, pointed, or used
16  the firearm found in his backpack at the time of his arrest,
17  the evidence is strong that he both knew the backpack held
18  the gun and that he was prohibited from possessing it.
19          The defendant argues the government has little
20  evidence that Mr. Douglas had knowledge, dominion or control
21  of the firearm inside of a backpack that he had received
22  minutes before the officers searched him -- see the
23  defendant's motion at page 4 -- but this argument defies
24  common sense.
25          The defendant was observed by an undercover

1    officer exchanging money for a bag, at which point the
2    defendant quickly placed -- took his coat off, put the bag
3    on his back, put his coat over the bag in a hurried fashion;
4    and this formed the foundation for the initial stop; and it
5    certainly appears sufficient to establish a reasonable
6    suspicion that an exchange for contraband had been made.
7            The arresting officer, after stopping the
8    defendant, inspected the bag by padding down its exterior
9    and felt what he believed to be the handle of a gun; looked
10   inside and, in fact, saw a gun.  And, in fact, the gun was a
11   fully loaded semi-automatic handgun.
12           The defendant did not resist arrest.  And defense
13   counsel suggests that just because he didn't resist arrest,
14   and -- he may not have known what the bag contained.  Yet,
15   as the government points out, the defendant told the
16   arresting officer the bag contained his glasses case which
17   it ultimately did, suggesting that the defendant did have
18   knowledge of the bag's contents.
19           In addition, the government developed additional
20   evidence from the search of a cell phone recovered from the
21   codefendant in this case; and that cell phone appears to
22   belong to the defendant, Theodore Douglas.  And on that
23   phone the government found a photograph of the defendant
24   actually brandishing and pointing a firearm which, also, the
25   government intends to use to establish his knowledge and

1   possession of the gun in this case.

2       The defendant makes the argument that the evidence
3   that the defendant's possession of the firearm is weak
4   because the police action here violated Mr. Douglas's Fourth
5   Amendment rights, and litigation of this issue would likely
6   lead to suppression.

7       A detention hearing is not a suppression hearing.

8       The Bail Reform Act itself makes clear that,
9   quote, the rules concerning the admissibility of evidence in
10  criminal trials do not apply to the presentation and
11  consideration of information at the detention hearing.  See
12  18 U.S.C. Section 3142(f).

13      Evidence that the defendant may at some point seek
14  to suppress is treated as admissible in this context of this
15  detention hearing.  See, for example, *U.S. v Hightower*, a
16  Tenth Circuit case from 2000, stating that:  We are mindful
17  that our ultimate ruling on the validity of the district
18  court's suppression order may have a bearing on the issue of
19  pretrial detention; but until the validity of that order has
20  been decided, however, we consider the facts sought to be
21  suppressed as if admissible; citing 18 U.S.C. Section
22  3142(f).  See, also, *U.S. v Apker*, Eighth Circuit case from
23  1992, and *U.S. v Angiulo*, a First Circuit case from 1985.

24      Regarding the last two factors, the history and
25  characteristics of the defendant, those also -- these

factors and considerations also weigh in favor of detention.

Although, as the defendant has pointed out, he has strong family connections in D.C.; he is an active father, and adds that he also has recently been working for a moving company -- those are all very positive aspects of his connections to D.C., but the defendant comes before the Court with very significant history that makes this Court have great trouble trusting that he would not be a risk of flight.

He has two prior convictions, a 2013 conviction for possession of a firearm and a 2010 conviction for carrying a handgun. He also has a pending criminal case in superior court for distribution of a controlled substance, and that pending criminal case dates back to 2015.

The offense conduct in 2015 occurred less than a year after the defendant's release from prison on the 2013 conviction; and in the 2015 case the defendant was released to be supervised on the HISP program. But on November 9th, 2015, he removed the electronic monitoring device from his leg and became what the pretrial services report calls a "loss of contact." That loss of contact continued for five years until his arrest in this case.

He has been noncompliant with terms of supervised release, and that is what -- is a decision he made back in 2015 that will give pause to any court to release him to the

1  HISP program again.  This factor weighs heavily in favor of
2  detention.
3          With respect to the danger to the community, while
4  the defendant has not been charged with violent conduct, a
5  gun possession charge against him is nonetheless serious;
6  and coupled with his prior firearms convictions, his prior
7  noncompliance with his supervision and his prior failure to
8  appear in superior court on his 2015 offense, the Court
9  finds the defendant poses a serious risk of flight and
10 danger to the community.
11         So upon consideration of the proffered evidence
12 presented, the factors set forth in Section 3142(g), the
13 possible release conditions set forth in 3142(c), the Court
14 finds all four statutory factors weigh in favor of pretrial
15 detention because the defendant presents a serious risk of
16 flight.
17         So, therefore, the government has met its burden
18 to show by a preponderance of the evidence that no condition
19 or combination of conditions will reasonably assure the
20 appearance of the defendant.
21         I, therefore, affirm the magistrate judge's
22 pretrial detention ruling.
23         Is there anything further today from the
24 government?
25         MR. WASSERMAN:  No, Your Honor.

```
 1              THE COURT:  Mr. Wasserman, if you have any
 2   difficulty with setting up a videoconference to the grand
 3   jury room if the MPD officers remain on quarantine, please
 4   speak to me.  I will talk to our Court's IT guru, John
 5   Cramer, and see what we can do about this.
 6              I can also call -- I will send a note to John
 7   Crabb telling him we have got to move the cases along.  We
 8   are getting a grand jury quorum, so let's use them.
 9              Is that understood?
10              MR. WASSERMAN:  I will, Your Honor.  Yes.
11              THE COURT:  Mr. Ohm, anything further from you?
12              MR. OHM:  Your Honor, I don't believe that there
13   is a control date set in magistrate court.  I was wondering
14   if we can just set one to make sure that -- in case an
15   indictment doesn't come down in the next couple of weeks.
16              THE COURT:  All right.  Well, I'm hoping that --
17   what date would you suggest?
18              I am just going to go ahead and set one.  If the
19   magistrate judge doesn't like it, the magistrate judge can
20   figure out another date.
21              MR. OHM:  How about July 31st, Your Honor?
22              THE COURT:  July 31?
23              MR. OHM:  Yes.
24              THE COURT:  July 31.  I believe they do magistrate
25   judge court at one o'clock.
```

1  MR. OHM:  One o'clock, Your Honor.

2  THE COURT:  July 31, one o'clock, in magistrate

3  judge court unless this case has already been indicted and

4  assigned to a district court judge.

5  MR. OHM:  Thank you, Your Honor.

6  MR. WASSERMAN:  Very well, Your Honor.

7  THE COURT:  Thank you.  You are all excused.

8  MR. WASSERMAN:  Thank you.

9  (Whereupon, the proceeding concludes, 1:29 p.m.)

10  \* \* \* \* \*

11  **CERTIFICATE**

12  I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
certify that the foregoing constitutes a true and accurate
13  transcript of my stenographic notes, and is a full, true,
and complete transcript of the proceedings to the best of my
14  ability.

15  **PLEASE NOTE:**  This hearing was held via
videoconference and telephonically in compliance with the
16  COVID-19 pandemic stay-safer-at-home recommendations and is
therefore subject to the limitations associated with the use
17  of technology, including but not limited to telephone signal
interference, static, signal interruptions, and other
18  restrictions and limitations associated with remote court
reporting via telephone, speakerphone, and/or
19  videoconferencing capabilities.

20  This certificate shall be considered null and void
if the transcript is disassembled and/or photocopied in any
21  manner by any party without authorization of the signatory
below.

22

23  Dated this 7th day of July, 2021.

24  /s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter

25