<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,
                                      CR Action
 4              Plaintiff,            No. 1:20-121

 5         vs.                        Washington, DC
                                      March 9, 2021
 6    TAVONTE WILLIAMS AND
      THEODORE B. DOUGLAS            3:10 p.m.
 7              Defendants.
      _____/
 8

 9      TRANSCRIPT OF TELEPHONE STATUS CONFERENCE/GUILTY PLEA
                BEFORE THE HONORABLE CARL J. NICHOLS
10                  UNITED STATES DISTRICT JUDGE

11


12

      APPEARANCES:
13

      For the Plaintiff:      STEVEN B. WASSERMAN
14                            U.S. ATTORNEY'S OFFICE FOR D.C.
                              555 Fourth Street, NW
15                            Washington, DC 20530
                              (202) 252-7719
16

      For T. Williams:        JOHN PETER MARSTON
17                            FOLEY HOAG, LLP
                              1717 K Street, NW
18                            Washington, DC 20006

19    For T. Douglas:         EUGENE OHM
                              FEDERAL PUBLIC DEFENDER FOR D.C.
20                            625 Indiana Avenue, NW, Suite 550
                              Washington, DC 20004
21                            (202) 208-7500

22

      Reported By:     LORRAINE T. HERMAN, RPR, CRC
23                     Official Court Reporter
                       U.S. District & Bankruptcy Courts
24                     333 Constitution Avenue, NW
                       Room 6720
25                     Washington, DC 20001
</pre>

1              **P R O C E E D I N G S**

2              THE COURT:  Good afternoon, everyone.  Assuming

3    everyone can hear me, Ms. Lesley, could you please call this

4    matter?

5              COURTROOM DEPUTY:  Yes, Your Honor.  This is

6    criminal case year 2020-121, Tavonte Williams Defendant

7    number 1 and Theodore Douglas Defendant number 2, both who

8    are present by video.

9              MR. WASSERMAN:  Good afternoon, Your Honor.

10   Steven Wasserman on behalf of the United States.

11             THE COURT:  Mr. Wasserman, good afternoon.

12             MR. MARSTON:  John Marston for Tavonte Williams.

13             THE COURT:  Mr. Marston.

14             MR. OHM:   Gene Ohm on behalf of Theodore Douglas.

15             THE COURT:  Good afternoon.  I note Mr. Williams

16   and Mr. Douglas are on the video.

17             We obviously have a number of topics to cover.  My

18   plan, but please tell me, Mr. Marston, if you have a problem

19   with this, is to do the plea hearing first.  And then after

20   we've done that, we can talk about how that impacts the

21   schedule of the case and the like.  But if you would like to

22   take it in a different order, let me know.

23             MR. MARSTON:  This is Mr. Marston.  That sounds

24   good, Your Honor.  Thank you.

25             THE COURT:  Okay.  Thank you.

1          So I understand that Mr. Douglas would like to

2     enter a plea of guilty to the 922(g)(1) charge; is that

3     correct, Mr. Ohm?

4          MR. OHM:  Yes, Your Honor.

5          THE COURT:  So before we proceed to take the plea

6     today, I need to address a preliminary matter, which is to

7     acknowledge the unique nature of today's hearing in light of

8     the pandemic.  Ordinarily, of course, we would conduct this

9     plea in person, but during the pandemic, Congress has

10    authorized federal judges to take felony guilty pleas by

11    video or teleconference so long as after consulting with

12    counsel the Defendant consents and the judge finds the plea

13    in the case cannot be further delayed without serious harm

14    to the interest of justice.

15         Mr. Douglas, after consulting with Mr. Ohm, have

16    you decided that further delay is inappropriate and that you

17    would like to resolve this matter as promptly as possible

18    and without the risks that attend being physically present

19    in the courtroom during the COVID-19 pandemic?

20         THE DEFENDANT:  Yes, sir, Your Honor.

21         THE COURT:  And, Mr. Ohm, do you agree the

22    interests of justice would be seriously harmed by further

23    delay and that we should therefore proceed with this plea

24    hearing by video?

25         MR. OHM:  Yes, Your Honor.

1          THE COURT:  I find that because Mr. Douglas, after

2     consulting with counsel, consents to proceed by

3     videoconference and with the interest of justice being

4     seriously harmed by further delay, that it is appropriate to

5     proceed by video.

