1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA

2

3   UNITED STATES OF AMERICA,

                            CR Action
4         Plaintiff,          No. 1:20-121

5       vs.                Washington, DC
                            May 4, 2021
6

7   THEODORE B. DOUGLAS         9:16 a.m.
         Defendant.
   _____/

8

9               TRANSCRIPT OF SENTENCING
         BEFORE THE HONORABLE CARL J. NICHOLS
10           UNITED STATES DISTRICT JUDGE

11

12

   APPEARANCES:
13

   For the Plaintiff:    STEVEN B. WASSERMAN
14                    U.S. ATTORNEY'S OFFICE FOR D.C.
                    555 Fourth Street, NW
15                    Washington, DC 20530
                    (202) 252-7719
16

17   For the Defendant:    EUGENE OHM
                    FEDERAL PUBLIC DEFENDER FOR D.C.
18                    625 Indiana Avenue, NW, Suite 550
                    Washington, DC 20004
19                    (202) 208-7500

20

21

22   Reported By:      LORRAINE T. HERMAN, RPR, CRC
                    Official Court Reporter
23                    U.S. District & Bankruptcy Courts
                    333 Constitution Avenue, NW
24                    Room 6720
                    Washington, DC 20001
25

1          **P R O C E E D I N G S**

2                  COURTROOM DEPUTY:  This is criminal case year

3     2020-121, United States of America versus Theodore B.

4     Douglas, Defendant number 2.  Probation Officer is Aidee

5     Gavito.

6                  Counsel, please introduce yourselves for the

7     record, beginning with the Government.

8                  MR. WASSERMAN:  Good morning, Your Honor.  Steve

9     Wasserman for the United States.

10                  THE COURT:  Mr. Wasserman, good morning.

11                  MR. OHM:   Eugene Ohm on behalf of Mr. Douglas.

12                  THE COURT:  Good morning, Mr. Ohm and  Ms. Gavito.

13     Mr. Douglas, good morning.

14                  THE DEFENDANT:  Good morning, Your Honor.

15                  THE COURT:  Just a few preliminary matters, first

16     with respect to conducting this hearing by videoconference.

17     Ordinarily we would hold this hearing in person, but during

18     the pandemic Congress has authorized federal judges to

19     conduct sentencings by video or teleconference so long as

20     after consulting with counsel, the Defendant consents and

21     the Judge finds that the sentencing cannot be further

22     delayed without serious harm to the interests of juctice.

23                  Mr. Douglas, after consulting with Mr. Ohm, have

24     you decided that further delay is inappropriate and that you

25     would like to resolve this matter as promptly as possible

1    and without the risks that attend being physically present

2    in the courtroom during the COVID-19 pandemic?

3              THE DEFENDANT:  Yes, sir, Your Honor.

4              THE COURT:  Thank you.

5              Mr. Ohm, do you agree that we should proceed this

6    morning by video?

7              MR. OHM:  I do, Your Honor.

8              THE COURT:  I assume, Mr. Wasserman, you agree as

9    well?

10             MR. WASSERMAN:  Yes, Your Honor.

11             THE COURT:  I find that because Mr. Douglas, after

12   consulting with counsel, consents to proceed by

13   videoconference, and that the interests of justice would be

14   seriously harmed by further delay, that it is appropriate to

15   proceed this morning by video.

16             Second, before we begin with the sentencing

17   matters, I believe we need to correct a -- what I think is

18   an administerial error from the plea agreement, which states

19   that Mr. Douglas is pleading guilty, and as we discussed at

20   the plea hearing, to Count 1 of the indictment against him.

21   But as the Probation Office correctly pointed out when

22   completing Mr. Douglas' pre-sentence investigation report,

23   that Count 1 of the indictment does not charge Mr. Douglas

24   with unlawfully possessing a firearm, instead it charges his

25   co-defendant, Mr. Williams, with that offense.  Mr. Douglas

1      is charged only in Count 2 of this indictment.

2              Mr. Wasserman, how do you propose that we correct

3      that error?

4              MR. WASSERMAN:  Your Honor, the parties submitted

5      to the Court yesterday, Page 1 of the plea agreement, which

6      essentially handwritten, crossed out, Count 1 on Page 1 and

7      wrote in Count 2, and all parties initialed and dated the

8      change; so that's how we propose to modify the plea

9      agreement.

10             THE COURT:  And, Mr. Ohm, you agree that that's an

11     appropriate course here, and that we'll docket it as an

12     amended plea agreement, I believe?

13             MR. OHM:  I do, Your Honor.

14             THE COURT:  Mr. Douglas, do you agree with this

15     course; that is to say, essentially substituting Count 2 for

16     Count 1 in the plea agreement to reflect the count that you

17     are charged with?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Okay.  Thank you very much.

20             So now that we have those two preliminary matters

21     out of the way, we are ready to proceed to sentencing.  I

22     have read Probation's pre-sentence investigation report and

23     recommendation, the Government's sentencing memorandum, the

24     Defendant's sentencing memorandum, Mr. Douglas' letter and

25     the letters of support submitted on Mr. Douglas' behalf.

1    Are there any other written submissions I should know about

2    or anything to add to those written submissions?  Of course,

3    I will hear argument and from the Defendant, if he would

4    like, but just as to the written submissions, anything I

5    have not mentioned or that I should be aware of?

6                MR. WASSERMAN:  Not for the Government, Your

7    Honor.

8                MR. OHM:  No, Your Honor.

9                THE COURT:  Thank you.

10               Will there be any family members or guests on the

11   videoconference today?

12               MR. OHM:  Your Honor, there are family members on

13   the public line, Mr. Douglas' parents and Mr. Douglas' -- I

14   believe the mother of Mr. Douglas' son are on the public

15   line.

16               THE COURT:  Thank you, Mr. Ohm.  Welcome to them.

17               So there are four steps for us to accomplish this

18   morning.  First, I will consider any objections to the PSR

19   and make my factual findings; second, I will calculate the

20   appropriate guidelines range, the sentencing guidelines;

21   third, I will hear from Probation, counsel and Mr. Douglas,

22   if he would like to speak; and, finally, I will pronounce

23   the sentence.

24               Before we turn to the objections to the

25   pre-sentence investigation report, I will just ask Mr.

1    Douglas a few questions to make sure that he has reviewed

2    and understands the report.

