# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 9, 2022                    Decided July 7, 2023

No. 21-3032

UNITED STATES OF AMERICA,
APPELLEE

v.

THEODORE B. DOUGLAS,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cr-00121-2)

———

*Tony Axam Jr.*, Assistant Federal Public Defender, argued the cause for appellant. With him on the briefs was *A. J. Kramer*, Federal Public Defender.

*Eric Hansford*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Chrisellen R. Kolb* and *Suzanne Grealy Curt*, Assistant U.S. Attorneys.

Before: WILKINS, *Circuit Judge*, and RANDOLPH and ROGERS, *Senior Circuit Judges*.

Opinion for the Court filed PER CURIAM.

2

Opinion concurring in the judgment filed by *Senior Circuit Judge* RANDOLPH.

Opinion concurring in the judgment filed by *Senior Circuit Judge* ROGERS.

Dissenting opinion filed by *Circuit Judge* WILKINS.

PER CURIAM: The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. Two members of the Court hold that the District Court properly found that the officers had reasonable suspicion to stop Theodore Douglas and that they did not act unreasonably during the protective search. One member of the Court dissents.

Accordingly, the District Court's order denying Mr. Douglas's motion to suppress evidence is affirmed.

*So Ordered.*

RANDOLPH, *Senior Circuit Judge*, concurring in the judgment:

> "Crime is not evenly distributed across cities; rather, it is concentrated in very small places, known as crime hot spots, that persistently generate a disproportionate share of serious crime."[1]

Many large cities contain "crime hot spots." The city of Washington, D.C., is no exception. The events in this case occurred in one of Washington's seven Police Districts. In 2020 in the Fifth Police District, in the city's northeast section, there were 22 homicides, 317 armed robberies, and 321 assaults with a deadly weapon. Metropolitan Police Department, *Annual Report* 20–21 (2021). (The Metropolitan Police Department's annual reports do not provide statistics about drug offenses by Police District.)

It was in the Fifth District that the police stopped Theodore B. Douglas, handcuffed him, patted him down, discovered a loaded .40 caliber Sig Sauer pistol and ammunition, and arrested him.[2]

Douglas pled guilty to possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). In his plea deal, which the district court accepted, Douglas reserved

---

[1] Anthony A. Braga & Philip J. Cook, *Policing Gun Violence: Strategic Reforms for Controlling Our Most Pressing Crime Problem* 57 (2023). Anthony Braga is a Professor of Criminology at the University of Pennsylvania. Philip Cook is a Professor of Economics Emeritus at Duke University and the winner of the 2020 Stockholm Prize in Criminology.

[2] At the time, Douglas was on supervised release from his latest criminal conviction and was a fugitive from justice, having failed to appear in D.C. Superior Court in his trial for drug trafficking.

2

the right to bring this appeal of the district court's denial of his suppression motion.  He raises issues about whether the police violated the Fourth Amendment to the Constitution.

I.

In analyzing this case it is helpful to contrast two scenes. The first is hypothetical.  The second depicts the actual events. Both the first scene and the actual second scene occur in the same location at about the same time, which I now describe.

A paved walkway lies between two large apartment buildings in the 2300 block of 15th Street Northeast, a mostly residential neighborhood.  On both sides of this walkway is a waist-high, black chain link fence.  On one end of the walkway is 15th Street.  On any given day, cars are parallel parked, bumper to bumper, on both sides of the two-way street.  Across 15th Street from the walkway is a recreation center and a children's playground.  On the other end of the walkway is a parking lot, entered from a street behind the buildings.

It is 3 p.m. on April 22, 2020, a Wednesday.   Officer Isaac Jackson of the Metropolitan Police Department is working undercover, watching as much as he can of the walkway, a spot noted for criminal activity.  Officer Jackson has been in this neighborhood many times and has observed illegal drug transactions there.  He is in plain clothes, sitting in an unmarked car parked among the other cars on the street, 15 yards from the street end of the walkway.

*First scene (hypothetical).*  While sipping his afternoon cup of coffee Officer Jackson notices a little girl in the walkway entrance.  School has let out.  A playground is across the street and an elementary school is nearby.

3

Another young girl arrives carrying a small black, opaque book bag, with a shoulder strap.  The arriving girl hands the book bag to the first girl.  The girl receiving the book bag opens it, looks inside and smiles, closes the bag, puts her arm through the strap and swings the bag onto her back.  The girls exchange greetings, smile, embrace and calmly go their separate ways.

After watching this exchange, Officer Jackson turns his attention elsewhere.

*Second scene (this case)*.  Now the scene changes.  An adult male who seems to be about 30 years old appears in the walkway between the two buildings.  He is pacing.  His location and his movements attract Officer Jackson's interest.