6          Incidentally, Mr. Wasserman, I assume you agree

7     that we should proceed by video today?

8          MR. WASSERMAN:  Yes, Your Honor.

9          THE COURT:  Ms. Lesley, could you please

10    administer the oath to Mr. Douglas?

11         COURTROOM DEPUTY:  Mr. Douglas, please raise your

12    right hand.  Do you solemnly swear that you will well and

13    truly answer all questions propounded to you, so help you

14    God?

15         THE DEFENDANT:  Yes, I do.

16         COURTROOM DEPUTY:  Thank you.

17         THE COURT:  Mr. Douglas, the purpose of this

18    hearing is to allow you to enter into a plea of guilty to

19    the charge against you.  Because this is an important

20    decision, it is vital you understand what rights you will

21    give up by entering a guilty plea.  I will ask you a series

22    of questions to make sure that the guilty plea is knowing

23    and voluntary and with the advice of your attorney.  If you

24    don't understand any of the questions, please tell me.  I'll

25    try to explain things more clearly or I will let you consult

1    with Mr. Ohm.  If you don't ask for clarification, I will

2    assume you understand the questions and discussions.  You

3    are under oath now and you are obligated to answer all

4    questions truthfully.  If you are not truthful, and the plea

5    should fall apart, the Government may be able to use some of

6    your statements against you in a later proceeding or

7    separate prosecution for perjury or making a false

8    statement.

9    **BY THE COURT:**

10        **Q.**   Mr. Douglas, what is your full name?

11        **A.**   Theodore Bernard Douglas, III.

12        **Q.**   How old are you, Mr. Douglas?

13        **A.**   Thirty years old.

14        **Q.**   Were you born in the United States?

15        **A.**   Yes.

16        **Q.**   Are you sick or impaired in any way that could

17    prevent you from understanding what is happening here today?

18        **A.**   No.

19            THE COURT:  Mr. Ohm, do you have any reason to

20    believe your client will be unable to understand what we are

21    discussing here today?

22            MR. OHM:  No, Your Honor.

23    **BY THE COURT:**

24        **Q.**   Mr. Douglas, have you had enough time to discuss

25    things with your attorney?

1    **A.**    Yes.

2    **Q.**    Have you received a copy of the indictment against

3    you, which is the written charge made against you in this

4    case?

5    **A.**    Yes.

6    **Q.**    Have you had the opportunity to discuss with Mr.

7    Ohm the charge against you and whether you should enter a

8    plea today?

9    **A.**    Yes.

10    **Q.**    Are you satisfied with the services of Mr. Ohm in

11    this matter?

12    **A.**    Yes.

13    THE COURT:  Mr. Ohm, have you had enough time to

14    review and investigate the law and facts in this case?

15    MR. OHM:  Yes, Your Honor.

16    THE COURT:  I find the Defendant Mr. Douglas is

17    responding appropriately to my questions and appears to

18    understand them fully.  I find he is competent and capable

19    of entering an informed plea.

20    **BY THE COURT:**

21    **Q.**    Mr. Douglas, before I accept your plea, I need to

22    explain the rights you have in this matter and confirm that

23    you understand them.  Please listen closely again, and

24    please let me know if you don't understand anything or need

25    to speak with Mr. Ohm privately, which we could arrange in a

1   separate, private videoconference.  I will now discuss your

2   right to a jury trial and an appeal.

3            Do you understand, Mr. Douglas, that you have the

4   right to plead not guilty to any offense charged against

5   you?

6       **A.**   Yes.

7       **Q.**   Do you understand you have a right to challenge

8   the Government's case against you in a jury trial where 12

9   citizens of the District of Columbia would sit as a jury and

10  determine whether you were guilty based on evidence

11  presented in the courtroom?

12      **A.**   Yes.

13      **Q.**   Do you understand that if you were to go to trial,

14  you would have the right to be represented by your lawyer at

15  that trial and at every stage of the proceeding?

16      **A.**   Yes.

17      **Q.**   Do you understand that if you were to exercise

18  your right to a trial, you would have the right to confront

19  and cross examine any of the Government's witnesses who

20  testify against you?