3            Mr. Douglas, have you had a chance to review the

4    pre-sentence report with Mr. Ohm?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  Did you have enough time to talk to

7    him about that report and the briefs that have been filed in

8    this case?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Are you completely satisfied with the

11   services of Mr. Ohm?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  Thank you.  Thank you, Mr. Douglas.

14           Now let's turn to the objections of the

15   pre-sentence investigation report lodged by the parties.

16   Mr. Ohm, why don't we start with you.  I believe the state

17   of play is as follows, which is that the Defendant and the

18   Government do not believe that there should be a four-level

19   enhancement for alteration or obliteration of the serial

20   number on the weapon at issue here under Section

21   (2)(k)(2.1)(b)(4) of the sentencing guidelines, but

22   obviously Probation, at a minimum, suggests that there is

23   enough evidence in the record, including the statement of

24   facts filed many months ago to support such an enhancement.

25           What is your -- obviously you've objected to that,

1    but what is your argument for why there isn't enough

2    evidence in the record to support that enhancement?

3                    MR. OHM:  Well, Your Honor, I think it's a factual

4    matter.  There simply isn't an obliterated serial number.

5    It is a serial number that is visible on the firearm.  Is

6    visible, I think, to the plain eye.  I actually inspected

7    the firearm a long time ago in preparation for the motions

8    hearing.  I was able to see in our pictures that it was

9    visible.

10                   I think it is plainly a factual matter.  Probation

11   here has, essentially, hearsay information reported to them

12   through police reports, but while it was somewhat visibly

13   affected, I don't think there is any reasonable argument

14   that it was anywhere near obliterated, because the

15   firearm -- the serial number of the firearm could plainly be

16   seen and was actually reported in the initial police report

17   when the firearm was collected.

18                   So, purely as a factual matter, Your Honor, the

19   parties that actually had access to the firearm are relying

20   upon the facts that are what they plainly are, which is that

21   the serial number is there and exists.  Probation obviously

22   has to rely on police reports and whatnot and so could not

23   see it is not obliterated.

24                   If the Court sort of follows the logic that

25   Probation set forth or is inclined to, I think that this is

1    probably the worst case for the Court to put out this test

2    run.  I think what was clear to the Court through the

3    body-worn camera and the testimony that the Court saw at the

4    suppression hearing, that Mr. Douglas never actually saw the

5    firearm that he possessed.  As a factual matter and, in

6    fact, I don't know if the Court knows this, when the

7    Government pursued its investigation, the Government took

8    DNA samples and had DNA testing done comparing Mr. Williams'

9    DNA with the firearm but not Mr. Douglas' because it was

10   agreed upon that Mr. Douglas had never touched the firearm

11   or it was not the Government's theory or anybody's theory

12   that he had ever touched or actually put his hands on the

13   firearm.

14          So to the extent that the obliterated serial

15   number is sort of this strict liability enhancement that's

16   being advanced here or could be considered that the Court

17   would have to combine this sort of strict liability concept

18   along with the idea that a serial number that is scratched

19   but not obliterated qualifies for the enhancement, is just

20   several bridges too far in the analysis.  So I urge the

21   Court not to apply the firearm enhancement.

22          THE COURT:  Mr. Wasserman, what is the

23   Government's view?

24          MR. WASSERMAN:  Your Honor, the Government

25   similarly objects to the application of the enhancement,

1    although for slightly different reasons.  I don't believe

2    there's sufficient evidence in the record for the Court to

3    conclude that the enhancement would apply.

4           What Probation is relying on is the statement of

5    facts from the Complaint, which really isn't evidence.  It's

6    certainly not evidence that was presented to the Court

7    during sentencing and subject to cross examination.  So I

8    don't really think that the Court necessarily needs to reach

9    the factual issue of whether or not the defacement of the

10   serial number is sufficient to apply the enhancement,

11   although the information that I have is that the serial

12   number was visible to the naked eye, notwithstanding the

13   attempts to scratch it off.

14          But that evidence isn't in the record, and as I

15   mentioned in my sentencing memorandum, the D.C. Circuit has

16   not addressed this specific issue about the extent of the

17   defacement that is necessary in order to apply the

18   enhancement.  There is not evidence in this record, from

19   which I submit the Court can make that determination.  The

20   parties, quite frankly, as part of the plea, agreed that the

21   enhancement should not apply.

22          As I pointed out in my sentencing memorandum, the

23   cases that Probation relied on largely applied the

24   enhancement in situations where there was at least partial

25   obliteration of the serial number, such that it was not

1    visible to the naked eye.  I think there may have been one

2    case where the Court applied the enhancement, even though it

3    was visible to the naked eye.  But those cases that were

4    cited by Probation, as I recall from reading them, one or

5    more of the numbers were not readable or ledgible to the

6    naked eye and could not be read without some sort of

7    forensic processing.

8            I don't think those cases would necessarily apply

9    in this case anyway.  Again, given the fact that the D.C.

10   Circuit has not addressed this issue, I don't think that

11   this is the appropriate case, based on this record, for the

12   Court to make that decision and apply the enhancement.

13           THE COURT:  Thank you, Mr. Wasserman.

14           Ms. Gavito, what is Probation's response to these

15   arguments?  I mean, in particular, other than the statement

16   of facts, is there any evidence in the record that would

17   support the argument that the serial number was obliterated

18   or altered here?

19           PROBATION:  No, Your Honor.  There is no other

20   evidence.  I relied on the documents that were filed with

21   the Court initially.  And there is nothing else to add, Your

22   Honor.

23           THE COURT:  Thank you very much.

24           So as to the pre-sentence report, under Rule 32

25   (1)(3)(a) I accept the factual findings regarding the

1   circumstances of the offense contained in the undisputed

2   portions of the presentence investigation report.  I adopt

3   those facts for the purpose of imposing the sentence.

4        As to the portions of the pre-sentence

5   investigation report, to which the Government and Mr.

6   Douglas have objected and we just discussed, the record

7   before me does not contain insufficient evidence to find

8   that the serial number on the firearm was altered or

9   obliterated within the meaning of Section (2)(k)(2.1)(b)(4)

10  of the sentencing guidelines; I therefore find on the record

11  before me that the four-level enhancement for an; altered or

12  obliterated serial number does not apply.  I don't believe I

13  need to reach the question of how much alteration or

14  obliteration is sufficient, nor do I need to reach the

15  Defendant's argument about the strict liability nature of

16  the enhancement, because I simply think the evidence in the

17  record does not support the enhancement.