The adult male is the defendant Douglas.  A few minutes later, another adult male (Tavonte Williams[3]) approaches from outside the walkway fence.  Both men appear to be of the age of those who commit the most street crimes, especially drug and firearms crimes.[4]

Williams holds a small, black, opaque book bag.  He hands

_____

[3] Williams was originally Douglas's co-defendant in the district court but the government dismissed the charges against him and he is not a party to this appeal.  Appellant's Br. at ii.

[4] The classic study is James Q. Wilson & Richard J. Herrnstein, *Crime & Human Nature* 126 (1985) ("Criminal behavior depends as much or more on age than any other demographic characteristic . . .."); *see also id.* at 129; Jeffery T. Ulmer & Darrell Steffensmeier, *The Age and Crime Relationship: Social Variation, Social Explanations*, *in The Nurture Versus Biosocial Debate in Criminology: On the Origins of Criminal Behavior and Criminality* 377, 378 (Kevin M. Beaver, J.C. Barnes, &  Brian B. Boutwell eds., 2014) ("It is now a truism that age is one of the strongest factors associated with criminal behavior.").

4

the bag over the fence to Douglas. Simultaneously, paper money changes hands – or, from that distance, Officer Jackson thinks he sees U.S. currency changing hands, although he is not 100% sure. Douglas now rapidly drops his coat, slings the book bag over his back without looking inside and puts his coat back on, thereby hiding the bag.

Officer Jackson broadcasts an alert, in police parlance "a lookout." Within a few seconds two uniformed officers arrive at the walkway. By then, Douglas has walked from the 15th Street opening of the walkway almost to the parking lot at the other end. In the next few minutes, more than a dozen uniformed officers and police cars arrive in the parking lot. These officers also have been alerted by Officer Jackson's broadcast as part of an operation of the Narcotics Special Investigation Division.

Moments before other officers arrive, one of the first two officers on the scene calmly approaches Douglas who is then standing near the parking lot not far from two other men of the same apparent age. The officer says to the three of them, "How you doing gentlemen?" Holding Douglas's arm, the officer directs him "over here for just a minute." He tells Douglas that he is "being stopped for an investigation." The officer, Maxwell Poupart, handcuffs Douglas and begins a pat down. Douglas does not resist. Pressing the back of Douglas's coat, Officer Poupart touches a hard, heavy object that feels to him like a pistol. Douglas says it is his glasses case. Then, Poupart pulls down Douglas's coat and pats the outside of the book bag. The officer now confirms that he may well be feeling a firearm. He opens the book bag and radios "1-800," the police code for firearm. Douglas is then arrested.

5

II.

Analysis of these events begins with *Terry v. Ohio*, 392 U.S. 1 (1968), a decision that, by last count, has been cited in nearly 48,000 federal and state court opinions.

*Terry* holds that in stopping a person on the street to investigate, law enforcement officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. "Reasonable suspicion,"[5] the Supreme Court has reminded us, is a standard that is "'not readily, or even usefully, reduced to a neat set of legal rules.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Justice Scalia made the same point in *Ornelas* when he wrote of "the futility of attempting to craft useful precedent from the fact-intensive review demanded by determinations of . . . reasonable suspicion." *Id.* at 703 (Scalia, J., dissenting).

Under *Terry*, a "fact" in this case, a significant fact, is that the location of the stop was not only in a general high crime area, but in a specific location – the walkway in the 2300 block of 15th Street – known for criminal transactions. *See Wardlow*, 528 U.S. at 124. That is why Officer Jackson was watching it. Officer Jackson knew the spot well and so did the defendant.

---

[5] The many decisions of the Supreme Court reiterating *Terry*'s holding use various formulations, all of which amount to the same basic meaning. *See, e.g.*, *Kansas v. Glover*, 140 S. Ct. 1183, 1187–88 (2020); *District of Columbia v. Wesby*, 138 S.Ct. 577, 588 (2018); *Navarette v. California*, 572 U.S. 393, 397 (2014); *Illinois v. Wardlow* 528 U.S. 119, 123–24 (2000); *Ornelas v. United States*, 517 U.S. 690, 695 (1996); *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

6

Before the events in this case, Douglas was arrested for possession of a gun near that same walkway (and eventually pleaded guilty to illegally possessing a firearm).[6]  For his part, Officer Jackson had been involved in nearly 200 investigations in the vicinity of the 2300 block of 15th Street Northeast.  And in staking out this particular walkway in the past he observed many illegal drug transactions.