21      **A.**   Yes.

22      **Q.**   Do you understand that if you were to exercise

23  your right to a trial, you would have the right to present

24  your own witnesses and the right to subpoena them and

25  require them to testify in your defense?

1       **A.**   Yes.

2       **Q.**   Do you understand that at a trial you would have

3    the right to testify and present evidence on your behalf,

4    but only if you wanted to.  If you did not want to testify

5    or present evidence, you would not have to do so?

6       **A.**   Yes.

7       **Q.**   Do you understand that unless and until I accept

8    your guilty plea, you are presumed innocent under the law

9    unless if you were to choose to go to trial, the Government

10    would have the burden of proving you were guilty beyond a

11    reasonable doubt?

12       **A.**   Yes.

13       **Q.**   Do you understand that if you choose to go to

14    trial and are convicted, you would have the right to appeal

15    your conviction and to have a lawyer prepare your appeal,

16    but that by pleading guilty, you are giving up many of your

17    rights to appeal your conviction and sentence with some

18    limited exceptions?  Do you understand that?

19       **A.**   Yes.

20       **Q.**   Do you understand that you are waiving the right

21    to appeal your conviction; that you could not later try to

22    appeal your conviction and argue, for example, that the

23    statute to which you are pleading guilty is unconstitutional

24    or that the conduct you engaged in did not fit within the

25    scope of the statute?  Do you understand all of that?

1      **A.**   Yes.

2      **Q.**   Do you understand you are generally waiving the

3   right to appeal your sentence, which means you can't appeal

4   your prison term, the fine, forfeiture, award of

5   restitution, term or condition of supervised release, my

6   authority to set the condition of release or how I

7   determined your sentence with some limited exceptions that I

8   will get to?  Do you understand all of that?

9      **A.**   Yes.

10     **Q.**   So as I mentioned, there are some limited

11  exceptions to the waiver of your appeal rights.  You can

12  appeal the sentence, if I sentence you above the statutory

13  maximum or the advisory guidelines range, and you could also

14  appeal the conviction and sentence on the basis that your

15  lawyer was ineffective.  Do you understand that you will

16  retain those appeal rights?

17     **A.**   Yes.

18     **Q.**   So, Mr. Douglas, do you understand that you are

19  largely giving up your rights if you plead guilty today?

20     **A.**   Yes.

21     **Q.**   Do you still wish to plead guilty and give up all

22  of the rights that we have discussed?

23     **A.**   Yes.

24        MR. WASSERMAN:  Your Honor, this is Steven

25  Wasserman.  I just wanted to make sure it was clear on the

1    record that Mr. Douglas is preserving his right to appeal

2    the denial of his Motion to Suppress, which is included in

3    the terms of the plea agreement.

4          THE COURT:  Okay.  Thank you, Mr. Wasserman.  Mr.

5    Ohm, do you agree that Mr. Douglas is, in fact, preserving

6    his right to appeal the denial of his Motion to Suppress?

7          MR. OHM:  Yes, Your Honor, it is set forth on Page

8    4 of the plea agreement.

9          THE COURT:  Thank you, Mr. Wasserman.

10         MR. WASSERMAN:  Yes, Your Honor.

11   **BY THE COURT:**

12        **Q.**   Mr. Douglas, do you understand you are giving up

13   your right to appeal my decision with respect to your Motion

14   to Suppress?

15        **A.**   Yes.

16         THE COURT:  Thank you, Mr. Wasserman, for that

17   clarification.

18   **BY THE COURT:**

19        **Q.**   I will hold up what appears to be a signed waiver

20   of a trial by jury form.  Does this document contain your

21   signature?

22        **A.**   Yes, Your Honor.

23         THE COURT:  Mr. Ohm, is there any reason Mr.

24   Douglas should not waive jury trial -- [inaudible]

25         MR. OHM:  I'm sorry, Your Honor.  I didn't really

1    hear the last part.

2         THE COURT:  That's okay.  There is some background

3    noise somewhere.  Let me say it again.

4         Mr. Ohm, is there any reason Mr. Douglas should

5    not waive his right to a jury trial and his right against

6    self-incrimination to a charge to which a guilty plea will

7    be made?