18        So as to the guidelines questions then, obviously

19  the sentencing guidelines apply here.  They are not

20  mandatory.  They are advisory but I, nevertheless, must

21  calculate and consider them.  According to the PSR, the

22  relevant guideline is Section (2)(k)(2.1) because Mr.

23  Douglas pleaded guilty to a violation of 18 US Code, Section

24  922(g)(1).  Because Mr. Douglas was a prohibited person at

25  the time of the offense, committed the offense with

1    knowledge, intent or reason to believe the offense would

2    result to the transfer of a firearm or ammunition to a

3    prohibited person, the base offense level is 14.

4           As I've already determined, the four-level

5    enhancement for the alteration or obliteration of the serial

6    number does not apply here because the record does not

7    contain sufficient evidence for the Court to find that the

8    serial number was altered or obliterated.

9           An offense level reduction, however, does apply

10   because Mr. Douglas accepted responsibility for his offense.

11   The offense level is decreased by 2; that results in a total

12   offense level of 12.

13          Putting aside the questions we've already

14   discussed -- and again, assuming that the four-level

15   enhancement, as I've already found, does not apply, does

16   anyone object to the total offense level calculation?

17          Mr. Wasserman?

18          MR. WASSERMAN:  No, Your Honor.

19          MR. OHM:  Not on behalf of Mr. Douglas, Your

20   Honor.

21          THE COURT:  Ms. Gavito, I assume Probation agrees

22   with that calculation assuming the four-level enhancement

23   isn't applicable; is that correct?

24          PROBATION:  That's correct, Your Honor.

25          THE COURT:  Thank you.

1        As to the criminal history category, Mr. Douglas

2    received five total points for his 2013 conviction for an

3    unlawful possession of a firearm.  Mr. Douglas received

4    three points for the offense itself, and a two-point

5    enhancement, committing the offense charged in this case

6    while under a criminal justice sentence before that 2013

7    offense, that results in a total criminal history category

8    score of five, which translates to criminal history --

9    sorry.  I am not sure if I said that correctly.  This

10   results in a total criminal history score of five, which

11   translates to criminal history category three.  That's

12   obviously in the pre-sentence report.  There weren't any

13   objections to that, but does anyone object to that

14   calculation of Mr. Douglas' criminal history category?  Mr.

15   Wasserman?

16            MR. WASSERMAN:  No, Your Honor.

17            THE COURT:  Mr. Ohm?

18            MR. OHM:  No, Your Honor.

19            THE COURT:  Ms. Gavito, it's in your report but

20   you agree?

21            PROBATION:  Yes, Your Honor, I agree.

22            THE COURT:  So that offense level of 12 and

23   criminal history category of 3 results in a sentencing

24   guidelines range of 15 to 21 months imprisonment.  I'll ask

25   again, I guess, I think I know the answer, but assuming

1     offense level of 12 and criminal history category 3, the

2     parties agree that the appropriate guidelines range is 15 to

3     21 months?  Mr. Wasserman?

4                    MR. WASSERMAN:  Yes, Your Honor.

5                    MR. OHM:  Yes, Your Honor.

6                    THE COURT:  And Ms. Gavito?

7                    PROBATION:  Yes, Your Honor.

8                    THE COURT:  As to a fine, I can impose a fine up

9     to $250,000 under the statute.  The guidelines range is 5500

10    to $55,000.  Mr. Wasserman, do you agree aside from the $100

11    mandatory special assessment, Mr. Douglas does not have the

12    means to pay a fine?

13                   MR. WASSERMAN:  I accept the Probation's findings

14    on that matter, Your Honor.  I usually defer to the Court on

15    the fine.  I am not specifically recommending one.

16                   THE COURT:  Fair enough.  Thank you.

17                   As to supervised release, the statue also permits

18    me to impose supervised release of three years and the

19    guidelines range is one to three years.

20                   Mr. Ohm, does Mr. Douglas object to any of the

21    conditions of supervised release that Probation has

22    recommended?

23                   MR. OHM:  No, Your Honor.

24                   THE COURT:  And, Mr. Wasserman, does the

25    Government recommend any additional conditions beyond what

1    Probation has recommended?

2              MR. WASSERMAN:  No, Your Honor.

3              THE COURT:  Thank you.

4              Counsel, any objections to my guidelines

5    calculations?  Mr. Wasserman?

6              MR. WASSERMAN:  No, Your Honor.

7              THE COURT:  Mr. Ohm?

8              MR. OHM:  No, Your Honor.

9              THE COURT:  So that's the relevant guidelines

10   calculations, and I will now hear from the parties.  By

11   that, I intend to first hear from the Government about what

12   the Government believes an appropriate sentence is, and then

13   from you, Mr. Ohm, then from you Ms. Gavito, if you have

14   anything you would like to add.  And then I will give Mr.

15   Douglas an opportunity to speak to me if he would like.

16             Mr. Wasserman, the Government has argued for a low

17   end of the guidelines range sentence here.  Why do you think

18   that is an appropriate sentence?

19             MR. WASSERMAN:  Your Honor, what I would suggest,

20   to highlight my sentencing memorandum, obviously the

21   Defendant has been incarcerated at this point for over a

22   year.  Certainly under probably more trying circumstances

23   than is typical given the COVID pandemic.

24             THE COURT:  Mr. Wasserman, does the Government

25   have a view about whether, essentially, time presently

1    served at the D.C. Jail under COVID conditions and

2    restrictions should, essentially, get more than a one-day

3    for one-day credit when thinking about an appropriate

4    sentence here?

5            MR. WASSERMAN:  I don't adopt that view, Your

6    Honor.  I certainly acknowledge that the circumstances of

7    the last year have made serving present time more unpleasant

8    than it otherwise already is.  I don't think that there's a

9    basis to somehow create a formula by which to reduce a

10   sentence based upon perceived hardships from the COVID

11   pandemic.

12           I don't know what each individual inmate, what

13   circumstances they served their sentence under; how it has

14   impacted them.  I understand Mr. Ohm's representations.  I

15   don't know, you know, the specifics of what Mr. Douglas has

16   undergone.  I just think that's kind of a bridge too far.  I

17   do think it's fine for the Court to consider those

18   circumstances, perhaps, in this situation in determining

19   where within the guideline range to fall, but not as a basis

20   of a variance.  I don't know if that answers the Court's

21   question.