Among the nearly 48,000 judicial decisions dealing with *Terry*, there are occasional opinions stating that "just because" an individual was in a high crime area does not mean, or "does not in itself show," that the individual should be suspected of engaging in criminal activity.  Statements like these are best understood as throwaway lines.  No rational police officer, indeed no rational person, would suppose that just because a person is in a high crime zone that person should be treated as a suspect.  Consider the little girls in my hypothetical.  They were in a high crime zone.[7]

It does not follow that the criminal nature of this place, noted for drug dealing and other crimes – the very reason Officer Jackson was there undercover on that April afternoon –

---

[6] The dissent objects to my including this detail.  *See* Dissent at 1 n.1, 8.  But I do not rely on Douglas's prior conviction in my reasonable suspicion analysis.  *See infra* at 8.

[7] My concurring colleague commits two obvious mistakes when she claims that my citation of *Crime & Human Nature* (*supra* note 4) "impl[ies] that the mere presence of a young minority male in a higher-crime area. . . could establish reasonable suspicion."  Rogers Op. at 1.  My citation was to the book's chapter on crime and age, not race or minority status, about which my opinion says nothing.  The second mistake is just as apparent.  As the text above shows, I expressly disagreed with the absurd idea that "mere presence" in a high crime area "could establish reasonable suspicion."

7

that this fact should be tossed aside because it is not in itself conclusive. The Supreme Court in *District of Columbia v. Wesby* reversed a panel opinion of our court that engaged in such mistaken reasoning.[8] *See* 138 S.Ct. at 588. The factors giving rise to reasonable suspicion are not like coin flips in which the probability of heads on one flip is independent of the probability of heads on the next flip. Instead, the facts here are interdependent: the existence of one makes the existence of another more (or less) probable. *See United States v. Prandy-Binett*, 995 F.2d 1069, 1070–71 (D.C. Cir. 1993); *see also Prandy-Binett,* 5 F.3d at 558–60; *Al-Adahi v. Obama*, 613 F.3d 1102, 1105–07 (D.C. Cir. 2010). If an individual hands a book bag to another person in the Library of Congress, that is one thing. If the hand-off takes place in a high crime area in an outdoor walkway noted for criminal activity, that is quite another.

Another point about high crime spots is that innocent persons in the vicinity will exercise caution – the common expression is that they will be "looking over their shoulder" – to avoid being mugged or murdered. Those engaged in criminal activity will also be on the alert, but for a different reason. High crime areas attract, or should attract, high police presence, as was certainly true in this case. Individuals meeting on the street

---

[8] I hesitate to put *Wesby* in terms of the "totality of the circumstances," although the Court used the phrase and it appears in opinions dealing with the sort of issues confronting us in this case. Sometimes these opinions treat the "totality" phrase as if it were a "test," which it surely is not. The phrase itself is "non-descriptive." *United States v. Prandy–Binett*, 5 F.3d 558, 559 (D.C. Cir. 1993) (denying rehearing). It tells us nothing about which circumstances are even relevant (surely, not all circumstances matter – whether the sky was overcast or not, for instance), and it reveals nothing about the probative value of any particular circumstance in the totality.

8

in such a location to conduct a criminal transaction will naturally take extra measures to avoid detection.

Another consideration, critical in my evaluation, relates to Officer Jackson's skill and experience. By the time of these events, Officer Jackson had been a police officer for more than 20 years and had conducted 500 undercover observation posts. When asked on cross-examination in the suppression hearing how many arrests resulted from his 500 operations he answered "I would say close to 500."

It is proper, indeed it is unavoidable, for "a police officer [to] draw inferences based on his own experience in deciding whether" reasonable suspicion warrants an investigatory stop. *Ornelas*, 517 U.S. at 700. At the suppression hearing, in compliance with *Terry*, Officer Jackson "articulated" the factors underlying his judgment, based on his experience. Hand-to-hand transactions, efforts at concealment, exchanges of closed containers like bags, money changing hands, on the streets in high crime areas – these factors together were, in Officer Jackson's experience, indications of illegal transactions of guns or drugs or both. And, as Officer Jackson testified, each of these factors converged in the transaction he witnessed between Douglas and Williams on the walkway.

Unlike my hypothetical exchange of the book bag between the young girls on the same walkway, what actually occurred on the walkway was very different.[9] First of all, as Officer Jackson testified, when Douglas took the bag from Williams Douglas did not look in and inspect its contents. If nothing else, this strongly suggested that Douglas already knew what was in the bag he so rapidly hid after Williams handed it to him.

---

[9] Not only because Douglas was of a different age and sex. *See supra* note 4.

9

What else might explain Douglas's actions?  The dissent suggests that Douglas might have hidden the book bag under his coat to prevent local thieves from stealing it.  After all, this was a high crime spot.  There are four answers to this.

*One*, in neither Douglas's opening brief nor his reply brief did he raise this argument.