8         MR. OHM:  No, Your Honor.

9         THE COURT:  I find that the waiver of a trial by

10   jury is knowingly and voluntarily made and it is accepted.

11   The signed waiver will be filed.

12        Mr. Douglas, before I can accept your guilty plea,

13   I must first determine that there was a factual basis for

14   the plea.  The Government has provided a document called the

15   Statement of Offense that describes what the Government

16   would be prepared to prove at trial.  Mr. Wasserman, could

17   you summarize the Statement of the Offense and the elements

18   of charges, please?

19        MR. WASSERMAN:  With respect to the elements of

20   the offense of unlawful possession of a firearm by a person

21   convicted of a crime punishable by imprisonment for a term

22   exceeding one year in violation of 18 US Code, Section

23   922(g)(1), the first element is that the Defendant knowingly

24   possessed a firearm and/or ammunition; secondly, at the time

25   of the charged act, the Defendant had previously been

convicted in a court of a crime punishable by imprisonment for a term exceeding one year; three, at the time of the charged act, the Defendant knew that he had previously been convicted in a court of a crime punishablable by a term exceeding one year, and finally, that the firearm or ammunition had been transported in interstate commerce.

If this case had proceeded to trial, the Government's evidence would have established that on April 22nd of 2020 officers of the Metropolitan Police Department were conducting an observation post in the 2300 block of 15th Street, Northeast, Washington, D.C.  An undercover officer observed the Defendant, Mr. Douglas, standing in a walkway in that block, at which time the undercover officer would testify that an individual, later identified as Tavonte Williams, approached Mr. Douglas and handed Mr. Douglas a black backpack with shoulder straps.  Mr. Douglas ultimately put this bag onto his back and put his jacket on over the bag.

The undercover observed Mr. Douglas hand Mr. Williams an unidentified object.  The undercover officer then alerted officers from the arrest team to move in and stop both Mr. Douglas and Mr. Williams.  Both defendants were ultimately stopped separately and positively identified by the undercover officer as the individuals previously observed exchanging the backpack and an unidentified object.

1    Mr. Douglas was found to be wearing the backpack

2    under his jacket as observed by the undercover.  The officer

3    who stopped Mr. Douglas conducted an external frisk of the

4    backpack worn by Mr. Douglas, and a later search of the

5    backpack revealed the presence of a firearm inside of the

6    backpack.  Mr. Douglas was placed under arrest.  The firearm

7    was recovered from the backpack and determined to be a Sig

8    Sauer model P320, .40 caliber, semi-automatic, obliterated

9    serial number.  When the firearm was recovered, it was also

10   loaded with 13 rounds in the magazine.  And these events,

11   with respect to the stop and search of Mr. Douglas, were

12   captured on body worn camera by the police.

13   Mr. Douglas would acknowledge and admit that at

14   the time that he possessed the loaded .40 caliber,

15   semi-automatic pistol, he had been previously convicted of

16   an offense for which the penalty was greater than one year

17   of imprisonment.  Specifically, carrying a handgun in the

18   Circuit Court of Prince George's County, Maryland, case

19   number CT090351X, an unlawful possession of firearm in D.C.

20   Superior Court, case number 2013-CF1-6028.

21   Mr. Douglas also agrees and acknowledges at the

22   time he possessed this firearm, he was aware that he had a

23   previous conviction for an offense, which the penalty was

24   greater than one year imprisonment.  And the Government's

25   evidence at trial would establish that the firearm and

1    ammunition had been shipped or transported from one state to

2    another; and that the firearm was capable of expelling a

3    projectile by means of an explosive.

4         THE COURT:  Thank you, Mr. Wasserman.

5    **BY THE COURT:**

6         **Q.**   Mr. Douglas, I am holding up for the video camera

7    a document entitled Statement of the Offense.  There is what

8    appears to be your signature on the last page.  Mr. Douglas,

9    have you read this document entitled Statement of the

10   Offense and discussed it fully with Mr. Ohm?

11        **A.**   Yes.

12        **Q.**   Is that your signature on the last page

13   acknowledging that have you read the description of the

14   criminal conduct and fully understand it?

15        **A.**   Yes.

16        **Q.**   And does the Statement of the Offense truly and

17   accurately describe what you did in this case?