22           THE COURT:  It does.  It does.  Thank you.

23           MR. WASSERMAN:  So in light of, you know, what

24   really the parties negotiated as part of the plea, I would

25   suggest to the Court that a sentence at the low end of the

1    guideline range is a pretty generous recommendation for this

2    particular Defendant, given his repeated possession of

3    firearms illegally.

4            I do take issue with the notion that somehow he's

5    possessed these guns solely for self-defense.  I think the

6    search of his iCloud and cell phone significantly undermine

7    that notion, particularly where he apparently sought to

8    purchase an assault rifle with an extended magazine, has

9    pictures of himself posing with weapons and a video of

10   himself firing a weapon.  And I would add on the fact that

11   the Defendant was awaiting trial in a narcotics trafficking

12   case in Superior Court at the time that he committed this

13   offense.  Those are facts that I would suggest undermine the

14   notion that this is just strictly for self-defense.

15           Notwithstanding that, whether or not that's true,

16   it's obviously illegal.  I mean, I know the homicide rate in

17   the District of Columbia has been on the increase over the

18   last several years.  The Defendant claims that he's had

19   close friends who have been the victim of gun violence.  So

20   if anybody should know what the impact of carrying illegal

21   firearms is and the consequence of that, it's the Defendant.

22           Quite frankly, and sadly, the overwhelming

23   majority of the victims of gun violence, particularly in the

24   District of Columbia but even nationwide and certainly in

25   major metro area, are African Americans and people of color.

1   So the notion that somehow enforcement of or antigun

2   enforcement that is focused in areas where gun violence is

3   at its worst, that that is somehow unfair or discriminatory,

4   quite frankly, is ridiculous in my opinion.

5           So I think the Defendant's prior record is

6   troubling.  It's troubling for the notion that he does not

7   continue to present a risk to reoffend given, obviously, his

8   past behavior; the fact that he's been on probation

9   previously and been revoked.  He was obviously on supervised

10   release in this case.  The fact that he lacks sufficient

11   education or vocational training to have, you know, real

12   opportunities for employability, notwithstanding again, that

13   he's had opportunities at least to try to take advantage of

14   prior periods of probation to get on track.

15           I would suggest that a sentence at the low end of

16   the guidelines is a generous one, but ultimately sufficient,

17   I would hope, to convey to the Defendant that he needs to

18   change his behavior.  Otherwise, he will wind up right where

19   he is or worse, and be the victim of gun violence himself.

20           I know he does face a potential parole hit.  I

21   think that also can factor into a sentence at the low end of

22   the guideline range, since he may face additional time, even

23   if it's just waiting to have his parole matter addressed.

24   Again, I disagree with defense counsel that it's the basis

25   -- it should be the basis of a variance, particularly in

1    light of Mr. Douglas' record.

2          So unless the Court has additional questions,

3    that's my recommendation.  I also would recommend a

4    three-year period of supervised release.

5          THE COURT:  Thank you, Mr. Wasserman.  Mr. Ohm?

6          MR. OHM:  Thank you, Your Honor.

7          As the Court knows, we are asking for a sentence

8    of a year and a day, with a term of one year supervised

9    release added on to that.

10         I want to start with where the Court asked the

11   Government about why the low end of the guideline range is

12   the appropriate place that Mr. Douglas should fall into.  I

13   think it starts with his criminal record.  I know that he

14   does have these offenses.  Obviously, he has to have prior

15   felony offenses or we wouldn't be here in front of Your

16   Honor.  That guideline range encapsulates all sorts of

17   people with criminal history.  Mr. Douglas' criminal record

18   has presumptary offenses.  There is no violent conduct,

19   which distinguishes him from many other individuals that

20   come before Your Honor in this case with 922(g) cases.  I

21   think it is very important in assessing an individual's

22   dangerousness.

23         I take to heart what Mr. Wasserman said.  Number

24   one, I would point out that the drug offense was dismissed

25   even prior to the plea agreement in this case.  So I'm not

1    sure about the evidence that actually supports that charge.

2           In addition to that, Mr. Douglas has lived long

3    enough, when an individual doesn't have any sort of record,

4    and frankly, stayed away from the police and had no contact

5    with the police for a substantial period of time, I think

6    that tells the Court about -- I don't think the Court can

7    infer any sort of malicious intent or behavior with the part

8    of gun possession, which both the law now and society

9    acknowledges now is something that is a part of life.

10          I do want to --

11          THE COURT:  Mr. Ohm, Mr. Wasserman points out,

12   however, that there is evidence in the record that from the

13   iCloud and cell phone about your client's interest in guns.

14   I think it is fair to say that doing more than merely

15   possessing a gun for self-defense purposes, as you suggest

16   in your brief, is really the main reason --

17          MR. OHM:  Your Honor, I don't think they are

18   mutually exclusive facts.  There are a lot of individuals in

19   the country who have firearms for self-defense who are

20   interested in the different types of firearms that exist.  I

21   think there are individuals who have firearms for

22   self-defense that actually go and shoot those firearms so

23   that the first time they use a firearm is not in

24   self-defense -- it's not the first time that they use a

25   firearm.  I don't think that those facts are at all mutually

exclusive.  I know plenty of individuals who are gun owners
and fire their firearms all of the time and have extremely
significant interest in the different brands and models of
firearms that are out there.  It doesn't mean they are using
them for any other purpose other than self-defense or their
interest in firearms.  One can't infer and one would not
think that there is any criminal purpose for that
possession.

What I think is more important is that the
Government went through Mr. Douglas' phone.  The
investigation here for a 922(g) case was significant and
far-reaching compared to other 922(g) cases I've seen.  It
is the first one I had a full extraction.  They couldn't
find any evidence of other criminal activity, any violent
activity or dangerous activity because there is none in Mr.
Douglas' history or nature.  So I think it is an important
fact for the Court to consider.