*Two*, even if Douglas had intended to protect the book bag from local thieves, this is entirely consistent with – indeed it reinforces – Officer Jackson's judgment that the book bag contained a pistol or narcotics, rather than some innocuous item like a book from the local library, which would hardly be of interest to a potential thief.

*Three*, in any event, a determination of reasonable suspicion "does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Wesby*, 138 S. Ct. at 588.

*Four*, it would be absurd – under the Fourth Amendment or otherwise – to require undercover officers observing suspicious activity, before moving in, to read the mind of the suspect and somehow determine whether he had an innocent reason for quickly concealing the object (here the book bag) being transferred in the exchange.

I therefore agree with the district court that the police, in stopping Douglas, did not commit an "unreasonable" "seizure" in violation of the Fourth Amendment to the Constitution.

III.

What I have written thus far decides only one of the issues on appeal.  Douglas also claims that even if the police were

10

justified in stopping him, they committed an "unreasonable" "search" in violation of the Fourth Amendment when they handcuffed him, patted him down, and found the gun and bullets in his book bag.

Here again *Terry v. Ohio* must be the starting point.  Here is the guiding principle.  When legally stopping a person on the street for suspected criminal activity the police are entitled to protect themselves.  They may do this by restraining the suspect and patting him down to make sure he does not possess a dangerous weapon.  Given the rationale, the pat down must be for the officer's protection, not a search for evidence of criminal activity.  *See Terry*, 392 U.S. at 23–26.

Officer Poupart's pat down of Douglas's clothing lasted less than a minute.  The police had good reason to check Douglas for weapons.  He was stopped at a spot known for drug trafficking.  "We have recognized many times that 'drugs and guns go together.'"  *United States v. Johnson*, 592 F. 3d 164, 169 (D.C. Cir. 2010) (quoting *United States v. Jenkins*, 928 F.2d 1175, 1179 (D.C. Cir. 1991)).  Officer Jackson, in his testimony at the hearing, confirmed that it is "very common" for individuals engaged in drug trafficking to possess firearms.  Officer Poupart agreed.

That the stop and pat down of Douglas entailed the use of handcuffs did not transform this legal *Terry* stop into an illegal search and seizure lacking probable cause.  The  "amount of force used to carry out the stop and search must be reasonable, but may include using handcuffs."[10] *United States v. Dykes*, 406

---

[10] Other circuits have long agreed.  *See, e.g.*, *United States v. Fiseku*, 915 F.3d 863, 870–872 (2d Cir. 2018); *United States v. Navarrete-Baron*, 192 F.3d 786, 791 (8th Cir. 1999); *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989); *United States v.*

11

F.3d 717, 721 (D.C. Cir. 2005) (quoting *United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989)); *see also Muehler v. Mena*, 544 U.S. 93, 98–100 (2005). Here, the police had good reason to suspect that a drug or firearm transaction had just occurred, and Williams – the other party in the transaction – remained at large, so the police used handcuffs to restrain Douglas while he was being frisked.[11]

There is nothing to Douglas's argument that the district court erred in crediting Officer Poupart's testimony that he felt a gun-like object through Douglas's coat at the beginning of the pat down. The body camera footage belies Douglas's claim and the district court, having heard the testimony and examined the exhibits, properly – indeed correctly – concluded that Officer Poupart was telling the truth. In any event, "[t]he scope of a Terry frisk is not limited to weapons, but rather to concealed objects which might be used as instruments of assault." *United States v. Holmes*, 385 F.3d 786, 791 (D.C. Cir. 2004). The body camera footage establishes that Officer Poupart felt a hard object underneath Douglas's coat – just the type of "concealed object" to which *Holmes* refers.

One further point deserves mention. After Officer Poupart patted down the book bag he asked Douglas for permission to

---

*Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989); *United States v. Glenna*, 878 F.2d 967, 971–73 (7th Cir. 1989); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983).

[11] In *Terry* stops, restraining the suspect during the pat down is often justified as protecting the officer doing the pat down and others nearby. There is another consideration. It is the danger – to the police and others – when, "if the suspect is not placed under arrest" but is instead released, "he will then have access to any weapons" on his person or nearby. *Michigan v. Long*, 463 U.S. 1032, 1051–52 (1983).

12

"check out" the bag's contents.  Douglas refused.  Douglas now
argues that the officer's request shows that he did not believe he
had possibly detected a pistol.  Here too Douglas's argument
goes nowhere.  Requests for consent are common even when the
police have ample suspicion to justify an involuntary search.
*See* 4 Wayne R. LaFave, *Search & Seizure* § 8.1 (6th ed. Dec.
2021).  In all sorts of personal interactions in America, it is also
common practice for one person to ask another for permission
to intrude even when the intruder can do so without permission.
"May I ask you a personal question?", for instance.  Erving
Goffman, *Relations in Public: Microstudies of the Public Order*
114–15 (1971).