18        **A.**   Yes.

19        **Q.**   Are there any corrections or changes you would

20   make to the Statement of the Offense?

21        **A.**   Well, no.  No, Your Honor, I can't say right now,

22   no.

23        **Q.**   Do you wish to confer with your counsel?

24        **A.**   Yes, if I can do that real quick.

25        THE COURT:  I'd rather not have you speak publicly

1    if you wish to confer with Mr. Ohm.  Ms. Lesley, can you put

2    Mr. Ohm and Mr. Douglas on a sidebar or whatever we call it,

3    in a separate room on the videoconference so that they can

4    confer in a non-public setting?

5                    (Discussion off the record.)

6                    MR. OHM:  Thank you, Your Honor.  I appreciate it.

7    I'm embarrassed to say that I didn't catch this.

8                    Mr. Douglas points out that within the plea

9    agreement on Page 7, under Paragraph 10, that the serial

10   numbers listed for the firearm, but in the estimated

11   guideline range that he is acknowledging -- he is being

12   asked to acknowledge an obliterated serial number.  He did

13   want to ask of that.  I spent a couple minutes trying to

14   look at the photos that we have been provided in discovery.

15   The photographs we have are of the other side, so I couldn't

16   tell one way or the other.  So that's the issue we are

17   trying to resolve.

18                   MR. WASSERMAN:  Your Honor, it's my understanding

19   that the Department of Forensic Services was able to raise

20   the serial number.  Although I don't have photos of the

21   seized gun that have the serial number exposed or where the

22   obliteration of the serial number is exposed; that was my

23   understanding, since the police reports indicated that the

24   serial number was obliterated and ultimately DFS, when they

25   did their report, provided a serial number when they

1    processed the firearm.

2          In order for me to, I guess, verify that, I would

3    have to probably go back and talk to somebody at DFS,

4    because -- I don't know that it's entirely clear from the

5    paperwork that I have.

6          THE COURT:  So what do you or Mr. Ohm propose we

7    do today?  Obviously, it seems consistent, in my view, that

8    you could have a pistol or firearm where the serial number

9    was obliterated to the normal, naked eye or at least

10   attempted to be obliterated, but then after significant

11   forensic work the serial number was able to be discerned.

12   So conceptually it sure seems possible to me.  But I think

13   we need to be pretty clear about the facts here.  It seems

14   like the record is going to be really kind of conjectural at

15   the moment.

16         Mr. Ohm or Mr. Wasserman, what do you propose we

17   do on this question?

18         MR. WASSERMAN:  Um, what I would have to do is --

19   because I don't know that I've got -- I'd have to see if I

20   can identify a photograph that I have that, you know,

21   essentially shows the serial number or the obliteration of

22   the serial number and provide it to Mr. Ohm.  I don't know

23   that I have that, because I did look as I was going through

24   generating the plea paperwork and, you know, went under the

25   impression that the serial number had been raised in the DFS

1    processing.

2            I don't think the paperwork, the DFS paperwork,

3    makes it completely clear, from my memory, about the raising

4    of the serial number.  So I am going to need to -- what I

5    would suggest, I guess, is perhaps rescheduling this until

6    Thursday, where we could either pick up the plea hearing

7    from here.  If the serial number was not obliterated, then

8    obviously, we will just scratch that.  It will impact the

9    guideline calculation, and we will just recalculate it to

10   whatever it is.

11           But if it is, in fact, obliterated, you know, I

12   will provide Mr. Ohm any confirmatory information that I can

13   get my hands on, you know, in advance of Thursday.

14           THE COURT:  Mr. Ohm, what do you think?

15           MR. OHM:  I don't think I am in a position to

16   object to that way of doing it.  I can't think of anything

17   better off the top of my head.

18           MR. WASSERMAN:  The only other thing I could do is

19   I could try to make a couple of calls to see if I could get

20   confirmation and perhaps -- I don't know how long -- given

21   that I am not in the office and I would have to sort of call

22   around, I think it would be difficult to get that

23   information that quickly.

24           THE COURT:  Right.  As we know, especially if we

25   pause the hearing, it could be a little bit difficult to

1    have Mr. Ohm communicate with Mr. Douglas at the jail.