Beyond that, this plea agreement came about at a
time when -- this doesn't really apply to Mr. Douglas,
himself per se, but I haven't appeared before Your Honor in
a sentencing hearing before.  I think that it is important
to point out that a Defendant, Defendants generally, both
have a right and it is helpful to the criminal justice
system to have a sense that is somewhat predictable that a
Government's allocution, which obviously isn't a

1      be-all-end-all, and obviously the sentence is ultimately

2      left to the judge.  That the criminal justice system

3      benefits when there is some sort of a predictability of a

4      sentence when an individual considers whether to accept a

5      plea offer.  Especially in a time when, I think, both US

6      Attorney's Office and defense bar is substantially stressed

7      and under a lot of pressure because of an influx of,

8      frankly, work that has come into our courthouse in the past

9      several months that individuals who are provided with a plea

10     agreement and given the incentive to dispose of the case

11     before trial, that it is important for Defendants who are at

12     the D.C. Jail who -- I'm sure Mr. Douglas will have

13     conversations when he returns to his cell block -- that it

14     is important for the system, for the Defendants in the

15     system, the other shareholders to know that when a plea

16     agreement is offered, that the presumption is that that will

17     strongly be considered; that those allocutions and those

18     limits on allocution are strongly considered by the Court,

19     just as a general matter.  So I think that is something that

20     the Court should also consider.

21            In terms of --

22            THE COURT:  Mr. Ohm, and that means what here?  I

23     understand the argument but in your view that means?

24            MR. OHM:  Your Honor, that means that if the Court

25     is on the fence, I think the Court should accept the

1    allocution of the Government and recognize that during the

2    time when, frankly, individuals are setting trials that may

3    be within a reasonable amount of time or time under the

4    Speedy Trial Act or made for a more practical purpose.  I

5    know that is not the case for Mr. Douglas, and he could have

6    had the trial earlier.  But if everybody -- I will say this

7    in a more plain manner.  If Your Honor becomes the judge

8    that in defense bar experience and in the D.C. Jail resident

9    experience becomes the judge who does not follow the

10   Government's recommendation for allocution, that does have

11   an impact on how cases get -- or how both defense lawyers

12   and defendants perceive plea agreements and the necessity of

13   or the wisdom of taking a plea agreement in front of one

14   particular forum or another.

15           THE COURT:  I understand that point but are you

16   talking about the Government's agreement to allocute to the

17   low end of the guidelines --

18           MR. OHM:  Yes.

19           THE COURT:  -- or are you talking about the

20   parties mistakenly thought the guidelines were going to look

21   like when they either executed the plea agreement or when we

22   did the plea before.  Because, I mean, I think Mr. Douglas

23   rightly pointed out there was a question about whether the

24   serial number had actually been obliterated, and a question

25   about what his criminal history category was going to be.

1          The Government seems to me is allocuting to the

2     low end of the guidelines.  The guidelines are agreed upon

3     to be 15 to 21 months.  Is it your argument that's the

4     number that I should not be quick to dispose of, or is there

5     some other number that you are suggesting I should take

6     because it was what incented the plea agreement in the first

7     place?

8          MR. OHM:  Your Honor, what I am suggesting is that

9     the defense's understanding is that the Government's

10    allocution cap is at 15 months at this point.  And for the

11    Court to exceed that, that that would simply be perceived as

12    the Court not following the Government's allocution.  I

13    don't mean to suggest much more than that, and the

14    importance of that predictability in decisions that

15    individuals like Mr. Douglas need to make.

16         THE COURT:  Fair enough.  As to the argument about

17    the time Mr. Douglas has spent in D.C. Jail post-COVID

18    restrictions, it seems to me -- though I will probably ask

19    you, Ms. Gavito for your view of this -- it seems to me that

20    there is an agreement, certainly between the parties that

21    time spent in D.C. Jail over the last year has been harder,

22    maybe even considerably harder than it would have been

23    pre-COVID -- I think that's actually pretty obvious -- and I

24    think probably also harder than it would have been at a BOP

25    facility pre-COVID, and maybe even harder than it would have

1    been at a BOP facility post-COVID.  So one question is

2    whether that's the case, if you know?

3              In other words, if Mr. Douglas had his sentencing

4    a year ago and went to one of the BOP facilities in the

5    post-COVID world, would the restrictions in a BOP -- the

6    most likely BOP facilities still have been less restrictive

7    than at the D.C. jail?  I'm interested in your view on that

8    specific situation.

9              Again, since there seems to be agreement that

10   these last 12 months have been harder than they would have

11   been -- I don't think there is any doubt about that --

12   harder at the D.C. Jail, how much I should credit that?

13             PROBATION:  Was that for me, Your Honor?

14             THE COURT:  It was for Mr. Ohm in the first

15   instance, and I have a few questions for you, Ms. Gavito.

16   So why don't we go to Mr. Ohm?

17             PROBATION:  Yes, Judge.

18             MR. OHM:  In short, yes, I think that is correct.

19   The information that came out recently is that the D.C. Jail

20   is the only correctional facility I think in the country,

21   that has imposed 23-and-1 restrictions throughout the

22   pandemic.  It would have been more harsher time at the D.C.

23   Jail than at the BOP, either post- or pre-COVID.

24             I think in modern history, it's just not clear to

25   me how long it's been since we've actually had prisons

1    impose this kind of -- I am not imputing any motive on the

2    part of the Department of Corrections -- mass solitary

3    confinement, as the Court knows is the main form of

4    punishment that the correctional facilities have been using

5    for a while, and there are recommendations that say it

6    should never be more than three days at a time, and

7    obviously everybody over there has been doing it for over a

8    year now.  And Mr. Douglas did it for his entire time there.

9            I don't think that that could be understated.

10    People talk to themselves.  People -- I've gotten over the

11    course of the year I've gotten phone calls at 1 or 2 in the

12    morning.  I will wake up and see missed calls, six or seven

13    missed calls because that's the only time an individual has

14    recreational time and they don't have anybody to talk to.

15            Sort of the confluence of all of these factors is

16    something, I think -- I mean, jail is difficult enough as it

17    is, and obviously it is supposed to be, but the combination

18    of those factors and restrictions that the DOC put in place

19    to keep Mr. Douglas safe.  Obviously, he didn't get COVID;

20    so that's an important thing.  We are not questioning the

21    decisions.  This isn't the forum for that, but it is

22    indisputable that the time he did was unusually and

23    incredibly harsh.