ROGERS, *Senior Circuit Judge*, concurring in the judgment: I agree that the district court's ruling denying Theodore Douglas's motion to suppress should be affirmed based on the totality of the circumstances observed by Officer Isaac Jackson and their contribution to reasonable suspicion of criminal wrongdoing under the Supreme Court's *Terry* stop precedents, as followed by this court. *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *see United States v. Arvizu*, 534 U.S. 266, 277 (2002); *United States v. Moore*, 394 F.3d 925, 930 (D.C. Cir. 2005); *United States v. Garrett*, 959 F.2d 1005, 1007 (D.C. Cir. 1992); *cf. United States v. Green*, 670 F.2d 1148, 1151, 1153 (D.C. Cir. 1981); *United States v. Taylor*, 997 F.2d 1551, 1553–54 (D.C. Cir. 1993); *United States v. Prandy-Binett*, 995 F.2d 1069, 1070–71 (D.C. Cir. 1993). But in affirming I adopt a narrower approach than my colleague.

It is well established that the Fourth Amendment does not tolerate an officer's unreasonable seizures "based on nothing more than [the] demographic profile" of an individual, *Kansas v. Glover*, 140 S. Ct. 1183, 1191 n.1 (2020) (internal quotation marks omitted); *United States v. Brignoni-Ponce*, 422 U.S. 873, 876 (1975), or his "presence in an area of expected criminal activity," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Brown v. Texas*, 443 U.S. 47, 52 (1979). Concurring only in the court's judgment, I part ways with my colleague's emphases on "crime hot spots," Op. at 1, 5–7, and the "demographic characteristics" of Douglas and his associate, *id*. at 3 & n.4, along with reliance on the biological-determinants-of-crime postulate, *id*. at 3 n.4 (citing JAMES Q. WILSON & RICHARD J. HERRNSTEIN, CRIME AND HUMAN NATURE 126 (1985)), implying that the mere presence of a young minority male in a higher-crime area in the District of Columbia could establish reasonable suspicion to effect a lawful *Terry* stop. Concern over these undue and unnecessary emphases may underlie the dissenting opinion. *See* Dis. Op. at 4–6.

Here there was a lot more. From an observation post facing a walkway long known to law enforcement as a site of

2

illegal drug transactions, Tr. Mot. Hr'g at 23 (Oct. 20, 2020), Officer Jackson observed a seemingly prearranged "hand-to-hand exchange" typical of "bulk" transfers of drugs, *id*. at 17. Douglas hurriedly concealed the object he had received from his associate, *see id*. at 30, and in return handed over what appeared to be "U.S. currency" based on its "light" color and "small" size, Douglas's hand movement, and the manner in which the associate cuffed it in his hands upon receipt, *id*. at 30–31, 67–68, 90, 124. Considering "the whole picture," *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)), and Officer Jackson's drug interdiction training and experience at that *particular* location, *Cortez*, 449 U.S. at 418, a fact slighted by the dissent, Dis. Op. at 2–3, 7, the district court could permissibly conclude that these specific observations supported the individualized suspicion required to effect a brief, investigatory stop of Douglas under the Fourth Amendment.  The authorities cited by the dissent cannot bear the weight it seeks to place on them.  Dis. Op. at 3–4.  For example, in *United States v. Johnson*, 212 F.3d 1313 (D.C. Cir. 2000), this court stated in dictum that "[i]f the seizure had taken place at that point" — that is, earlier in the investigation than when the *Terry* stop in fact had occurred — it "doubt[ed] very much whether it would have been valid," *id*. at 1316.  But "at that point" the suspected seller of drugs had not given the would-be buyer "anything in exchange," *id*., making it unreasonable for the officer to infer that a drug transaction had occurred.   Here there is no dispute that Officer Jackson witnessed a hand-to-hand exchange.   *See Green*, 670 F.2d at 1151.

Further, because courts have "frequently recognized that guns and drugs go together in drug trafficking" and the attendant risks to officer safety, *United States v. McLendon*, 378 F.3d 1109, 1113 (D.C. Cir. 2004); *see, e.g*., *United States v. Bullock*, 510 F.3d 342, 347 (D.C. Cir. 2007); *United States*

3

*v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006), the police did not act unreasonably in handcuffing Douglas and patting him down for weapons upon observing a "bulk" drug transaction while his associate and the area were unsecured.  *See, e.g.*, *United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989).

WILKINS, *Circuit Judge*, dissenting:  I concede that this is a close case, but on these facts, I would find that the police stopped and seized Theodore Douglas without the reasonable, articulable suspicion required by *Terry v. Ohio* and its progeny. 392 U.S. 1 (1968).  For that reason, I respectfully dissent.