2           I think probably the most efficient course,

3    probably the best and fairest course -- because I think the

4    goal should be to get this right, whatever the facts end up

5    being.  A day or two more to allow that to happen, I think

6    is the most efficient way and the best way to go forward.

7           Assuming that this is resolved in whatever fashion

8    as to the facts, I don't think we need to go over all of the

9    groundwork we already covered.  So my intent would be to

10   simply pick up where we are, which is essentially, with the

11   Statement of Offense.  So we basically would be continuing

12   the plea hearing.

13          Why don't we continue the plea hearing until

14   Thursday or Friday, either of those days is fine with me.

15          MR. WASSERMAN:  Your Honor, Friday would probably

16   be better because it would give me an extra day to make sure

17   that I can get this information and revise the plea

18   paperwork, if necessary, and also get any information over

19   to Mr. Ohm.

20          THE COURT:  Okay.  Ms. Lesley also is telling me

21   that there are no times available on Thursday for

22   videoconference at the jail.  In any event so we are looking

23   at Friday.  Do the parties have time limitations on Friday?

24   Other than one motions hearing, I am free.  But as

25   Ms. Lesley looks at the time.  If you all have constraints,

1    please let her know.

2              MR. WASSERMAN:  Friday afternoon would be better

3    for me.  I have a meeting at 10:00 a.m. on Friday afternoon.

4    I mean Friday at 10:00 a.m.

5              THE COURT:  Duly noted.

6              MR. OHM:  Your Honor, I can't do after 3:30.

7              THE COURT:  Ms. Lesley, look for between 12 and

8    2:30.  It looks like 1:00 is available.  Does that work for

9    everyone?

10              MR. WASSERMAN:  That's fine for the Government,

11    Your Honor.

12              MR. OHM:  That works for me, Your Honor.

13              THE COURT:  Mr. Marston?

14              MR. MARSTON:  That's good for me, Your Honor.

15              THE COURT:  Mr. Williams, are you able to

16    participate at 1:00 on Friday?

17              THE DEFENDANT:  Yes, Your Honor.

18              THE COURT:  Okay.  Thank you.

19              So that's what we will do.  Thank you, Mr.

20    Douglas, for bringing this to our attention.  Mr. Wasserman

21    will go dig into this.  He will be in touch with Mr. Ohm.

22              If necessary, either information will be provided

23    to you or the parties will make whatever changes might be

24    appropriate to the papers, and my intention as I've already

25    said, is to not redo what we've already done with respect to

1    today's hearing, but to pick it up with the discussion of

2    the Statement of Offense.  Frankly, we don't even have to

3    pick up the whole Statement of Offense, just resolve this

4    question on the record.  See if you are then in agreement

5    with the Statement of Offense and go forward.

6              MR. WASSERMAN:  I apologize for the confusion.  I

7    had thought this was clarified, but when I am looking at the

8    DFS paperwork, it's not entirely clear.  And I don't want to

9    -- I think it is correct to not move forward.  I should

10   apologize.  I should have picked up on that.

11             THE COURT:  Not a problem.  We will figure it out,

12   and we will resume this on Friday.

13             Mr. Marston, do you want to wait until after we

14   have a concluded guilty plea, assuming that's where we land,

15   of course, before we talk about next steps in your matter,

16   Mr. Williams' matter?

17             MR. MARSTON:  Yes, Your Honor.

18             THE COURT:  Okay.  So we will just do that.  This

19   hearing is continued for all purposes until Friday at 1:00

20   p.m.  We will be together on video then and we will,

21   obviously, pick up the plea and then we will discuss

22   whatever we need to discuss with respect to Mr. Williams.

23   Thank you, Counsel.

24             MR. WASSERMAN:  Thank you, Your Honor.

25             MR. OHM:  Very good.  Thank you.

1          MR. MARSTON:  Thank you.

2              (Proceedings concluded at 3:44 p.m.)

1                          **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8                   **Please Note:**  This hearing occurred during

9    the COVID-19 pandemic and is therefore subject to the

10   technological limitations of court reporting remotely.

11

12

13

14      ___**July 15, 2021**____              ___**/s/**_____
                 **DATE**                          **Lorraine T. Herman**
15

16

17

18

19

20

21

22

23

24

25