24            I think it makes sense, Your Honor, especially

25    when combining that with our argument about the Parole

1    Commission time sort of the dead time he will lose in the

2    next three months is another place where it comes into play

3    because he has more time that he's going to have to do under

4    these circumstances, which I read an email today that said

5    June 1st they are going to try some things but the next

6    month he will continue to live under these circumstances;

7    that's time that's not going to be credited at all, because

8    if the Court does follow the Government's recommendation,

9    then he will essentially be eligible for release.  It will

10   take two weeks for the BOP to determine that time.  And then

11   once it's credited, and it's determined that he would have

12   been done with his time now, the time between the end of his

13   sentence is calculated, which will be two weeks from now at

14   the earliest, to the time the parole warrant is issued.

15   Then he has to be brought before the Parole Commission for a

16   probable cause hearing and then there has to be a final

17   determination.

18          All of those things, Your Honor, it's time that he

19   is going to have to spend.  If the Court sentences him to

20   the 15 months, rather than the year and a day that we've

21   asked for, then that time will not be credited to anything;

22   so that's why we came up with a year and a day.

23          I think I agree with Mr. Wasserman.  I don't think

24   that there is a broad formula that you can apply to

25   everybody under every circumstance.  It's not what we are

1    advocating for.  In this situation where the difference

2    between 15 months and a year and a day would only really

3    cover time that he would not actually be credited for, given

4    the fact that he -- we are still in the pandemic.  Given the

5    fact that the D.C. Jail restrictions are still in place and

6    the harm is obvious to anybody.  I think given all of those

7    things, the Court can consider and should consider when

8    fashioning its sentence, the hardships that Mr. Douglas is

9    going to face, both for his violation of the law in this

10   case and for the supervised release violation that is

11   coming.

12           I think it's also important to note that Mr.

13   Douglas, we see him at this point as facts in a case.  Mr.

14   Douglas is a young man.  He has a beautiful son, a dutiful

15   father.  He has suffered and been punished in the most human

16   way that he hasn't and wasn't able to be there for the birth

17   of his child.  He has not been able to interact with his

18   daughter and, frankly, Mr. Douglas for all -- despite the

19   circumstances from which he comes before the Court, Mr.

20   Douglas is a proud and responsible father, who has always

21   taken care of his family; and that that has always been a

22   priority in his life.

23           The fact that he has not been able to help his --

24   the mother of his baby through the most difficult times of

25   the infant's life is something that he takes to heart and he

1    recognizes is something that he has to stop.

2          His responsibility -- not necessarily the

3    punishment but the responsibility that he's had time to

4    consider to think about over the past year while he's been

5    sitting in his cell for 23 hours a day, that is what has

6    motivated him and will continue to motivate him to be a

7    different person, to be somebody who will be productive, and

8    to avoid this sort of situation so that he can be there for

9    his children and also continue to be there for his parents,

10   who are getting a little bit older now.

11          So, Your Honor, all of those reasons are why I ask

12   the Court and recommend a sentence of one year and one day.

13   And then on top of that I ask the Court for -- oh, one other

14   thing I didn't mention is the Parole Commission warrant also

15   effects his ability to go to the halfway house at the end of

16   the sentence.  So I think that that is something that the

17   Court can consider.  It also prolongs the incarceration

18   aspect of the sentence under the D.C. Code Parole Commission

19   regulations.

20          For all of those reasons, Your Honor, under the

21   Booker factors I ask the Court to sentence Mr. Douglas to

22   one year and one day.

23          THE COURT:  Thank you, Mr. Ohm.

24          Mr. Douglas, I will give you an opportunity to

25   speak in one minute, if you would like, but I want to turn

1    to Ms. Gavito, to just -- any comment she might have on my

2    questions around the post-COVID restrictions at the D.C.

3    Jail, vis-a-vis, either current BOP restrictions or

4    otherwise.

5             PROBATION:  No, Your Honor.  With regards to the

6    restrictions, I know that the facilities have taken more

7    precautions because it has been, even for Probation

8    Officers, it has been a bit more taxing to schedule

9    interviews and that's for the safety of everybody at the

10   facilities, including Mr. Douglas and everybody that

11   interacts with him.  I couldn't give any more information or

12   comment anymore about the restrictions.  I would need to be

13   better informed to advise the Court any further.

14            I do want to clarify that Mr. Douglas has been in

15   custody for approximately 12 months and 12 days.  Just in

16   case Your Honor is inclined to Mr. Ohm's sentence

17   recommendation of 12 months and a day.  In that case the

18   Court would probably need to vary upwards, to credit the 12

19   months and 12 days that Mr. Douglas has been in custody.

20            Finally, Your Honor, the only other thing that I

21   would seek for clarification, is Your Honor going to request

22   or order that the pre-sentence report be amended or modified

23   to include the deletion of the minus four for the specific

24   offense characteristics?

25            THE COURT:  That doesn't seem to be necessary.

1    I've made findings on the record about that.  Certainly the

2    pre-sentence report is Probation's view of things, and I

3    have a different view based on the record, as is exists.  I

4    think it is crystal clear unless you, I suppose, Mr. Ohm or

5    Mr. Wasserman, you think there should be an amendment to the

6    pre-sentence report.  But I think the record is very clear

7    right now.

8              PROBATION:  Thank you, Judge.

9              MR. OHM:  Your Honor --

10             MR. WASSERMAN:  Go ahead, Mr. Ohm.

11             MR. OHM:  I think I would request an amendment

12   just because I know these PSRs follow individuals throughout

13   their lives, and I think it would be helpful to have --

14   nothing long or lengthy but something reflecting the Court's

15   decision.

16             THE COURT:  That's fair.  Ms. Gavito, could you do

17   a short addendum or amendment that reflects my determination

18   that that enhancement is not appropriate here?

19             PROBATION:  Yes, Your Honor, we can prepare

20   something.

21             THE COURT:  Thank you, Ms. Gavito.

22             Mr. Douglas, I am happy to hear from you, if you

23   would like.  You are not required to speak, but if you would

24   like to address the Court about any and all topics that we

25   discussed today or any others that you would like me to hear

1    about, please feel free to do so.

2            THE DEFENDANT:  Your Honor, I just want to say

3    that this has really been a rough situation and rough

4    experience being in lockdown for 23 hours and sometimes more

5    and in jail.