## I.

On April 22, 2020, at approximately 3:00 PM, Officer Isaac Jackson was conducting surveillance as part of an undercover narcotics unit of the District of Columbia Metropolitan Police Department.  *See United States v. Williams*, 507 F. Supp. 3d 181, 188 (D.D.C. 2020).  Officer Jackson was sitting inside an unmarked car parked in the 2300 block of 15th Street Northeast, *see id.*, when he observed a man standing in a public walkway between two sets of rowhouses with "one to two other individuals," J.A. 228, 237.

Officer Jackson, who was about fifteen yards away and observing without the assistance of binoculars or any other visual aids, saw a second man approach the first.  *Williams*, 507 F. Supp. 3d at 188; *see also* J.A. 232.  There was no testimony that Officer Jackson knew either of these men or that he had any prior information or reports about them.[1]  Officer Jackson did testify that he had conducted "close to 200" investigations in this area in the preceding five years, J.A. 228, and that the area was known as a high crime area, with a prevalence of drug activity and violent crimes, including robberies,  *Williams*, 507 F. Supp. 3d at 197;  *see also* J.A. 226.

Officer Jackson observed the second man hand the first man a "little" backpack; after which the first man quickly

---

[1] Curiously, Judge Randolph discusses prior criminal activity of Mr. Douglas even though it has no relevance to this case since it was unknown to the officers when they seized Mr. Douglas.  *See United States. v. Castle*, 825 F.3d 625, 635 (D.C. Cir. 2016).

2

removed his jacket, donned the backpack, and put back on his jacket. J.A. 267; *see also Williams*, 507 F. Supp. 3d at 188. Officer Jackson then saw the two men shake hands. J.A. 238. During the handshake, Officer Jackson "believed" the first man handed the second a "light-colored object." *Williams*, 507 F. Supp. 3d at 188, 196. He could not identify for sure what it was, but Officer Jackson thought it could have been currency. *Id.* at 188.

Believing that he may have just witnessed a transaction of money for a bulk quantity of drugs or a firearm, Officer Jackson called a lookout with a description of the two men, asking that they be stopped and frisked. *Williams*, 507 F. Supp. 3d at 188, 197. Within about 90 seconds, uniformed police officers seized the first man, later identified as Mr. Douglas. J.A. 346–47, 349. After physically separating Mr. Douglas from the group of individuals he was standing with, one of the officers immediately handcuffed Mr. Douglas's hands behind his back before beginning to pat him down. *Williams*, 507 F. Supp. 3d at 188. The officer felt a handgun when "frisk[ing]" the backpack that Mr. Douglas was wearing. *Id.* at 188. Shortly thereafter, the officers seized the second man, identified as Tavonte Williams, *id.*, but when the officers searched Mr. Williams, they found neither contraband nor currency, *id.* at 202.

**II.**

The central question in this appeal is whether Officer Jackson had reasonable, articulable suspicion that these two men had committed a crime when he issued his lookout, based on his brief observations, as well as his knowledge and experience. My colleagues rely upon three facts to uphold the seizure: (1) the exchange of an object for the backpack; (2) the prevalence of drug activity in the neighborhood; and (3) the

3

perceived attempt to secrete the backpack under the jacket.  I believe that these facts, in their totality, were insufficient.  *See United States v. Castle*, 825 F.3d 625, 635 (D.C. Cir. 2016).

With respect to the first fact, it is quite significant that the District Court did not credit that Officer Jackson witnessed an exchange of currency; instead, the District Court found only that a "hand-to-hand transaction" occurred, and that Jackson "believed" he may have seen currency.  *Williams*, 507 F. Supp. 3d at 196, 197.  Also significant is that the District Court did not make a finding that Jackson's belief that currency was involved was a reasonable inference.  As stated above, Williams was seized in the vicinity of the walkway very shortly after the exchange, and a search of him revealed no currency whatsoever.  Indeed, Officer Jackson conceded that he made an "assumption" that a sale had taken place and that he could not even tell if the object exchanged was paper, let alone currency.  J.A. 313–14.  Thus, the fairest reading of the record is that Officer Jackson saw a "light-colored object"—that he could not identify—given in exchange for the backpack.  *Williams*, 507 F. Supp. 3d at 188.