6            At the same time, I can really say I honestly

7    appreciate the whole situation because it's given me time to

8    rethink a lot of stuff and rethink a lot of things that I've

9    done in my life and my thought process.  It's given me,

10   like, a new sense of looking at my life and doing it for my

11   children and really wanting to be there and not putting

12   myself or my children or my family through this experience

13   again.  I can honestly say I appreciate it, even though it

14   was really rough and still is really rough, I can say I

15   appreciate the whole situation.

16           THE COURT:  Thank you, Mr. Douglas.

17           Mr. Ohm, anyone else since I think family members

18   are on the public line?  Anyone that will be addressing the

19   Court as far as sentencing?

20           MR. OHM:  That's correct, Your Honor.

21           THE COURT:  Thank you, Counsel, Ms. Gavito and Mr.

22   Douglas.  Having heard from counsel and Mr. Douglas, I will

23   now indicate the sentence to be imposed.  Counsel will have

24   an opportunity to make any file legal objections before we

25   conclude today.

1    Obviously under Section 3553(a) I have to consider

2    a series of individual factors.  As to the nature and

3    seriousness of the offense, Mr. Douglas is charged with

4    unlawfully possessing a firearm and ammunition.  He is 30

5    years old and this is his third felony firearms conviction.

6    At the time of the offense, Mr. Douglas was

7    non-compliant with his supervised release conditions from

8    his 2013 firearms conviction, and he was also a fugitive

9    from justice after failing to appear in Superior Court for a

10   then pending felony drug trafficking offense.

11   As to the history and characteristics of Mr.

12   Douglas, he is, as I mentioned, a 30-year-old.  He is a D.C.

13   resident and has been all his life.  According to the PSR he

14   had a structured childhood, was raised by two working

15   parents who encouraged education, but he strayed from the

16   straight and narrow path.  Before he was a teenager, he

17   experimented with drugs and alcohol and quickly ran into

18   legal trouble.  As a juvenile he was charged with two

19   criminal offenses, one which involved the destruction of

20   property, and then dropped out of high school.

21   Unfortunately, at the age of 18 he was convicted

22   of his first firearms offense, and four years later he was

23   found in unlawful possession of a firearm.  As Mr. Ohm

24   noted, and as I have certainly taken note of, Mr. Douglas is

25   the father of two children, a three-year-old son and a very

1    young daughter.

2           As to the third factor, protecting the public,

3    respect for the law and deterrence.  When looking to

4    deterrence as it relates to the Mr. Douglas and other

5    criminal defendants, the Court has a strong interest in

6    deterring felons from illegally possessing firearms.  It

7    does not appear that the sentence is administered as a

8    result of his previous firearms convictions, adequately

9    deterred Mr. Douglas from illegally possessing a firearm,

10   and his previous failures to appear at court hearings and to

11   comply with court-imposed conditions of supervised release,

12   demonstrate serious lack of disrespect for the law.

13          As to the need for educational or job training or

14   treatment, the PSR notes that Mr. Douglas would benefit from

15   educational and vocational training.

16          Mr. Douglas completed the eleventh grade and was

17   on track to graduate from Spingarn High School, but based on

18   what he described as a feeling of lack of security and

19   mental anguish, he discontinued his education.  Shortly

20   after dropping out, he attempted to obtain his GED through

21   the Pittsburgh Job Corps Center in Pittsburgh, Pennsylvania,

22   but failed to complete the program.  As to employment, he

23   has been sporadically employed as a landscaper and laborer

24   for a local moving and hauling service, but other than these

25   occasional odd jobs, he has not maintained steady

1  employment.

2        According to his mother, Mr. Douglas is interested

3  in continuing his education and receiving vocational

4  training as an electrician, which is encouraging.  Mr.

5  Douglas' parents indicated to the Probation Officer that

6  Mrs. Douglas and Mr. Douglas' father would be willing to pay

7  for the vocational training.

8        As to substance abuse, the PSR also indicates that

9  Mr. Douglas would benefit from substance abuse testing and

10 treatment.  He began using drugs and alcohol when he was 12.

11 He said that he would drink alcohol on the weekends and

12 occasionally drink to the point of losing consciousness, but

13 he reported to Probation that he has not consumed alcohol

14 since 2012, which is great.  Mr. Douglas began smoking

15 marijuana at 12 and continued to use the substance regularly

16 until the day of his arrest.  Mr. Douglas also said he

17 became addicted to prescription pain killers in 2014.  He

18 admitted he continued to use the prescription pain killers

19 at least recreationally until 2019.

20        As for his mental health, although Mr. Douglas

21 reported no family history of mental health issues, and has

22 never sought mental health treatment, he did tell Probation

23 that his upbringing was filled with tragic events, including

24 gun violence that has led to trauma.  Obviously, witnessing

25 your friends or other people you know be killed by gun

1    violence is obviously traumatic.  Mr. Douglas now believes

2    he may now benefit from counseling.

3            So based on my consideration of the sentencing

4    guidelines, which we have already discussed, and the 3553(a)

5    factors, as well as the discussion here today, I have the

6    following views, which is, first, I believe a term of

7    incarceration of approximately 18 months would have been --

8    in other words, a mid-guideline range sentence would have

9    been appropriate given Mr. Douglas' criminal history,

10   background, the nature of the offense, and the like here.

11   But for two reasons, principally because of the nature of

12   the time he has served to date in D.C. Jail, the 23-hour

13   lockdown, the lack of vocational and other opportunities

14   and, frankly, the fact that as everyone seems to agree, the

15   12-plus months that Mr. Douglas has spent in the D.C. Jail

16   have been harder than they would have been before COVID-19

17   and probably harder than they would have been even during

18   COVID-19 at a BOP facility, that I think it is appropriate

19   to recognize that fact; and I therefore believe that a low

20   end of the guidelines term of incarceration is appropriate.

21   And it is my judgment, therefore, that a sentence of 15

22   months term of imprisonment is appropriate here, which is

23   obviously the lowest end of the guidelines.

24           It is therefore my judgment that you, Mr. Douglas,

25   are committed to the custody of the Bureau of Prisons for a

1    term of imprisonment of 15 months.

2           As to supervised release, I believe a term of

3    three years of supervised release is important, both because

4    of the opportunities that can be provided to you as part of

5    supervised release and, frankly, because historically you

6    have not done a very good job of complying with terms of

7    supervised release, and I think it is important to ensure

8    that there is some contact between you and the system so

9    that we can try to not have you commit another offense.