Skipping to the third fact, our precedent forecloses assigning significant weight of suspicion on Mr. Douglas's placing of the backpack under his jacket.  In *United States v. Johnson*, an officer observed a man inside a car in a "high narcotics area" when a woman leaned into the car and handed the man an object.  212 F.3d 1313, 1316 (D.C. Cir. 2000).  When a police officer "approached in his unmarked car, the woman walked away, and [the man] made a 'shoving down' motion."  *Id*.  Based on these facts, we observed that "[i]f the seizure had taken place at that point, we doubt very much whether it would have been valid."  *Id*.  Critically, we explained that while the "shoving down" gestures "may be . . . suspicious, they are significant only if they were undertaken in response to

4

police presence." *Id*.  This is so because citizens have a right to keep their private affairs private and thus to conceal their activities and their possessions from others.  *See generally United States v. Green*, 670 F.2d 1148, 1152 (D.C. Cir. 1981). If such concealment is not performed in response to knowledge of a police presence, it is not indicative of consciousness of guilt, and thus illegal activity.

Indeed, we have an unbroken line of authority holding that "furtive gestures 'are significant only if they were undertaken in response to police presence,' [a]nd a suspect can respond to the presence of a police officer only if he has recognized him as an officer."  *United States v. Brown*, 334 F.3d 1161, 1168 (D.C. Cir. 2003) (alterations in original) (quoting *United States v. Edmonds*, 240 F.3d 55, 61 (D.C. Cir. 2001)).  We have made it quite clear that "[w]hen putative police evasion or an alleged furtive gesture is what provokes police suspicion, our precedent requires that the Government proffer evidence, *apart from that behavior or gesture*, from which an officer could reasonably have inferred that the individual in question was aware of the recognizable police presence and was responding to it."  *Castle*, 825 F.3d at 638 (original emphasis).[2] Notwithstanding our precedent, my colleagues in the majority place considerable weight on the wearing of the backpack under the jacket in their calculus of reasonable suspicion.

It is true that we have found concealment relevant to our analysis where the suspect cupped his hand to prevent

---

[2] Our precedent is consistent with *United States v. Sharpe*, 470 U.S. 675, 682–683 (1985); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); and *District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018), all cases where the Supreme Court found that furtive gestures were probative of reasonable suspicion or probable cause because the actions were taken in response to a known police presence.

5

onlookers from seeing the small object he handed over in exchange for currency. *See Green*, 670 F.2d at 1151, 1153. But here, there was no attempt to hide that a backpack was being exchanged. Indeed, it was handed over openly while standing in the middle of a public walkway in broad daylight. If anything, this was an attempt by Mr. Douglas to conceal the backpack from anyone who might later see the bag and attempt to take it off his person, and it is nothing like the "deliberately furtive" creeping around on tiptoes credited in *Sibron v. New York*, 392 U.S. 40, 66–67 (1968). The government argues that the fact that the backpack was used for the exchange is itself evidence of concealment, because someone selling drugs or guns would use an opaque bag to obscure the contraband contained inside. *See* Gov't Br. 26–27 ("The 'bag' conceals the contents, and thus hides the nature of the transaction."). Crediting that argument means that citizens in high-crime neighborhoods can be deemed suspicious for "concealment" by handing something over to anyone in a bag at all, unless of course the bag is transparent, quite a remarkable position.

Assigning such weight of suspicion to the "concealment" of the backpack not only violates our precedent, it also ignores the fact that this neighborhood was known by Officer Jackson for its prevalence of robberies. *See* J.A. 226. As Mr. Douglas's counsel explained, it is "understandable that in a high-crime area, that Mr. Douglas would wear something that he does[] [not] want others to see under his clothes—something that appears valuable to, [or] may appear valuable to, others—out of sight." Oral Arg. Tr. 4. Hiding one's valuables from potential robbers is Crime Prevention 101; indeed, young men in crime-ridden areas of Washington often consider "a wallet nothing more than tidy packaging for robbers." Marcia Slacum Greene, *Going Legit; Thomas Derrick Ross Grew Up Hiding From the Law, Surrounded by Violence. Now He's Trying to Get a Job, a Credit Card, a Life. It's the Hardest Thing He's*

6

*Ever Done*, Wash. Post, July 11, 1999, 1999 WLNR 8872622. Thus—coming back to the second fact—it is of course fair to consider the prevalence of drugs in the neighborhood as adding to the calculus of Officer Jackson's suspicion, because it makes it perhaps more likely that the exchange involved drugs.  But then it must also be fair to consider the prevalence of robberies as subtracting from that calculus, because it makes it perhaps more likely that the concealment of the backpack was to avert a robbery.  In such a circumstance, the concealment of the backpack is a wash.  *Cf. Reid v. Georgia*, 448 U.S. 438, 441 (1980) (holding that an "agent's belief" that by looking around "the [defendant] and his companion were attempting to conceal the fact that they were traveling together, . . . was more an inchoate and unparticularized suspicion or hunch, . . . than a fair inference in the light of [the agent's] experience") (internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 27).