10          In my view, the sentence of 15 months of

11   incarceration, plus 3 years of supervised release, is

12   sufficient but not greater than necessary to reflect the

13   seriousness of the offense, promote respect for the law, to

14   provide justice punishment, to protect the public from

15   future crimes by Mr. Douglas.

16          As to supervised release, I'm basically going to

17   adopt all of the recommendations from Probation but will go

18   through them quickly at least for the record.  You are

19   required to abide by several mandatory conditions.  You must

20   not commit another federal, state or local crime.  You must

21   not unlawfully possess a controlled substance, refrain from

22   unlawful use of controlled substance.  You must submit to

23   one drug test within 15 days of placement on supervision,

24   and at least two periodic drug tests thereafter as

25   determined by the Court, and you must cooperate in the

1   collection of DNA as directed by the Probation Officer, if

2   necessary, but I think that that has already happened in the

3   past.

4           As I noted, I am also following the

5   recommendations from Probation as to the following special

6   conditions:  Substance abuse, you must participate in an

7   inpatient and/or outpatient substance abuse program.  You

8   must submit to substance abuse testing to determine if you

9   have used a prohibitive substance.  Mental health treatment,

10  you must participate in a mental health treatment and follow

11  the rules and regulations of that program.

12          Vocational services, I think this is very

13  important.  I note your parents' commitment to helping you

14  find a career, and I'm very hopeful that their efforts

15  together, perhaps with a vocational services program, will

16  be effective.  You must participate in such a program,  a

17  vocational services program and follow the rules and

18  regulations of it.

19          Finally, educational services program, it seems to

20  me that you are quite close to getting your high school

21  degree, and I think that would be a good thing to try to

22  achieve; and so therefore, I am ordering you to participate

23  in an educational services program, which could include a

24  high school equivalency and other classes designed to

25  improve your proficiency in skills that people develop in

1    high school.

2              As to the fine, I find you are unable to pay a

3    fine and waive the imposition of one.  As to forfeiture,

4    pursuant to Rule 32.2(a) of the Federal Rules of Criminal

5    Procedure, Mr. Douglas is ordered to forefit the Sig Sauer

6    P320 semiautomatic pistol, magazine and 13 rounds of .40

7    caliber ammunition.

8              A few other general notices.  You must pay a

9    special assessment of $100, in accordance with 18 US Code

10   Section 3013, that amount is payable to the Clerk of Court.

11   If you change address, you must notify the Clerk of the

12   change, until such time as that $100 is paid in full.

13             As to the pre-sentence investigation report, I

14   think we have already discussed an amendment to it to

15   reflect my determination that the four-level enhancement is

16   not warranted here.  That will happen and then Probation is

17   permitted to release that report to other appropriate

18   agencies in order to execute the sentence.

19             I believe we discussed this during the plea

20   hearing, but there are some appellate rights I believe have

21   been preserved.  If you do choose to appeal, Mr. Douglas,

22   you must file any appeal within 14 days after entry of the

23   judgment.  If you are unable to afford the cost of the

24   appeal, you may request permission from the Court to file an

25   appeal without cost to you.

1      Also, as defined in Federal Statute 28 US Code

2  section 2255, you also have the right to challenge the

3  conviction entered or sentence imposed if new and currently

4  unavailable information becomes available to you or on a

5  claim that you received ineffective assistance of counsel in

6  entering a plea of guilty to the offense or conviction in

7  connection with sentencing.

8      So with all of that, are there any questions about

9  the sentence I've imposed or any objections to state for the

10  record?  Mr. Ohm, why don't we start with you.

11      MR. OHM:  Just to clarify, Your Honor.  So the

12  Court has essentially taken the language from the Probation

13  Officer's recommendation.  Everything would be essentially

14  at the discretion of the Probation Officer.  Right?

15      THE COURT:  Yes.

16      MR. OHM:  Okay.  Thank you.

17      Your Honor, other than what we've argued both here

18  and in our sentencing memorandum, we don't have any

19  additional objections.

20      THE COURT:  Thank you.  Mr. Wasserman?

21      MR. WASSERMAN:  No objections from the Government,

22  Your Honor.

23      THE COURT:  Ms. Gavito, anything you would like to

24  add?

25      PROBATION:  Nothing further, Your Honor.  Thank

41

1      you.

2                      THE COURT:  Mr. Ohm, are there any recommendations

3      you would like me to make to the Bureau of Prisons?

4                      MR. OHM:  Your Honor, my calculation, based on the

5      Court's sentence, is that, no, that won't be necessary.

6                      THE COURT:  Thank you.  Anything else we should

7      discuss today, Counsel?

8                      MR. WASSERMAN:  Nothing from the Government, Your

9      Honor.

10                     MR. OHM:  Nothing on matter of law, Your Honor,

11     but I would ask if Ms. Lesley could indulge us with the

12     breakout room, I would very much appreciate it.

13                     THE COURT:  Yes.  Ms. Lesley, before we close the

14     hearing, could you put Mr. Ohm and Mr. Douglas in a breakout

15     room we will wait for them to return.

16                     COURTROOM DEPUTY:  Yes, Your Honor.

17                     MR. WASSERMAN:  Are we excused, Your Honor?

18                     THE COURT:  Oh, I apologize.  I thought you wanted

19     to consult with him before we close the hearing.  You'd like

20     to talk to him after the hearing is over.

21                     MR. OHM:  Correct.  Sorry about that.

22                     THE COURT:  So we are concluded for today.  Thank

23     you, Mr. Wasserman.  And Ms. Lesley, if you could put Mr.

24     Ohm and Mr. Douglas in a breakout room after this hearing is

25     over, I would appreciate it.  Thank you all.

1          MR. WASSERMAN:  Thank you, Judge.  Have a good

2   day.

3          PROBATION:  Thank you, Your Honor.

4          MR. OHM:  Thank you, Ms. Lesley.

5          COURTROOM DEPUTY:  You're welcome.

6          (Proceedings concluded at 10:22 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

1                   **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8                   **Please Note:**  This hearing occurred during

9    the COVID-19 pandemic and is therefore subject to the

10   technological limitations of court reporting remotely.

11

12

13

14        ____**July 15, 2021**____          ____**/s/**_____
                    **DATE**                        **Lorraine T. Herman**
15

16

17

18

19

20

21

22

23

24

25