I grant that an officer is not "require[d] . . . to rule out a suspect's innocent explanation for *suspicious* facts."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (emphasis added).  However, that does not mean that we are required to rubber stamp an officer's characterization of an action as "suspicious" in the first place, particularly when that action is consistent with how common sense, and the police, counsel citizens in  high crime neighborhoods to act to prevent being victimized.  *See, e.g.*, Dallas Police Department, *Crime Prevention Tips – Purse and Wallet Theft Prevention*, https://perma.cc/C6BQ-7RP2 ("During cooler months, carry your purse under your coat[.]"); Columbus Ohio Police Department, *Personal Safety*, https://perma.cc/AZT3-JKFY ("[C]arry your purse under your coat or close to your body."). *Cf. United States v. Leon*, 468 U.S. 897, 914 (1984) (noting a magistrate must "not serve merely as a rubber stamp for the police" when reviewing a warrant application for probable cause).

7

My colleagues rightly reference Officer Jackson's significant drug interdiction experience and knowledge that this was a "high crime area," *see* Randolph Op. 6, 8; Rogers Op. 2, but we cannot permit the Government to use an officer's experience and recognition of an area as "high crime" as a one-way ratchet—only ever adding to suspicion, never detracting from it.  Here, Officer Jackson testified that he knew this area to suffer from significant drug trafficking activity, but he also explained that numerous "people . . . have been victims of . . . robberies" in the area.  J.A. 226.  Rather than looking to the totality of the circumstances, my colleagues' analysis ignores the latter fact, defaulting to "heads I win, tails you lose" in favor of finding that Officer Jackson had reasonable suspicion.

Courts already face confirmation bias when we evaluate reasonable, articulable suspicion in suppression motions.  After all, these are searches where the police actually found something inculpatory.  Courts almost never decide what constitutes reasonable, articulable suspicion in civil lawsuits where nothing illegal was found.  In civil cases, officers are entitled to qualified immunity unless already existing precedent clearly demonstrates that there was no reasonable, articulable suspicion.  *See White v. Pauly*, 580 U.S. 73, 79 (2017).  Even if courts doubt that the officer in fact had reasonable suspicion, we must find qualified immunity if the officer's actions were objectively reasonable.  *See Hedgpeth v. Rahim*, 893 F.3d 802, 807 (D.C. Cir. 2018).  Thus, if the officers had found nothing in the backpack and Mr. Douglas asserted a Fourth Amendment claim pursuant to 42 U.S.C. § 1983, we would almost certainly grant summary judgment for the officers on one of the aforementioned qualified immunity grounds, without deciding whether the officers had reasonable, articulable suspicion. We almost always decide whether a quantum of acts constitutes reasonable suspicion in contexts

8

raising the specter of whether we are giving the guilty too many rights, rather than situations in which we actually confront whether we are shearing away the rights of the innocent. In sum, courts are already at risk of using confirmation bias to validate inchoate hunches as reasonable suspicion in suppression motions given "the familiar shortcomings of hindsight judgment[,]" *Beck v. Ohio*, 379 U.S. 89, 96 (1964), and it makes matters worse when we consider those living in high crime areas as more suspicious than others, regardless of the circumstances of their actions.

Judge Randolph places the icing on the cake with his invocation of Mr. Douglas's criminal record, even though it was not known to Officer Jackson, and his one-sided reliance on generalized social science analysis and crime demographic data. *See* Randolph Op. 1 nn.1–2, 3 & n.4, 6 & n.7, 8 & n.9. The end result is that—despite lip service otherwise—people living in high crime areas have fewer Fourth Amendment rights than those who do not, because we rubber stamp characterizations of their actions as "suspicious" and justifying search and seizure, even when those persons are taking innocent actions merely to protect themselves.

\* \* \*

After he broadcast the lookout, and before the officers announced that they had found a gun in the backpack, Officer Jackson told the officers, "I want you all to check that book bag for me, copy?" Gov't Ex. 3 at 00:09:12. In doing so, he gave up the game. He had a hunch that something illegal was in that bag, and he ordered the stop so that the officers could "check" that bag to find out. The directive to "check that book bag" was potentially quite problematic, since probable cause would have been required to search the bag, *see Torres v. Puerto Rico*, 442 U.S. 465, 470–71 (1979); *United States v. Most*, 876 F.2d

9

191, 193–94 (D.C. Cir. 1989), and the government does not seriously contend that Officer Jackson had probable cause when he issued the directive.  In hindsight, Officer Jackson's hunch was correct and—fortuitously for the government—a pat down of the bag, rather than a full-blown search, allowed the officer to confirm the hunch.  But even so, the Fourth Amendment does not allow the police to seize a citizen, handcuff his hands behind his back, and frisk him based upon a hunch—even when the seizure takes place in a "high crime" area.

I respectfully dissent.